[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON REQUEST OF THE PLAINTIFFS FOR INJUNCTIVE RELIEF
The City of New London has approved a development plan for a 90 acre parcel of land known as the Fort Trumbull area. Acting under the authority of that plan, the New London Development Agency has taken various properties in the Fort Trumbull Development area.
In this case, the plaintiffs who own homes and property in the Fort Trumbull Development area seek injunctive relief to prevent the taking of their homes by eminent domain. These plaintiffs do not want compensation for their property, as must in any event be provided when property is taken by the state; they want to remain in their homes and argue that the issue of fair compensation does not even arise. Article I § 11 of our constitution states: "The property of no person shall be taken for public use, without just compensation therefore." Implicit in this language is the principal that no person's property can be taken if it is not taken for a "public use" regardless of any procedure providing for compensation. It is argued that a taking cannot be for a public use if it is motivated by a private entity, here, the Pfizer Corporation, and if ultimately a private entity is to determine "the fate of the property owners — and, it might be added the ultimate use of the land.
Related at least to some of the latter assertions is the plaintiffs' argument that apart from the question of the propriety of the takings as such, the delegation of the power of eminent domain to the New London Development Corporation (NLDC) was illegal and unconstitutional since it is also a private entity.
The plaintiffs have also raised claims outside those made under the eminent domain clauses of the state and federal constitution. They have raised arguments under the equal protection clause and have claimed CT Page 3064 violation of their rights to procedural and substantive due process.
Apart from all these constitutional or constitutionally-related claims, the plaintiffs maintain that whether or not the takings in this case could otherwise pass constitutional muster they are illegal because the Municipal Development Plan (MDP), pursuant to which their property is to be acquired, is not authorized by Chapter 132: ("Municipal Development Projects") of the Connecticut General Statutes. Also, even if they were so authorized, the takings to be legal had to be exercised in accordance with the New London City Charter; this, it is argued, was not done.
Conceptually, at least, the final position taken by the plaintiffs is that the propriety of the acquisition of their property is to be determined not at the time the MDP was adopted by the New London City Council, but at the time of the takings — that time, practically speaking, being frozen in place by the bringing of this suit. In other words, when all is said and done, the court must find that to accomplish the goals of the MDP it is necessary" to take the property of the plaintiffs. Several of the plaintiffs testified and their position seems to be both prior to and at trial that they do not object to the MDP but they do not want to lose their homes and, in fact, there is no need to destroy their homes in order for the MDP or at least development in the Fort Trumbull area to go forward.
The defendant city and NLDC take issue with all of the plaintiffs' constitutional claims. They argue that taking private property for economic development purposes that will benefit the whole city is appropriate. They further argue that the power of eminent domain can appropriately be delegated by the NLDC. It is further maintained that it is not improper for a municipality to try to take advantage of the development plans of a major corporation, nor does the fact that a development project will benefit private businesses necessarily mean that a taking which creates the possibility of that benefit cannot be a public use. Underpinning much of the defendants' argument under the taking clauses of the state and federal constitution is their position that court decisions have made it clear that in this area the courts cannot interfere with what is after all the proper exercise of legislative discretion. They also take issue with the plaintiffs' claims that their rights to equal protection and procedural and substantive due process were violated.
The defendants argue that Chapter 132 of the Connecticut General Statutes does, in fact, authorize the MDP and the acquisitions of property included in that plan and approved by the city. They further argue that the plaintiffs give too narrow a reading to the city's charter; the charter does not require that the sections relied upon must CT Page 3065 be followed; state statutes can be relied upon. Also the charter sections cited by the plaintiffs, it is said, do not apply to the issues before the court.
The defendants further argue that it is necessary to take the homes of the plaintiffs if the goals of the MDP are to be accomplished and in any event the road infrastructure plans and land filling required by the fact that some of the properties are within the one hundred year flood plain make the takings necessary.
The court will give a brief factual rendition of the events surrounding this litigation. Like the foregoing discussion of the various legal issues, it is necessarily incomplete, life, after all, is short, unlike this decision and the excellent briefs filed by the parties. In the various sections of the decision dealing with the specific legal issues that have been raised, the court will more completely refer to the relevant facts.
In 1978, the NLDC was established to assist the city in planning economic development. In January, 1998, the State Bond Commission authorized bonds to support planning activities in the Fort Trumbull area and property acquisition to be undertaken by NLDC in support of the project and other money toward the ultimate creation of a state park at Fort Trumbull. In February, 1998, Pfizer announced it was developing a global research facility on the so-called New London Mills site which is adjacent to the Fort Trumbull area. In April, 1998, the New London City Council gave initial approval to prepare a development plan for the Fort Trumbull area and the NLDC began holding informal neighborhood meetings regarding the MDP process. In May, 1998, the city council authorized NLDC to proceed under Chapters 130, 132 and/or 588(I) of the state statutes.
The State Bond Commission approved more funds for NLDC activity. In June, 1998, the city formally conveyed the New London Mills site to Pfizer. In July, 1998, a consulting team was appointed for the state Environmental Protection Act process and to prepare the MDP. Six alternative plans for the project area were considered as part of the required Environmental Impact Evaluation. A Municipal Development Plan was prepared and approved by the NLDC board in early 2000 and shortly thereafter by the city council of New London. The MDP was also approved by the Department of Economic and Community Development (DECD), the Department of Environmental Protection (DEP), the State Office of Policy and Management (OPM) and the Southeastern Connecticut Council of Governments. The city council in approving the MDP authorized the NLDC to acquire properties within the development area. On October 16, 2000, the NLDC voted to use the power of eminent domain to acquire properties within the development area whose owners had not been willing to convey CT Page 3066 their property. In November, 2000, the NLDC began to file the condemnation actions which are the subject of this suit.
The development area consists of approximately 90 acres divided into various parcels. Four of the properties owned by three plaintiffs are situated on parcel 3 which is currently scheduled for R D/office space. Eleven properties owned by four of the plaintiffs are located in parcel 4A which in the MDP is designated as "park support."
Each of the plaintiffs testified and said they wished to remain in their homes for a variety of personal reasons. Two of the people referred to the fact that their families have lived in their homes for decades. They all testified that they loved their homes and the Fort Trumbull area. Several have put a lot of work into their property and all of them appeared to the court to be sincerely attached to their homes. One owner, Mrs. Kelo, loved the view her house afforded her and the fact that it was close to the water. All testified that they were not opposed to new development in the Fort Trumbull area. Also, two of the plaintiffs own their property as business investments — the rental of apartments. These two people have put much time, money and effort into renovating their properties, one has owned his property for seventeen years, the other for about eight years.
The testimony of the plaintiffs as well and the evidence presented by the defendants underlines the difficulty presented in deciding this case. Really what is involved is conflicting dreams. The plaintiffs wish to live out the typical American dream of abiding and owning in peace homes and property that they have chosen. Any threat to that dream is understandably forcefully and emotionally opposed as it should be in a free society. In fact, they are to be respected because whether their position is agreed with or not their very struggle reinforced shared values in our society.
On the other side of this controversy are what may be considered abstract entities — the City of New London, the New London Redevelopment Agency. But the people behind these abstractions have a dream also. The accomplishment of their dream presents no opportunity of personal gain or favor. Their dream is for their city buffeted for decades by hard times and until recently declining prospects. They hope by this development project and resistance to the plaintiffs' litigation to provide an economic and social uplift for their city — jobs that will provide the underemployed or unemployed new hope, new tax monies so the tax burden on the community can be lifted and new programs and projects for the city that can be realized.
With these observations in mind, the court will attempt to discuss the CT Page 3067 issues raised by the parties.
 Applicability of Chapter 132
As the court will discuss, the plaintiffs argue that under the state and federal constitution the power of eminent domain can only be exercised for a public use. They further argue that even where property is condemned for a constitutionally acceptable use which can be defined as a public use, eminent domain may only be used in our state when the taking is reasonably necessary to achieve or accomplish the public use.
Before addressing these questions, the court will discuss two issues raised by the plaintiffs which, at least analytically, can be considered preliminary and indeed somewhat independent of the foregoing claims. In other words, even if hypothetically the takings here could have been constitutionally justified as a public use and reasonably necessary to accomplish that purpose, the takings were unjustified, it is argued, because not statutorily authorized or because they were orchestrated by a purely private organization, the New London Development Corporation (NLDC) in an improper delegation of eminent domain power.[1]
The plaintiffs' position that the takings were not authorized under Chapter 132 as well as the improper delegation argument are at least in part based on the extraordinary nature of the eminent domain power and the need to limit its arbitrary exercise. It is a broader power than the right to tax property in the possession of the owner. Under eminent domain, even with the requirements of just compensation, the fact remains that the property is taken from the owner.
All would agree that in some circumstances property justifiably can be taken by the state, but a rudimentary concern is the necessary effect or nature of eminent domain taking. That is, taxation in most cases affects broad classes of the population; this provides a salutary limit on its indiscriminate exercise and, perhaps more to the point, helps ensure, if not guarantee, that an unfair burden or cost is not placed on particular individuals or a discrete group by a majority or governmental agencies acting for a majority even with the best of intentions.
Because of these concerns, eminent domain statutes have been subjected to strict construction, Waterbury v. Plait Brothers Co., 75 Conn. 387,392 (1902); State v. McCook, 109 Conn. 621, 629 (1929); West Hartford v.Talcott, 138 Conn. 82, 89-90 (1951); Northeastern Gas Transmission Co.v. Collins, 138 Conn. 582 (1952) where the court said at p. 592 . . . "when (the legislature) delegates to another the power to exercise the right of eminent domain, the extent of the power is limited by the express terms or clear implications of the statute authorizing its CT Page 3068 exercise. Connecticut Light Power Co. v. Bennett, 107 Conn. 587, 593
. . ."; cf. City of Birmingham v. Brown, 2 SO.2d 305, 308
(Ala., 1941) (statute conferring eminent domain power on municipality);Baycol, Inc. v. Downtown Development Authority,315 So.2d 451, 455 (Fla., 1975) where the court said: "The power of eminent domain is one of the most harsh proceedings known to the law. Consequently, when the sovereign delegates the power to a political unit or agency, a strict construction must be given against the agency asserting the power.
It is not disputed in this case that the NLDC purports to exercise eminent domain under Chapter 132, Section 8-186, et seq. The city council authorized the Municipal Development Plan under that Chapter, Ex. 1; the NLDC resolution authorizing the takings were made under that chapter, Ex. I; the Statement of Compensation filed by the city states the proceedings were brought under that chapter.
The plaintiffs argue that Chapter 132 does not authorize the taking in this case and raise several arguments. Section 8-186 refers to the acquisition and improvement of unified land and water areas and vacated commercial plants. The plaintiffs note that the core of the statute was enacted in 1967. They point to portions of the legislative history. In 1967, the legislature was concerned with areas of land contiguous to two or more municipalities not being developed. The debate on Public Act 760 "was primarily concerned about ways to insure that multiple municipalities would be able to receive tax revenue in the same proportion in which they contributed to the development of such parcels" argue the plaintiffs. The director of the Connecticut Development Corporation told the legislature that ways must be found so more than one town can join together to develop industrial parks. The plaintiffs also note that this 1967 history does not mention the need to condemn prior existing structures or that the "unified land areas" might have any existing structures. The plaintiffs point to the fact that although Chapter 132 does not define the word "unified land areas" the word is often used to describe the united efforts of municipal jurisdictions or multiple state entities." See §§ 17a-37 and 18-99a which under particular circumstances allow the creation of "unified school districts." When seeking to unite different jurisdictions to achieve a set goal, the word "unified" is used to describe the result. See § 22a-352 (unified planning program "crossing several municipalities to manage water resources); § 26-159a which calls for "unified coast wide management" of certain fish species across multiple coastal towns.
In fact, the plaintiffs argue the act was meant to apply to undeveloped land — the word "development" is used, not redevelopment, as in Chapter 130 — "The Connecticut Redevelopment Act." CT Page 3069
The plaintiffs note that in 1967, Chapter 132 gave municipalities the power to acquire land "only" but in 1972 "vacated commercial plants" was added to § 8-186. "If unified land area meant any piece of land whether improved with structures or not, there could be no need to add something as specific as vacated commercial properties" maintain the plaintiffs. Clearly, the plaintiffs' homes are not "vacated commercial plants."
The plaintiffs cite several cases which typify how Chapter 132 is to be and was intended to be used — disputes regarding joint contiguous towns were involved in these cases; City of Milford v. South CentralConn. Regional Council of Governments, 27 Conn.L.Rptr. 48 (2000); Cityof New Haven v. Town of East Haven, 35 Conn. Sup. 157 (1977); ManchesterEnvironmental Coalition v. Stockton, 184 Conn. 51 (1981). The plaintiffs thus argue that the development plan for the Fort Trumbull area "is not in accord with prior Chapter 132 projects as reported in Connecticut case law. The Fort Trumbull neighborhood is completely enclosed within New London." In a slight analytical variation of the theme, the plaintiffs then say "there is simply no municipality with which New London can
`unify' its efforts to "develop' the neighborhood." (Emphasis added by the court.) In their reply brief, the plaintiffs make an additional arguments in support of their position that "land" areas as used in the declaration of policy section, § 8-186, refers to undeveloped property. In a 1974 amendment to that section, the legislature in addition to allowing vacated commercial property to be acquired and improved also added the word "demolish" — that is, municipalities were permitted to acquire and improve or demolish vacated commercial plants." In effect, demolition as applied to land areas "was not needed because there would be no structures to demolish on the unified land areas.
The court will now attempt to address the plaintiffs' various positions regarding the appropriate interpretation and ambit of Chapter 132.
First, the court will refer to some general rules of statutory interpretation. In Bortner v. Woodbridge, 250 Conn. 241, 258-59 (1999), the court said:
"The process of statutory interpretation involves a reasoned search for the intention of the legislature . . . we seek to determine in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine the meaning, we look to the words of the statute itself, to the legislative history and CT Page 3070 circumstances surrounding its enactment, to the legislative policy it was designed to implement and to its relationship to existing legislation and common law principles governing the same general subject matter. . . ."
In Gateway Co. v. Dinoia, 232 Conn. 223, 237 (1995), the court said:
 "In determining the meaning of a statute (it) must be considered as a whole, with a view to reconciling its separate parts in order to render a reasonable overall interpretation . . . We presume there is a purpose behind every sentence, clause or phrase used in an act and that no part of a statute is superfluous."
In Rutledge v. State, 63 Conn. App. 370, 379 (2001), the court said: "It is the duty of courts to interpret statutes as they are written . . . In addition, the statute must be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation."
Many of the more recent appellate cases concentrate on use of legislative history to interpret statutory language but it is well to keep in mind that which Rutledge implies — in interpreting a statute, a court should first look to the words of the statute itself andthen the court resolves any ambiguity by turning to the legislative history and purpose of the statutory scheme. Westport Taxi Service v.Westport Transit District, 235 Conn. 1, 39 (1995). Indeed as the court said in Rhodes v. Hartford, 201 Conn. 89, 93 (1986): "When the words of a statute are plain and unambiguous, we need look no further for interpretive guidance because we assume the words themselves express the intention of the legislature, however, with ambiguity in a statute, we seek to ascertain the actual intent by looking to the words of the statute itself . . . the legislative history and circumstances surrounding the enactment of the statute and the purpose the statute is to serve."
The court will now try to discuss the points raised by the plaintiffs. Assuming it is appropriate to refer to the legislative history given the explicit wording of various sections of Chapter 132, it must be said that the plaintiffs' reading of the 1967 legislative history of Chapter 132 when first adopted is somewhat selective.
If structures of various types were not contemplated as being on the "land" referred to in § 8-186, the section that defines the act's CT Page 3071 purposes, what on earth did Representative Mayer mean when he said in support of the act that under it "state aid (for implementation of the act) would include planning, land acquisition, demolition, and so forth, not just sight improvement" (emphasis added) — what would there be to demolish on vacant land?
Furthermore, as plaintiffs note, Representative Mayer and others saw a great advantage in the act's facilitation of joint development projects by municipalities on contiguous land; this may have been the primary purpose of the act. However, Representative Mayer did not think this was the exclusive purpose. At one point he said: "This particular bill will be of interest to towns interested in industrial development not onlywithin their own confines but within multi-town districts." (Emphasis added.)
Tracking the legislative history of the act in the broad sense the plaintiffs also point to the 1972 amendment to § 8-186. In that year, the plaintiffs argue that the wording "vacant commercial plants" was added to the statute — why, it is argued, use this language if it had been contemplated in 1967 or 1972 that other types of structures would be on such land. This argument ignores the entire language of the 1972 amendment — "acquire and improve vacated commercial plants." The underlined language was an attempt to make clear that the act applied to such buildings, and perhaps by indirection more importantly, that state funding would also be provided for rehabilitating and improving vacated commercial property as opposed to just demolishing such structures. All of this has nothing to do with whether the act envisaged the presence of other structures.
The plaintiffs' reference to other statutes[2] using the word "unified" in situations of united efforts by more than one jurisdiction is not helpful since these statutes have diverse purposes unrelated to each other and certainly to the topic of development of municipal areas.
As noted, the plaintiffs reference several cases which they say typify how Chapter 132 has been used in the past — they involved disputes between towns regarding joint development projects under the chapter and have been previously cited by the court. But there are other cases not referred to which involve the use of Chapter 132 by individual municipalities to develop parcels located within such municipalities and not as part of a joint development project with another town; see, for example, Manchester Environmental Coalition v. Stockton, 184 Conn. 51, 53
(1981); Avalonbay Communities, Inc. v. Town of Orange, 256 Conn. 557,561-562 (2001). Frankly, none of these cases are particularly helpful since none of them address an issue that has been specifically raised here as to the appropriate ambit of Chapter 132 — is it limited to CT Page 3072 development of vacant land and the power to acquire, improve or demolish vacated commercial plants?
Turning to its own analysis of Chapter 132, the basic problem the court has with the plaintiffs' position as to the applicability of the chapter to the Fort Trumbull area is the fact that there are references throughout the chapter which belie any notion that (1) the act only applies to the development of vacant land areas apart from vacated commercial plants thus, of course, barring the demolition of the homes of the plaintiffs; and (2) that the act in any event only applies to joint development projects by towns on land contiguous to more than one town.
In other words, the court has to read the act as it reads it in its entirety now not by applying a scholastic analysis of the meaning of each accretion over the past thirty-plus years. Insofar as possible, the court must give a harmonious reading to the statute and interpret its plain words as written, see Rutledge v. State, supra; Westport Taxi Service v.Westport Transit District, supra; Gateway Co. v. DiNoia, supra.
Let us look at the complete language of Chapter 132 to examine the plaintiffs' position. The plaintiffs' view of the universe covered by Chapter 132 — vacant land areas with the only structures being vacated commercial plants — makes other statutory language inexplicable. That is, if the only structures the legislature understood as being located on Chapter 132 land were vacated plants which could be acquired and improved, how does one explain subsection (f) of § 8-189? That statute states that the designated development agency of a municipality may initiate a development plan under Chapter 132 and the "project plan shall include . . . (f)a plan for relocating project area occupants." (Emphasis added.) The "occupants" cannot be owners or lessees in the vacated commercial plants — the occupants of such plants, if there be any, are not relocated, the city acquires the plants, if it so desires, for the purpose of improving them. The "project area occupants referred to in § 8-189 (f) must be occupants of other structures — homes and functioning (not vacated) businesses in the project area. In fact, Chapter 135, the Uniform Relocation Assistance Act, mandated by federal law, is being administered in the Fort Trumbull project area by the NLDC — a designated "state agency" for applying the Relocation Act under § 8-267 (1). That act must be the reference suggested in subsection (f) of § 8-189. The relocation Act explicitly was set up to assist residents and businesses displaced "by the acquisition of real property by state and local acquisition programs," § 8-266 of the Relocation Act. Section 8-193 of Chapter 132, "Municipal Development Projects," authorizes development agencies to "acquire by eminent domain real property within the project area." (Emphasis added as to both statutes.) CT Page 3073
Also, § 8-187 is the definition section of Chapter 132 and in subsection (9) it says that "real property means land, subterranean or subsurface rights, structures . . . etc." (Emphasis added.) The people who enacted Chapter 132, realizing it contained subsection (f) of §8-189 must be taken to have been aware of the fact that the Relocation Act was also in our statutory scheme and that it applied to structures understood to exist in Chapter 132 project areas. They must further be taken to have understood that the only structures in such project areas were not "vacated commercial plants" which in subsection (5) of § 8-18
are defined as "buildings formerly used principally for business or industrial purposes, etc. . . ."
That is why it was necessary to include the previously referred to definition of "real property" in subsection (9) of § 8-187 which includes "structures" as part of the definition. There was a realization that the Relocation Act applied and "vacated" businesses might not have occupants subject to the assistance mandated by that law. Furthermore, subsection (5) of § 8-187 describes vacated commercial plants as "buildings." Subsection (9) describes "real property" as including "structures." The definition of "building" in Webster's Third International Dictionary indicates a building as a "structure;" the third edition of Ballentine's Law Dictionary says a "building" is "a structure designed and suitable . . . for use and occupation for private and public business . . . in the broad sense any structure erected and fixed upon or in the soil." If vacated commercial plants were the only "structures" contemplated on Chapter 132 project areas, why was it necessary to include "structures" in the definition of "real property" in subsection (9) of § 8-187? The apparent reason was that a variety of different structures were envisaged as existing in these project areas, not just vacant commercial plants.
There are other statutory sections of Chapter 132 which make the plaintiffs' narrow reading difficult to accept if the statutory language is to be given meaning. Subsection (c) of § 8-195 states the commissioner of economic development "is authorized to make special development grants to municipalities . . . for the purpose of assisting industrial and business firms to locate or expand within development projects and which, upon such location or expansion would result in a significant increase in employment or municipal real estate tax revenue to the municipality within which such redevelopment project is located." (Emphasis added.) This language assumes the existence of businesses on project area land prior to development area designation — they are to be "expanded." The language cannot be referring to "vacated commercial plants" because before they are "improved" they are "acquired" by the municipality under § 8-186 — not something that would happen CT Page 3074 with ongoing businesses receiving money for expansion of their business under § 8-195 (c).[3]
The statutory language of Chapter 132 also presents difficulties for the plaintiffs' other characterization of the ambit of that act — that it only applies to joint development projects by municipalities on contiguous land areas. It is certainly true that the facilitation of such joint projects was an important aim of the act but not its only goal. If that were not the case, as the defendants point out, why include §8-196 which was part of the original 1967 legislation and specifically addressed joint development of contiguous land parcels. Interestingly, in 1975 an amendment to the act deleted the initial requirement that the municipalities jointly initiating the project be contiguous (see history of § 8-196). If towns engaged in joint development project need not be contiguous how could the parcel being developed be contiguous to both municipalities?
Also, if joint development projects by more than one municipality are the only type of project contemplated by Chapter 132 the language and purport of subsection (k) of § 8-189 is somewhat odd. Again, that subsection indicates a development agency of a municipality may initiate a project plan which shall include among other things "a statement of the number of jobs which the development agency anticipates would be created by the project and the number and types of existing housing units in the municipality in which the project would be located, and in contiguousmunicipalities, which would be available to employees filling such jobs." (Emphasis added.) In a joint project why would one town provide this information to the contiguous town with which it is engaged on the development plan? And why put in the underlined language at all if it was assumed the statute applied only to development projects by contiguous towns?
Subsection (b) merely reflects how the statute's operation and applicability was envisaged by Representative Mayer — it can apply to situations where a town, acting on its own, wishes to initiate a development project within its own borders and not on land necessarily contiguous to another municipality.
For all the foregoing reasons, the court does not accept the plaintiffs' interpretation of Chapter 132.
 Delegation
As indicated, separate from the question of whether the exercise of eminent domain would be appropriate given the facts of this case no matter what entity, including the state exercised that power, the CT Page 3075 plaintiffs also argue that in this case, the NLDC cannot appropriately and indeed constitutionally exercise that power.
The plaintiffs do not challenge the delegation of eminent domain power to the City of New London. The argument raised is that . . . "some things may only be done by governmental bodies. The NLDC is a private body, yet the city council has delegated the power of eminent domain to it. The NLDC decides whether particular properties will be condemned and whether possible future uses within the Municipal Development Plan (MDP) area serve a public purpose. Public use decisions should be made by the city council, not by the NLDC in the guise of "Minor" changes to the MDP. Finally, the NLDC does not serve as an agent of the city . . . and cannot . . . be treated as the functional equivalent of the city in decision making. Instead, the city has delegated away to a private party its responsibility for these condemnations and for insuring that properties are condemned for public use."
In their usual thorough fashion, the plaintiffs then support each of the foregoing assertions.
The NLDC is indeed a private non-stock corporation and it is not elected by popular election or directly "controlled by the political process."
The record is replete with the many ways in which the city has delegated its eminent domain power to the NLDC. The city council authorized the NLDC to use eminent domain but
 — the NLDC, not the city, has made decisions about when and more importantly, whether particular property will be condemned.
 — the NLDC, not the city, decided not to condemn the Italian Dramatic Club (IDC) although it was not to remain in the MDP as approved by the city council.
 — the NLDC, not the city, has decided not to condemn the property of the Pasquilini's occupied by two elderly ladies (at least for the time being).
— through the "minor" modification process referred to in § 8-200 (a) the NLDC has made decisions about future uses within the MDP without attempting to get city council approval; e.g. (1) action re IDC; (2) elimination of stand alone CT Page 3076 athletic club; (3) increased area in MDP devoted to office use; (4) added extended-stay facilities while reducing residential use; (5) eliminated reference to Coast Guard Museum but now resurrected it as a possible future use.
In making their argument that the NLDC is not an agent of the city, the plaintiffs also point to its actions. For example, the NLDC has selected a developer for the development project, Corcoran Jennison. Before actual work can begin on the project, a development agreement must be arrived at. Various draft proposals have been prepared over a period of several months in an attempt to reach a final development agreement. New London's City Manager made several requests to see these draft proposals which were not complied with by the NLDC. The city manager only received one of the drafts when the DECD told the NLDC that the city should receive a copy. Also, the final development agreement for the project area is to be signed by the developer, the NLDC and the DECD. The city is not a signatory to the agreement which sets forth what is to be built under the MDP and where various parts of the project will be located within the various parcels of the project.
Given all of these circumstances, it can hardly be said that an agency relationship existed between the city and the NLDC according to the plaintiffs. For such a relationship to be found, there must be an understanding that the principal, here the city, will be in control of the undertaking with the right, that is, to direct and control the agent's work. Beckenstein v. Potter Carrier, 191 Conn. 120, 133
(1983).
The NLDC is more an agent of the state than the city, according to the plaintiffs, and they point to the fact that the NLDC's executive director testified to that effect. That is underlined by the just noted fact that the state received draft proposals of the development agreement and the city manager got one only when the state suggested to the NLDC that that would be a good idea. Furthermore, the NLDC consulted with the state (DECD) on the question of how to determine whether a change to the MDP was major or minor in light of the requirements of § 8-200 (a) of the General Statutes, which talks of the effect of a substantial change in the plan. Finally, as the project moves forward, compliance with the MDP will be monitored by the NLDC, not the city.
The thrust of what the plaintiffs argue is that the delegation of eminent domain to the NLDC is unconstitutional.
This argument of improper delegation is predicated as the plaintiffs seem to concede on the premise that they "have established that the CT Page 3077 eminent domain power was completely delegated to the NLDC." Gohld RealtyCo. v. Hartford 141 Conn. 135, 144 (1954), is cited for the proposition "that the exercise of eminent domain power by the government itself or a public agency thereof is different from its exercise by a private person to whom the government has granted the power." Gohld drew this position from Connecticut College v. Calvert, 87 Conn. 421, 427 (1913) and Gohld
referred to p. 430 of that case for a second proposition which the plaintiffs rely upon here. There, the Gohld court said, referring to theConnecticut College case . . . "the basis of the decision is . . . that when a private person is granted the power to appropriate property, it must be for a use to which `the public will have a common right upon equal terms independently of the will or caprice of the corporation.'" The Gohld court points out at pages 143-44 that under our Redevelopment Act, removal of slum conditions is a public use by definition and prevention of the recurrence of slum conditions by requiring private parties to develop and use the land to be cleared in accordance with the development plan is also a benefit to the public. "These uses (slum clearance and prevention of slum recurrence) will continue in the public whether title to the land stays in the city or is transferred to private persons. 141 Conn. 144.
The plaintiffs argue that not only is the NLDC a private entity, but a private developer chosen by the NLDC will choose the tenants of the office buildings to be constructed on parcel 3. The benefits of tenancy or entrance to the buildings will not be available to the general public." Especially in parcel 4A, future uses will be determined by the NLDC, "the private condemnor" — that is, at the "will or caprice of a private party." See Connecticut College, 87 Conn. 436.
The court will now discuss the issues raised by the plaintiffs.
As noted, the plaintiffs take the position that the NLDC is a "private body" — "not elected by popular election or controlled by political process." It is compared to other non-profit organizations doing worthy work but not entitled to acquire the power of the sovereign for eminent domain, such as the ACLU, the Diabetes Foundation or the Institute for Justice. But this statement goes too far. In many ways the NLDC is subject to the political process and the control of its activities by city and state. The court will first discuss the ways that the statutory framework of Chapter 132 enmesh the NLDC in the political process of the city council and how it is subject to the control of that municipal legislative body. Obviously New London's city council is popularly elected and is that city's legislative body for Chapter 132 purposes. Section 8-188 provides that the legislative body can vote to designate a nonprofit development corporation as its development agency and the municipality through such agency can exercise the powers granted the city CT Page 3078 by Chapter 132. In May, 1998, the city council so designated the NLDC and authorized it to prepare a development plan for the Fort Trumbull area. None of the actions taken by the NLDC, whether affecting the plaintiff or others, none of its work in formulating the MDP or choosing a developer would have taken place without this designation by the defendant city's legislative body in the first instance. Under § 8-191, the NLDC as the city's designated development agency adopts a development plan — here the MDP. That is the whole basis and source of activity as regards the Fort Trumbull area. One of the things necessary to the adoption of a development plan under this statute is a finding by the city planning commission "that the plan is in accord with the plan of development for the municipality.[4]
Once the development agency (NLDC) adopts the development plan "the agency shall submit such plan to the legislative body which shall vote toapprove or disapprove" the plan under § 8-191 of Chapter 132. It is only then, under the statute, that the plan is submitted to the State Commission of Economic Development. It is only after the commissioner gives his or her approval to the development plan that the commissioner can give development grants (see § 8-195). Without such grants from the state, nothing could have gone forward or will go forward with regard to this plan. But the predicate for MDP approval by the commissioner is the prior approval by the popularly elected legislative body, i.e. the city council (see § 8-191 again).[5] In fact, the mechanism for the NLDC to apply for these development grants appears to be the prior application by the city council to request that the commissioner grant funds to the NLDC to carry out the development plan (see city council resolution, 5/21/01).
Bond issues may be necessary to advance development projects of this type. It is unclear from the record whether the city has actually issued bonds but the ability to do so in conjunction with a development plan remains an option under the statutory scheme. Section 8-192 states that: "For the purpose of carrying out or administering a development plan or other function authorized under (Chapter 132), a municipality, acting by and through its development agency is authorized . . . (to issue bonds)." But such a bond issue must be authorized by the municipality's legislative body. The Connecticut Development Authority may issue and administer bonds for the purpose of carrying out or administering a specified development plan authorized under this chapter" (i.e. Chapter 132) but only after the project is "adopted by the legislative body of the municipality." See § 8-192 (d).
And the "political process" as reflected in the ability of the legislative body of the municipality to control or affect the operations of this private non-stock corporation makes itself felt in other ways CT Page 3079 than purely financial mechanisms and makes it difficult to analogize the operations of the NLDC even vis a vis the City of New London as similar to the independent activity of purely private charitable or public service corporations like the ACLU or the Institute for Justice.
In its harshest exercise of power — eminent domain — it is true that the NLDC chooses the particular property that is to be taken and the timing of the taking.
But the fact remains that for the power of eminent domain to be exercised at all the NLDC needs "the approval of the legislative body," see § 8-193 (a), which was given in this case, when the MDP was approved — a project plan which envisaged the taking of property.Avalonbury Communities, Inc. v. Town of Orange, 256 Conn. 557 (2001), was a case arising under Chapter 132. Referring to the statutory framework and the need for legislative approval of the project plan, the court at pp. 572-73 said:
 "This statutory frame work contemplates and serves to effectuate the acquisition or real property, by eminent domain if necessary, in order to foster industrial and business development. In essence, under this framework, without the acquisition of the subject property the project plan would not accomplish its intended legal purpose. Indeed, it is only after approval of the (project) plan as provided in (Chapter 132), that the development agency may proceed with the acquisition of real property within the project area. C.G.S. § 8-193
(emphasis added). Commenting at p. 575 on the distinction between a town plan which is merely
advisory, the court speaking of a Chapter 132 project plan said that the distinction between the two types of plans "illuminates one of the significant, if not the primary, legal functions that a project plan is designed to serve, namely, to effectuate the municipal acquisition of property.
The argument that the NLDC was not truly an agent of the city and/or that its seizure of particular pieces of property under a grant to do so that was only general does not ipso facto make the delegation inappropriate or unconstitutional.
It has been held that no question of improper delegation of the power of eminent domain arises where the legislature does not specify the particular property which is to be taken for the defined public purpose. CT Page 3080 Under a general grant of power to take any property necessary for the public purpose, the legislature can delegate the determination of necessity to an independent board or tribunal or even a corporation or person empowered by the legislature to condemn. Water Commissioners v.Johnson, 86 Conn. 151, 157 (1912). Similarly confining the analysis to the delegation issue, under Chapter 130 the determination of what particular property in a redevelopment area is to be taken to effectuate the public purpose is a matter for the legislature and when the legislature delegates the power of the determination to another agency, such as the Redevelopment Agency, "the decision of that agency is conclusive; it is open to judicial review only to discover if it was unreasonable, or in bad faith or was an abuse of the power conferred."Gohld Realty Co. v. Hartford, 141 Conn. 135, 146 (1954). This language was quoted favorably in a Chapter 132 case. Bugryn v. City of Bristol,63 Conn. App. 98, 107 (2001).
Here, the NLDC's decision to condemn the plaintiff's property was in conformity with the MDP, which does not provide for single-family detached residences. That decision was not based on some private whim of a private agency.
Also, the structure known as Building 2 and 194 Howard Street were originally to be removed in the MDP as was the Italian Dramatic Club (IDC). Now they are to be retained. But the first two mentioned structures are office buildings to be located in a parcel scheduled for office buildings. There are concerns raised by the plaintiffs as to how and why the DC was allowed to remain, but there is not any claim that the IDC and the type of use it represents conflicts with any use set forth in the MDP and no evidence was presented to that effect.
It is the court's understanding that the plaintiffs are not claiming any changes to particular aspects of the MDP which the NLDC decided were "minor," were not "minor" but major or substantial, thus requiring the NLDC to have gone back to the municipal legislative body for approval, see § 8-200 (a). The problem they raise is rather that the discretion exercised under the major-minor rubric is so broad that it belies any notion of a true agency relationship and represents an unconstitutional delegation of power. But the NLDC made its minor-major determination with the template of the MDP as a guide and a common sense reading of subsection (a) of § 8-200 is that it is left to the determination of the development agency as to whether a change is minor or substantial. The NLDC reported all changes to the city council which it determined to be minor. As the defendants point out, nothing in the statutory scheme suggests or perhaps could constitutionally permit a situation where the municipality acting through its city council could not terminate its relationship to the NLDC. CT Page 3081
For the foregoing reasons, and from the perspective of political control over the NLDC by the city's legislative body, it can hardly be said that the NLDC vis-a-vis that entity is some free-wheeling private body attendant to its own affairs and acting as only it sees fit.
But the problem of delegation cannot be viewed only from that perspective. The municipality and its legislative body is not the only governmental entity that factors in Chapter 132. At one point, Admiral Goebel, the executive director of the NLDC, suggested that the NLDC is more of an agent of the state than the city. That is an interesting observation, but the plaintiffs, analytically at least, seem to put it aside and, as indicated, concentrate on their argument that the delegation problem centers on the fact that the NLDC is not the city's agent in any realistic sense, and while the delegation of eminent domain power to the city is not being challenged, public use decisions should be made by the city council and not delegated to a private entity like the NLDC.
What the plaintiffs have largely done is set up an analytical strawman then, because they are very able lawyers, proceeded to demolish it. As to control of the development process, which includes the exercise of eminent domain, they propose a dichotomy between state power and the delegation of that power to the municipality. They argue that delegation in this instance will not pass muster since the agency that will exercise the powers envisaged under Chapter 132 acts independently of and not truly as the agent of the delegatee — the municipality. What is ignored is the state's retention of certain aspects of the delegation of eminent domain power as an adjunct to fostering development projects under Chapter 132.[6]
It is no doubt true that the power of eminent domain emanates from the state legislature; the legislature can itself exercise that power or delegate it to another entity. Northeastern Gas Transmission Co. v.Collins, 138 Conn. 582, 586-587 (1952); State v. McCook, 109 Conn. 621,628 (1929); Clark v. Saybrook, 21 Conn. 313, 324 (1851); H.A. Bosworth Son, Inc. v. Mitchell Tamiola, et al, 24 Conn. Sup. 328, 332 (1963); Nichols, Law of Eminent Domain, § 7.01(1), pp. 7-15, cf. FaristSteel Co. v. City of Bridgeport, 60 Conn. 278, 284 (1891).
A close reading of Chapter 132 indicates that what the legislature has chosen to do is to delegate eminent domain power to municipalities, but through state agencies retain substantial control over the financing and actual operation of development projects and thus in part over when and how the power of eminent domain is exercised by redevelopment or development agencies — agencies authorized to effect these projects CT Page 3082 by their municipalities.
The court fails to see what is improper with such a model. More to the point, when the operations of the NLDC are viewed in this statutory matrix of state agency control and municipal control by the legislative bodies of the cities, such development agencies certainly cannot be characterized as purely private corporations acting for a public purpose but in a manner and on a schedule that is completely up to them. This is not the Connecticut College v. Calvert, 87 Conn. 421 (1913), case. The court has already reviewed in what way the genesis of NLDC operations regarding development of the Fort Trumbull area and the operations of the NLDC with regards to that project are brought about by, controlled, and influenced by the actions of the municipality and its legislative body.
Now the court will review state interaction with the NLDC as set forth in the statute and how the state agency monitors and controls NLDC actions. The court will then somewhat repetitively relate this to traditional agency law and finally discuss the claim of unconstitutional delegation of eminent domain power.
The court will now again refer to the statutory language of Chapter 132 for evidence of continued state involvement. Accomplishment of the development plan envisages the possible need to use eminent domain power. And any such plan under § 8-189 must be prepared in accordance with the regulations of the DECD commissioner who is authorized to make planning grants to help prepare the plan under § 8-190. The commissioner under the same statute "may consult with and advise any development agency in the preparation of a plan for a development project" — a process which occurred here. Under § 8-191, not only must the municipality's legislative body approve the final development plan, but so must the DECD commissioner. After the plan is so approved, the commissioner under § 8-195 is authorized to make development grants to effectuate the goals of the plan. In this case, the state has contributed the great bulk of the monies to accomplish the development plan which would in itself give it a large measure of control through the DECD commissioner over NLDC operations. All aspects of this plan, including the exercise of eminent domain power, would not go forward at all without the provision and assurance of state funding.
In this regard, § 8-193 (a) is worth attention, it underlines state agency control and explains, perhaps, why the city need not be a signatory to any final development agreement from a constitutional point of view. That statutory subsection reads: "The development agency may, with the approval of the legislative body, and of the commissioner, if any grants were made by the state under § 8-190 or § 8-195 for such development project, and in the name of such municipality transfer CT Page 3083 by sale or lease at fair market value, as the case may be, the whole or any part of the real property in the project area to any person, in accordance with the project plan and such disposition plans as may have been approved by the commissioner."
In any event, the commissioner is to be a signatory to the development agreement in this case, along with the developer and the NLDC. As signatory and primary funder of the project, it strains credulity to believe that the state acting through the DECD will not (1) have the wherewithal to control the activities of the NLDC to a sufficient degree so as not to allow that agency to be characterized as being able to act according to its own "will and caprice;" and will not (2) have the ability to ensure through the development agreement that the developer and the NLDC will seek to meet the goals and purposes of the MDP, which the commissioner had to approve in the first place to get the project going.[7]
The state's involvement in the statutory scheme and its formal and informal control of the operations of the NLDC is again revealed if we closely examine another of the plaintiffs' arguments meant to show that the NLDC acts on its own without any real control in important matters by the city council. Under § 8-200 (a), the NLDC can modify the development plan, but where the modification "will substantially change the development plan as previously approved, the modification must be approved in the same manner as the development plan." The plaintiffs point out that in trying to make his determination on the issue of whether certain changes were substantial, the attorney for the NLDC did not go to the city, but contacted the DECD which sent him certain guidelines as to the major-minor change distinction. But why would he not logically contact the DECD for help on this question — the statutory scheme indicates the DECD might have some expertise in this area.[8] That is so because § 8-191 discusses the adoption of the development plan and says:
 "In the event the commissioner requires a substantial modification of the project plan before giving approval, then upon the completion of such modification such plan shall first have a public hearing and then be approved by the development agency and the legislative body (of the municipality)." (Emphasis added.)
To summarize the foregoing observations — the state legislature has enacted a statute authorizing municipalities to enact development plans. As part of the powers invested in the municipality to effectuate these plans, the state legislature has also given the municipalities the power CT Page 3084 to use eminent domain, and to effectuate these plans and exercise eminent domain power, the state legislature has decided under Chapter 132 that the municipality can appoint a development agency.
At the same time, however, the state legislature having created a Department of Economic and Community Development headed by a duly-appointed commissioner, Chapter 578, §§ 32-1 et seq. In effect, the legislature has provided that its delegation of eminent domain power, along with the effectuation of development projects, is only to exist with the approval and supervision of the designated state agency.
Nothing in the law of eminent domain bars the creation of such a statutory scheme and the court could find no cases that say the contrary. It would be silly to say that the absolute power of eminent domain resides in the state legislature, the legislature can delegate the power to other entities but it cannot, through state agencies, retain some control over the delegation and whether and how it is exercised.
In a discussion that admittedly will be somewhat repetitive, the court will now try to fit its foregoing analysis within the confines of traditional law.
Nothing in the statutory scheme, as it has been discussed over these many pages, interferes with accepted concepts of agency law. It is black letter law that: "The rule which precludes one from acting as agent to both parties to a transaction is limited in its application to situations where loyalty to one involves a breach of duty to the other, and an agent may be allowed to serve both parties to a transaction if there is no necessary conflict in interest," Am.Jur.2d, "Agency," § 244, p. 743.
This is a necessary implication of § 391 of the Restatement (Second) Agency.
What we have here is dual agency; the NLDC is the agent of both the city and the state acting through the DECD and it is subject to the control of one or the other depending on the activity at hand. There can be no conflict of interest between city and state since absolute power of eminent domain rests in the state and the city receives that delegation of the power that the state chooses to give.
Connecticut relies heavily on the Restatement (Second) Agency to define the creation and scope of agency law. Beckenstein v. Potter Carrier,Inc., 191 Conn. 120 (1983); Town Country v. House Home Services,Inc., 150 Conn. 314 (1963). Section 14 of the Restatement says that "a principal has the right to control the conduct of the agent with respect to matters entrusted to (the agent)." Comment (a) says "the principal's CT Page 3085 right to control is continuous and continues as long as the agency relation exists, even though the principal agreed he (sic) would not exercise it. Thus, the agent is subject to a duty not to act contrary to the principal's directions, although the principal has agreed not to give such directions." But, as noted, the NLDC did report to the city council concerning the changes it considered minor thus complying with its duty to give information to its principal, § 381 of Restatement. The council took no action but what is there to indicate it could not have disagreed with the NLDC determination and demanded compliance with the original approval process. Also, a development agreement is the lynchpin of this whole project — the DECD must sign off on such an agreement before an MDP can be effectuated. As previously noted, it strains credulity to think that the DECD would sign off on a development agreement where it determined the NLDC made substantial changes in a project it approved, by statute had to approve, and into which it has poured over seventy million dollars with more on the way.
Using an agency analysis, the plaintiffs point to the fact that the NLDC did not provide the city with drafts of the development agreement that it was preparing with the developer. Let us look at the duty of the agent to give information to its principal, certainly recognized in Connecticut law. McKay v. Aetna Life Ins. Co., 118 Conn. 538, 554
(1934). The Restatement at § 381 says:
 "Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give (the) principal information which is relevant to affairs entrusted to the (agent) and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty toward a third person.
The point of the matter is that the drafts of the development agreement went only toward preparation of the final development agreement concerning which the city is not to be a signatory. The state, through the DECD, is to be a signatory. Again, we have dual agency, the DECD and the city have no conflicting interests as regards the accomplishment of the development plan, the state agency created by the state legislature which is the source of eminent domain power must decide to sign or not sign the agreement no matter what the position of the NLDC is regarding the matter so it is difficult to see how the failure of the city to receive copies of drafts being developed towards completion of a final agreement, it will not sign off on, violates any duty of the NLDC to disclose information to one of its principals.
The DECD, through its approval of the development agreement, will, in CT Page 3086 effect, guarantee that the delegation of eminent domain power to the NLDC is reflected in its agreed upon scope and operation in the development plan. Given these factual circumstances, it is an unacceptable leap to say that, despite the fact that a DECD sign off on the development agreement is required, the delegation of eminent domain power to the NLDC is improper or the NLDC acts at its own caprice.
But the plaintiffs do not rest their improper delegation argument merely on agency law. The plaintiffs have also argued that the delegation of eminent domain power to the NLDC is unconstitutional. The court has made some reference to this argument in its foregoing discussion, but will now focus its analysis on two older, but leading, Connecticut cases: Connecticut College v. Calvert, 87 Conn. 421, 427 (1913); andGohld Realty Co. v. Hartford, 141 Conn. 135 (1954). With reference to those cases, the plaintiffs' unconstitutional delegation argument appears to be predicated on the proposition "that the exercise of eminent domain power by the government itself or a public agency is different from its exercise by a private person to whom it has given that power." Gohld
at 141 Conn. p. 144, (which relied upon Connecticut College, 87 Conn. p. 427
for this principle). The Gohld court went on to say that "when a private person is granted the power to appropriate property, it must be for a use to which "the public will have a common right upon equal terms independently of the will or caprice of the corporation."141 Conn. at p. 144. The plaintiffs point to the fact that under the MDP, parcel 3 is designated for office buildings and a private developer will decide who the tenants are and the general public will not benefit from or have open access to these buildings. Let us examine the cases closely. ConnecticutCollege and Gohld will be discussed.
In the Connecticut College case, the legislature, by special act, had given the college, then a women's college, the power to take real estate in New London and Waterford. The court, at 87 Conn. p. 428, said, "We accept and endorse the legislative declaration that the higher education of women is in its nature a public use." In the Gohld case, a redevelopment agency intended to exercise the power of eminent domain under the state Redevelopment Act which authorizes such agencies to condemn property in areas which are "deteriorated, substandard or detrimental to the safety, health or welfare of the community." Id, p. 142.
In Gohld the court set up a two-part consideration on the issue of proper delegation which is somewhat confusing in its second part since it impinges analytically on the strict question of what is a "public use" (of which more later). As indicated, the court, as its firstconsideration said the exercise of eminent domain by the government or a public agency is different from its exercise by a private person. Gohld
CT Page 3087 said at page 144 there is a distinction on this score between the Connecticut College Board of Trustees and the redevelopment agency.Gohld appeared to accept the fact then that a redevelopment agency is a "public agency" not a private entity or person. The implication of all this being that if the power of eminent domain is delegated to a public agency, there can be no problem with such a delegation. As to the College Board of Trustees, the court in Connecticut College, id, p. 422, noted that: "The control and disposition of its property and the management of its affairs are vested in a board of trustees to be elected by the members of the corporation." A redevelopment agency under Chapter 130, § 8-126, like a development agency under Chapter 132, § 8-188, is designated by the legislative body of a municipality. By application of principles of analogy just stated, or by reference to the previous discussion on how and under what controlled and supervised circumstances the NLDC operates, the NLDC, like a redevelopment agency, is a public agency as Gohld envisaged the concept and, in any event, cannot be analogized to a private person or entity like the board of trustees of a private college not selected by government or subject to the type of supervision of its operations that a redevelopment agency under Chapters 130 and 132 is subjected to by government entities.
But Gohld does not end its discussion there. There is a second consideration. It goes on to say, let us assume the eminent domain power is granted to a private person or entity, it must be a use to which "the public will have a common right upon equal terms, independently of the will or caprice of the corporation," id, p. 144.
The Gohld court was not saying a Redevelopment Agency is not a "public agency" despite what we just said three sentences ago. The court was concerned with the fact that the Redevelopment Agency — purportedly a public agency — entitled to resort to eminent domain in the first instance would be turning the slum cleared land over to private developers. The court reasoned that was not a problem because . . . "the prevention of recurrence of slum conditions (is) clearly (a use) for the benefit of, and to be enjoyed by the public at large without restriction. (This use) will continue in the public whether title to the land stays in the city or is transferred to private persons."141 Conn. at p. 145.
In analyzing this second aspect of unconstitutional delegation of power, the plaintiffs refer to the Connecticut College case, but one cannot stop reading the Connecticut College case at p. 430 to analyze this problem. At 87 Conn. p. 435, the court says:
"There is no allegation in the petition (of the college) that the public has or can acquire the CT Page 3088 right to enjoy the benefits of the land sought to be taken, no provision to that effect in the petitioner's charter, and the stated corporate purposes of the petitioner are not such as to impose upon it, as a necessary legal consequence of its corporate character, the obligation of admitting to its courses all qualified candidates, to the extent of its capacity, without religious, racial or social distinction."
Thus, the court was not saying every female member of the general public to apply had to be admitted or that a lottery system had to be established for admission governed by pure change. Any candidate had to be "qualified," the school only had to admit applicants "to the extent of its capacity" and no invidious distinctions on the basis of religion, race or class distinctions could be used to bar certain sections of the public. If these requirements were to be made part of the charter or by-laws of the college, the implication is clearly that the delegation of eminent domain to the college would have been acceptable to the court since the public could be assured that the contemplated use would be open to the "public" in a manner acceptable to the court. This being so, even though the college board of trustees is purely private and not selected by government.
But this discussion of the second consideration in Gohld is not purely one of whether the delegation of eminent domain power to an entity, whether public or private, is appropriate or constitutional. It really involves the issue of whether and under what circumstances a use can continue to be public if private corporations or persons receive property that has been condemned. That issue would exist whether the legislature itself took the land from one private party and gave it to another, whether a "public agency" did, or whether a clearly private entity, like Connecticut College, was permitted to condemn the land for its own uses.
ln this regard, let us look at the case of Bugryn v. City of Bristol,et al, 63 Conn. App. 98 (2001). That was a case where a development agency was a codefendant and eminent domain was to be used for pure economic development purposes — an industrial park was planned. To say the delegation problem does not arise in that case because, after all, the city was still to own the land on which the private business establishments were to operate really is not quite satisfactory. Even if the city still owned the land, private businesses not open to the public on an equal basis but run in that regard subject to the "will or caprice" of private corporations were still being planned for the industrial park. In other words, if there is no "delegation" problem in Bugryn, why should there be a "delegation" problem in a case where an agency, like CT Page 3089 the NLDC, engages a developer to build and lease office space. Suffice it to say that the court does not accept the plaintiffs' improper delegation argument and believes some of the concerns they raise and suggested byConnecticut College and Gohld are not really, strictly speaking, issues involving improper delegation of eminent domain power as such, but are best addressed in the discussion as to whether the uses contemplated for parcel 3 and parcel 4a of the Fort Trumbull area can properly be characterized as public uses especially in light of whether there are appropriate guarantees that such uses will remain in effect and whether the latter concern is affected by the fact that the seized land will be devoted to economic development.
 City Charter
The court will now discuss another matter which it believes is conceptually separate from other arguments the plaintiffs have made challenging the taking of the property. In other words, even if the takings here were for a valid public use and it was necessary to acquire these properties, the plaintiffs maintain that the takings cannot stand because they were effectuated in violation of the city charter.
New London's City Charter sets out certain steps that are to be followed upon the taking of property for a public use. See §§ 96 through 102. The city manager testified that the requirements of the charter were not followed. He further testified that the NLDC was the entity that exercised the power of eminent domain. But the NLDC even under state statute can only acquire property "with the approval of the legislative body" (here the New London City Council). See § 8-193. To the plaintiffs' claim that the takings were illegal because the charter provisions were not followed, the defendants answer that the takings were effectuated pursuant to Chapter 132 which does not require the same steps and procedure set forth in the city charter and that the city charter allowed the takings to proceed pursuant to state statute, here Chapter 132.
The court will first set forth its understanding of the city charter provisions.
The relevant sections of the charter are set forth in Article XIV of that document. Section 96 sets up a board of compensation whose function is to review value placed on seized property and later recommend to the city council what the board feels is fair compensation. (Section 99.) Section 97 without referencing the board does say that before any property is taken, a resolution has to be passed by the city council to do so and a report must be prepared by the city manager indicating the value of the properties seized. This report is to be placed on file for public CT Page 3090 inspection. Section 98 requires notice be given to affected parties and these people have a right to appear before the board of compensation to advance their views on the value of their property. Section 99 then states the board shall file a report with the city council as to the value of each piece of property to be taken. Section 101 says the council can accept modify or reject the board's report. If the council decides to proceed with the takings after receiving any report, it shall pass an ordinance authorizing "the action, work or improvement" apparently referring to the exercise of eminent domain power. Section 102 requires that the city clerk file notice of the property that "may have been taken" and the amount to be paid for the land.
The plaintiffs cite well-established law in quoting a case like Fennellv. Hartford, 238 Conn. 809, 813 (1996), which stand for the general proposition that the city charter is "the fountainhead of municipal powers" and thus it follows "that agents of the city have no source of authority beyond the charter." See also Alexander v. Retirement Board ofWaterbury, 57 Conn. App. 751, 758 (2000).
In Testa v. Waterbury, 55 Conn. App. 264, 270 (1999), the court said: "To determine the intent of the charter, the enactment must be examined in its entirety and its parts reconciled and made operative so far as possible." In Fennell, the court held that "in arriving at the intention of the framers of the charter, the whole and every part of the instrument must be taken and compared together." In other words, effect should be given, if possible, to every section, paragraph, sentence, clause and related laws. 238 Conn. 826.
First, the court will discuss whether the provisions of the city charter were violated assuming that the provisions of the charter were controlling. As Fennell and Testa indicate, the charter must be read as a whole. Article I § 3 of that document says: "The City of New London shall have the power to acquire real . . . property . . . in furtherance of any power granted by this charter or the laws of the State . . . by condemnation." Section 4 of Article I is entitled "Enumeration of Powers, not in limitation thereof" and reads:
 "The enumeration of powers by this act shall not be held or deemed to be exclusive but, in addition to the powers enumerated herein, implied thereby and appropriate to the exercise thereof, the City of New London shall have and may exercise all powers that now are or hereafter may be granted to cities and towns by the constitution and laws of Connecticut."
It would appear then that the provisions of the charter §§ 96-102 do CT Page 3091 not preclude these takings even though the requirements of those sections were not followed since the takings were done and in effect could appropriately be done by the city charter's own terms pursuant to state statute, here, Chapter 132. Unless this were the result, §§ 3 and 4 of the charter would be inexplicable appendages.
But the plaintiffs cite several cases to support their position that the takings were illegal because the city charter provisions were not followed. As the defendant city points out, however, some of those cases do not seem on point since they simply involved the issue of the obligation of a city to follow its charter provisions and not the issue here. Here, the issue is whether a municipality can proceed under a state statute where its charter gives it the flexibility to do so even though the charter has different requirements than the state statute. Cases cited by plaintiffs and distinguished by defendants on the foregoing grounds are Fennell v. Hartford, supra; Alexander v. Retirement Board ofWaterbury, supra; New Haven v. Local 884; 44 Conn. App. 764 (1997);Bredice v. Norwalk, 152 Conn. 287 (1964).
However, the plaintiffs do not rely on only the just-mentioned cases. They also point to the case of Berne v. Stratford, 23 Conn. App. 554
(1990). In that case, the Town of Stratford condemned a portion of the plaintiff's land. No formal notice or hearing was given prior to the taking. The court reasoned that that in itself presented no problem since "Under state eminent domain proceedings, no such notice or hearing is required. Connecticut General Statutes §§ 48-6, 48-12 and 8-130
through 8-133. Where the takings are for public use, the due process clause of the Fourteenth Amendment to the United States Constitution does not require that the taking be determined upon notice and hearing. Id. 556. However, a provision of the town charter required a public hearing prior to the commencement of condemnation hearings. Therefore, the court held Stratford's actions were illegal since "it did not follow its own charter provisions when it indicated the taking." Id., 559.
Furthermore, the plaintiffs note that the Stratford charter had a "non-exclusivity" clause which they regard as similar to New London's, but that did not prevent the Berne court from reaching the result that it did. The plaintiffs want the court to take judicial notice of the Stratford non-exclusivity clause; it will, but should note that the hearing of the clause on the question before it did not come up inBerne. In any event, § 1.1 of the Stratford Charter says:
"In addition to the powers hereinafter specifically set forth, the council shall have all the powers granted to municipal corporations by the Constitution and General Statutes of the State of Connecticut, and CT Page 3092 all implied powers necessary to carry into execution the powers hereinafter set forth and the powers granted to municipal corporations by the Constitution and General Statutes of the State of Connecticut, subject only to the limitation imposed by this charter and by the Constitution and General Statutes of the State of Connecticut." Stratford Charter at § 1.1 (1992). (Emphasis added.)
The court is not aware of any language in the New London City Charter similar to the underlined language in § 1.1 of Stratford's charter. But it is clear that the underlined language serves as a limitation on Stratford's ability to resort to state statutes which do not have provisions or requirements set forth in the city charter.
Two other cases cited by the plaintiffs also do not seem helpful to their position. In Miller v. Eighth Utilities District, 179 Conn. 589
(1980), there was an attempt to consolidate the utilities district and the Town of Manchester. The issue before the court was whether citizens who brought the action for consolidation had to follow procedures set forth in state statutes (Home Rule Act § 7-195, et seq.) or the procedures set forth in the town charter. The court held the town charter provisions had to be complied with; specific local procedures must be followed unless a general law exists showing an "intent to repeal or alter" the specific local statute. Id., 593. But the citation to Miller
misses the point. The answer to the plaintiffs' argument that is being offered is not — we do not have to follow the city charter, we can ignore it and rely on state statutes regulating eminent domain. What is being said is that we are in effect following the provisions of our charter which explicitly permits us to use the eminent domain procedure set forth in the state statutory scheme for eminent domain. See § 8-193
which refers to procedure set forth in the Redevelopment Act at §§ 8-128
to 8-133.
Furthermore, Miller made a point of saying that the state statutory scheme of the Home Rule Act in § 7-192 explicitly "provides that the charter provisions prevail over the provisions in the Home Rule Act relating to the consolidation so that the district, under the foregoing provisions, would be authorized to consolidate with the town in accordance with the charter procedure." Id., 595. (See earlier discussion at pp. 593-94 of § 7-192.) There is no similar language in Chapter 132; at § 8-193 the legislature simply said for taking procedure, the development agency will rely on § 8-128 through § 8-133 of the General Statutes.
Also, Keeney v. Old Saybrook, 237 Conn. 135 (1996) is not of any help CT Page 3093 to the plaintiffs' position. One of the issues before the court was the validity of Old Saybrook's agreement to a modified order of the Department of Environmental Protection. The state statute before the court, § 22a-436, did not indicate the manner in which a municipality had to manifest its agreement to such a modified order whereas the city charter did. Under the terms of the state statute itself, the validity of the order, however, depended on a finding of agreement to it. Not surprisingly, the court held that, in the absence of a state statutory mandate, the validity of the town's agreement to the order depended on compliance with statutory and town charter provisions. Because the town charter had not been complied with as to the mode of agreement the court found that "Old Saybrook never agreed to the modified order. . . ." Id., 155. Again, New London, because of its nonexclusivity clause is, in fact, following its city charter so Keeney for that reason alone is not on point. Also, as noted, § 8-193, which provides for use of eminent domain power by a development agency, simply refers that agency to sections of chapter 130 (§§ 8-128 through 8-133) which simply do not provide for notice and hearing to determine appropriate compensation — something the plaintiffs are not interested in in any event. Also, as in Keeney the city charter provisions do not fill in some requirement necessitated by the state statute to validate the taking procedure — as Berne says notice and hearing are not required in taking cases statutorily or constitutionally. 23 Conn. App. 556.
But the issue before the court goes beyond the straightforward issue of nonexclusivity clause in New London's City Charter and whether its existence therein means that in fact the city was complying with and acting under its charter in following state statutory procedure for taking property by eminent domain. That is, not only must the charter provisions be read as a whole, giving effect to all its clauses but also, since municipalities are creatures of the state municipal statutes must be read in the context of the applicable state statutory scheme. Bredicev. City of Norwalk, 152 Conn. 287, 292 (1964); and in the Miller court at 179 Conn. 593 made a pertinent observation:
 "In determining whether the provisions of a general statute or those of a special law prevail, the general rule is that a special and local statute, providing for a particular case or class of cases, is not affected by a statute general in its terms, broad enough to include cases embraced in a special law, unless the intent to repeal or alter is manifest."
It does not seem appropriate that when exercising eminent domain power through state statute a city can impose on the instrumentality it chose CT Page 3094 to exercise that power procedural requirements that state statutes do not require and which differ from the procedure set forth in the state statute. Referring to Miller and the just-referenced quotation, the procedure for taking referred to in §§ 8-128 to 8-133 is not "general" and "broad" — it provides a procedure for exercising the details of taking and compensation in a way completely different from the New London City Charter.
The court would make one final observation. Section 48-6 (a) of the General Statutes permits a municipality "in accordance with its charter or general statutes" to acquire property by eminent domain. Section 8-193
(a) provides a mechanism to do that pursuant to Chapter 132. It is clear that under that chapter any development agency "shall exercise its powers in the name of the municipality" and title to land or property taken under a development plan "shall be solely in the name of the municipality." § 8-199. But it is evident that under § 8-193 that the development agency, although it must get the general approval to use the power of eminent domain actually is the entity that does the taking — the statute says: "The development agency may. . . . acquire by eminent domain real property located within the project area."
In effect, then the sections of the city charter §§ 96-102 do not even apply to a Chapter 132 taking since § 97 envisages a taking by the city itself, not some delegated entity. Section 97 says "before proceeding to take any land the city council shall declare its intention to do so" and then goes into other steps required for an appropriate taking procedure by the council under the section. These takings, although in the city's name and with its general approval to so act, are takings by the NLDC.
In any event, for all the foregoing reasons, the court does not accept the plaintiffs' argument under the city charter.
 Public Use
Having tried to address these preliminary matters, the court will now address the central issue in this litigation.
At the heart of this case is the question of whether it can be said that the plaintiffs' properties have been taken for a so-called public use. Both the state and federal constitution demand that the power of eminent domain be exercised only for a public use. If the taking is not for a public use, then the question of appropriate compensation does not arise since no amount of compensation can be a constitutional substitute for the right of the citizen to remain in his or her home or business free of government trespass on that right. CT Page 3095
 A.
The problem historically has been in defining the term "public use." Nichols is a leading authority in this area and he says:
 "Two opposing views have emerged, each of which has its ardent supporters among legal scholars and courts. the supporters of one school insists that "public use' means `use by the public.' This means that to make a use public that the property acquired by eminent domain must actually be used by the public or that the public must have the opportunity to use the property taken. Law of Eminent Domain Nichols, § 7.02(2), p. 7-26.
This view is the so-called narrow view. At p. 7-29 Nichols sets forth the so-called broad view.
 "Many courts are inclined to sustain the broadest construction of public rights over private property and contend that "public use' means "public advantage.' Any eminent domain action which tends to enlarge resources, increase industrial energies or promote the productive power of any considerable number of inhabitants of a state or community manifestly contributes to the general welfare and property of the whole community and thus constitutes a valid public use."
For similar definitions of the two views in the case law, see 26 Am.Jur.2d, § 50, p. 494 of article on "Eminent Domain." A more concise definition is provided in a 1999 North Dakota Law Review article entitled "The Use of Eminent Domain for Economic Development" where at p. 785 of the article the author Klemestrud says, "The public use doctrine is defined as either "use by the public' or `use for public advantage.' The former interpretation includes any actual use by the public or opportunity for the use by the public. The latter details any use which tends to enlarge resources, increase industrial energies or promote the productive power of any considerable number of habitants of a community."
Trying to determine if a particular use is a public use, however, cannot depend on a linguistic analysis. As Nichols says at § 7.02 (7), p. 7-37:
". . . efforts at providing a precise definition of CT Page 3096 public use "are doomed to fail, and many courts have recognized this and have repudiated efforts to lay down hard and fast rules freezing the definition of this phrase. Overall, the law governing the meaning of `public use' is the product of tradition, precedent and judicial employment of both the narrow and broad construction of `public use.'"
As said by the court in Barnes v. New Haven, 140 Conn. 8, 15 (1953):
 "A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences changing conceptions of the scope and functions of government and other differing circumstances brought about by an increase in population and new modes of communication and transportation."
Deciding whether a particular use is a public use can be difficult for a variety of reasons, one of which is a disturbing aspect of cases of this type. Despite the many shared values of people and parties on both sides of the question in a particular case, these values are often forgotten in the heat of courtroom and public argument. A temptation arises to demonize the opposing side. But a court has to be aware of the fact that there are dangers to the public welfare and to the rights of individuals presented by both the "broad" and "narrow" view of public use.
If the broad definition is applied and it is accepted that any public benefit or advantage created by a taking for economic development is a public use then an observation in the Am.Jur.2d article at § 51, pp. 496-97 is worth noting:
 "Earlier cases pointed out that almost any legitimate business enterprise, indirectly to some extent, may be regarded as of benefit to the public and that an indefinite field is opened up when the doctrine is accepted that public benefit alone is sufficient to make the use a public one, warranting the exercise of eminent domain power."
In other words, the danger presented is that the Eminent Domain Clauses of the state and federal constitutions could be rendered meaningless and that private values of home and property would be obliterated by allowing free rein to expanding capital markets. CT Page 3097
But if a narrow view is adopted and a taking for economic development is not permissible under any circumstances since such a use would not provide for actual use by the public, then the observations of an ancient case quoting an even older one must be attended to.
 "The principle is, that the lands of individuals are holden subject to the requisitions of the public exigencies, a reasonable compensation being paid for the damage. It is not taking the property of one man and giving it to another. At most it is a forced sale to satisfy the pressing wants of the public. Now this is as it should be. The will or caprice of an individual would often defeat the most useful and extensive enterprises if it were otherwise." Olmstead v. Camp, 33 Conn. 532, 547 (1866).
If this narrow view had prevailed in our history, it could be said that we might all still be huddled along the eastern seaboard or presently our central cities would be severely handicapped in trying to recover from the malling of our state.
 B.
Our Appellate Courts seem to have consistently articulated an acceptance of the broad view of what is a public use at least in the context of the cases which they were deciding.
In Olmstead v. Camp, supra, 33 Conn. 546, the court said:
 "`Public Use' may therefore well mean public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the state under its right of eminent domain for purposes of great advantage to the community is a taking for public use."
cf. Barnes v. New Haven, 140 Conn. 8, 15 (1953), referred to with approval in Katz v. Brandon, 156 Conn. 521, 532 (1968). In upholding the Redevelopment Act as an appropriate exercise of seizing property for a public use, the court in Gohld Realty Co. v. Hartford, 141 Conn. 135, 141
(1954) referred to the above-quoted language from Olmstead and cited other cases. Todd v. Austin, 34 Conn. 78 (1867); Water Commissioners v.Manchester, 87 Conn. 193, 204 (1913).
When the power of eminent domain is exercised pursuant to legislation CT Page 3098 the problem of defining whether the purpose of a particular taking is a public use is at least more focused. Here, the plaintiffs' property has been taken pursuant to Chapter 132 of the General Statutes with the actual taking authorized by § 8-193. That chapter labeled "Municipal Development Projects" and its purpose is set forth in "Section 8-186
Declaration of Policy"
 Sec. 8-186. Declaration of policy. It is found and declared that the economic welfare of the state depends upon the continued growth of industry and business within the state; that the acquisition and improvement of unified land and water areas and vacated commercial plants to meet the needs of industry and business should be in accordance with local, regional and state planning objectives; that such acquisition and improvement often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost; that permitting and assisting municipalities to acquire and improve unified land water areas and to acquire and improve or demolish vacated commercial plants for industrial and business purposes and, in distressed municipalities, to lend funds to businesses and industries within a project area in accordance with such planning objectives are public uses and purposes for which public moneys may be expended; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination.
Our legislature has clearly stated that economic development pursuant to Chapter 132 which authorizes the use of the eminent domain power is a public use. Nichols at § 7.03 (11) (b) states that: "The presumption is that a use is public when the legislature has declared it to be. Legislative decisions must be treated with the consideration due to a coordinate department of the government of the state." At § 61 of the Am.Jur.2d article on "Eminent Domain" it also says: "Primarily, the right to declare what shall be deemed a public use is vested in the legislature. Consequently, when the public nature of a use for which a taking has been authorized by law is disputed, the question as it presents itself to the courts is not whether the use is public, but whether the exercise of eminent domain power is rationally related to a conceivable public purpose, whether the legislature might reasonably have considered the use public or whether the use is clearly private in nature," p. 503. CT Page 3099
On the deference due legislative pronouncements our courts have said the following:
 "That the uses to be furthered are public, is a question the decision of which by the legislative department, while not absolutely conclusive upon the judicial department, on a proceeding like the present, is entitled to very great weight." New York N.H. H.R.R. Co. v. Offield, 77 Conn. 417, 421
(1904).
cf. Northeastern Gas Transmission Co. v. Collins, 138 Conn. 582, 588
(1952), Gohld Realty Co. v. Hartford, supra, 141 Conn. at p. 141, where the court said that legislation must be given "great weight" but "whether the purpose for which a statute authorizes the condemnation of property constitutes a public use is in the end, a judicial question," on deference to legislature also see Barnes v. New Haven, 140 Conn. 8, 15
(1953), where the court said legislative "determination should not be reversed by the court unless it is manifestly and palpably incorrect," also see City of New Haven v. Town of East Haven, 35 Conn. Sup. 157, 165
(1977). But broad statements on public use and deference to the legislature must be qualified.
Thus, the Connecticut courts really ascribe to the statement in Nichols to the effect that: "if after giving due respect to a legislative declaration, the court considers the purpose not to be reasonable or connected to a valid public use, it is the duty of the court to declare the act authorizing the taking as unconstitutional," § 7.03 (11) (b) at pp. 7-77 to 7-78. cf. Reter v. Davenport R.I. N.W. Ry. Co.,54 N.W.2d 863, 867 (Iowa, 1952), Burnham v. Mayor and Aldermen ofBeverly, 35 N.E.2d 242, 243 (Mass., 1941); New York City HousingAuthority v. Muller, et al, 1 N.E.2d 153, 154 (N.Y., 1936), cf. Mayor City Council of Baltimore, et al v. Chertkof, 441 A.2d 1044, 1051
(Mryd., 1982), where the court said "Whether the use for which private property is taken is public or private is a judicial question to be determined by the court; a legislative body cannot make a particular use either public or private by merely declaring it so. Prince George'sCounty v. Beard, . . . 291 A.2d 636 (1972). . . ."
There is also another consideration. A cursory reading of Chapter 132 indicates that the net results of its policy will be that the property of some people may have to be acquired by eminent domain while private businesses will receive a benefit by that acquisition and the work on infrastructure that the legislation envisages. It is certainly true that the legislature cannot authorize the taking of one person's property for the benefit of another private party, cf. Bugryn v. City of Bristol, CT Page 310063 Conn. App. 98, 103 (2001); Farist Steel Co. v. City of Bridgeport,60 Conn. 278, 292 (1891), where the court said, "Private properties cannot be taken for other than public uses under the guise of taking it for public use. This is the general law. N.C. State Highway Commissionv. Asheville School, Inc., 173 S.E.2d 909, 913 (N.C., 1970).
Section 55, p. 499 of 26 Am.Jur.2d "Eminent Domain" sets forth the general rubric followed in our state:
 "The general rule is settled that the exercise of eminent domain for a public purpose which is primary and paramount will not be defeated by the fact that incidentally a private use or benefit will result which would not of itself warrant the exercise of the power.
See Katz v. Brandon, 156 Conn. 521, 533 (1968); Barnes v. New Haven,140 Conn. 8, 15 (1953), cf. Water Commissioners v. Manchester 87 Conn. 193,203 (1913).
But again, the corollary of this is that "It is a well-established principle that incidental benefits accruing to the public are not sufficient to make the purpose of an improvement or enterprise a public one," § 56 Am.Jur. article at p. 500.
First, the court will examine the wording of Chapter 132. What is its primary purpose — what does the legislature define as the public use that the legislation hopes to achieve? Then the question must be asked whether, despite that statement of purpose, the structure and wording of the act make clear that the purported public purpose is only an incidental factor to the operation of the act with private business being the primary beneficiary of legislative activity.
The public use objectives of Chapter 132 and what the legislature hoped to achieve through the creation of municipal development plans which would sometime require the use of eminent domain and lead to the placement and growth of private industry in project areas is set forth in § 8-186 of the chapter.
Section 8-186 indicates that the motivating force of the legislation lies in the recognition that the state's economic welfare "depends on the continued growth of industry and business within the state." It goes on to state that the acquisitions and improvements in project areas "often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost." The section then says permitting and assisting municipalities to acquire and CT Page 3101 improve (the areas subject to the act) . . . and in distressed municipalities, to lend funds to businesses and industries within a project area in accordance with such planning objectives are public uses and purposes for which public monies may be expended. . . ." Under §8-190 the DECD commissioner is authorized to make planning grants to assist municipalities in the planning of projects. If a municipality is designated a "distressed municipality" under § 32-9p of the General Statutes, these planning grants may be made up to one hundred percent of planning costs.
Section 8-195 talks of development grants that can be made by the commissioner once a plan is approved. Lower pay back to the state is provided for if the community is a "distressed municipality." Subsection (d) states that: "In allocating funds available for the making of development grants, said commissioner is authorized to establish priorities among municipalities, taking into account their relative needs for development projects, the effect of proposed projects on existing housing and the extent to which particular projects are likely to advance the purposes of this chapter."
Is legislation designed to foster economic growth and development, especially in distressed cities, an expression of an appropriate public purpose when the public use envisaged as the end product of government activity will mean private property must be taken and other private parties will at least in part secure a benefit because their industrial and business activities are encouraged? Is this an appropriate public use that can be embodied in legislation that will pass muster under the state and federal taking clauses?
The answer federally[9] and under our state constitution appears to be yes. The plaintiffs seem to provide the answer in their own initial brief where at p. 33 they say: "Only one Connecticut appellate case upholds a condemnation for something approaching simple economic development — the creation of an industrial park in Bugryn v. Cityof Bristol, 63 Conn. App. 98 (2001)." This court is only a trial court and would be bound by the rulings of the appellate court. But query whether the Bugryn faced the issue of whether simple economic development is a public use. At one point, the court said the question was not "disputed" by the parties, id. p. 104, although earlier it did say one of its tasks was to determine whether the trial court was clearly erroneous in its "factual finding that the industrial park constitutes a public use," id. p. 103, and it is interesting to note that in Bugryn the industrial park project plan would have necessitated the acquisition of residential property, 63 Conn. App. at pp. 103 and 109.
In any event, Supreme Court cases under Chapter 130, our Redevelopment CT Page 3102 Act, indicate that that court is likely to conclude that condemnation for simple economic development will be upheld. Two cases after Gohld RealtyCo. v. Hartford, 141 Conn. 135 (1954), go beyond the reasoning of Gohld
in judging the propriety of municipal action under the Redevelopment Act. Gohld merely said slum clearance is a public benefit in and of itself and locating private industry in a redevelopment area is also a benefit because it will prevent the recurrence of slums. In Graham v.Houlihan, 147 Conn. 321 (1960), the court pointed out that the Redevelopment Act reads in the disjunctive. The declaration of public policy in the statute is a broad one — it refers to the fact that a redevelopment area is an area within the state which is deteriorated, substandard or detrimental to the safety, health, morals or welfare of the community, id. p. 327, 329.
At p. 329, it notes that, "The conditions in the definition of a redevelopment area as stated disjunctively. The agency could establish a redevelopment area if one or more of the conditions are met." Then it goes on to interestingly say in referring to the neighborhood before the court:
 "While not a slum, it nevertheless has a large proportion of substandard wooden structures located on small lots and is bordering on a complexity of poorly arranged streets."
(and perhaps even more interestingly, the court goes on to say:)
 "In these days of advanced city planning and urban improvement the city authorities could properly conclude that there was a probability of greater benefit to the whole community if the land in the area could be put to better use," id. p. 329.
The language in Katz v. Brandon, 156 Conn. 521 (1968), which, as will be discussed is relevant to another issue to be addressed in this opinion, also is on point on the present issue of whether condemnation for simple economic development can be a public use. It cited Gohld and its slum clearance language, but also like Graham, waxed expansive first describing an area that hardly sounds like a classic slum then offering a reason for exercise of the eminent domain power:
"The Underwood location was under study as a possible redevelopment area from 1950 until 1961 prior to its being declared a renewal area. Factors which brought the Underwood redevelopment to the CT Page 3103 fore in 1961 were its mixed uses and housing close to factories, periodic flooding of the area, and the east west highway. Because of these conditions, it was a natural renewal area to develop. In this day of keen competition, to attract industry and business to a state or to a particular locality, public officials are expected to cooperate in helping an industry to locate in their community. They must be at all times alert in providing for future as well as present needs."[10]
From reading many of these cases, one gets the feeling that in the eminent domain area each state court seems to operate in its own little universe. But in ascertaining the proper parameters of a state taking clause and the use of eminent domain power thereunder it is not unhelpful to look at how the states in general approach a problem. It is done when trying to define due process standards, why not when examining an eminent domain clause in a state constitution.
Generally speaking, and moving outside of Connecticut many states support the view that pure economic development is an appropriate public use justifying exercise of the power of eminent domain; that is certainly the federal view as discussed in a previous footnote. The articles cited in that footnote indicate this appears to be the prevailing view among the states. Nichols at § 7.07(1) states that: "In general, eminent domain may be used to help a private enterprise if the primary goal of the taking leads to a project that will eventually promote the public welfare or advantage." Economic development will certainly do that and is especially needed in economically distressed areas which are, because of that very condition, less likely to attract development money from capital markets without government assistance. Poletown NeighborhoodCouncil v. City of Detroit, 304 N.W.2d 455 (Mich., 1981) is a leading case in validating use of eminent domain power for economic development purposes in a particular project area, other leading cases are City ofJamestown v. Leevers Supermarket, Inc., 552 N.W.2d 365, 369 (N.D., 1996); City of Duluth v. State, 390 N.W.2d 757, 763 (Minn., 1986); In theMatter of Northeast Parent Child Society, Inc. v. Schenectady,494 N.Y.S.2d 503 (N.Y., 1985).[11] There are certainly cases taking an opposite view; see, for example, the powerful dissents in Poletown itself by Justices Fitzgerald and Ryan, also see Opinion of Justices,131 A.2d 904, 907 (Me., 1957); Hogue v. Port of Seattle, 341 P.2d 171,187 (Wash., 1959), cf. Sweetwater Valley Civic Assoc., Inc. v. City ofNational City, 555 P.2d 859, 863 (Cal., 1976); Williamington ParkingAuth. v. Land with Improvements, 551 A.2d 227 (Del., 1987). These latter cases appear to be in the minority and at least some of them, likeOpinion of Justices, supra, and Hogue v. Port of Seattle, suffer from a CT Page 3104 valid criticism in Nichols at § 7.02(2), p. 7-28: "The cases which lend support to the narrow reading of public use are numerous, but the force of many of these decisions is weakened by an erroneous belief that `public use' determinations are solely the province of the judiciary without regard to legislative pronouncements on the issue." In any event nothing in the state of the law throughout the states would lead this court to believe the legislative purpose expressed in Chapter 132 violates the general sense of what is an appropriate public use justifying in some circumstances use of the eminent domain power.
The court finds the statement of purpose in § 8-186
constitutionally acceptable despite the fact that the power of eminent domain is authorized as a mechanism to effectuate projects under Chapter 132, which will encourage private development. Economic growth and its encouragement, especially in "distressed municipalities" is a valid public use because it obviously confers a benefit to all members of the public.
The next question to be examined in what might be called a facial examination of the act is whether there is any other language in Chapter 132 apart from its statement of purpose in § 8-186, which indicates that its primary purpose is not the acceptable ones stated therein but a mechanism to primarily private business with only incidental benefit to the public. Just the contrary is indicated. The court has earlier discussed the various provisions of the act and will now reemphasize those that belie any notion that it was meant to be a boondoggle to business. Why would special favor be given to "distressed municipalities" — there is no reason to think business would be more desirous in taking a chance in such project areas as opposed to more economically viable areas of the state. Section 8-195 requires the project plan to contain a statement on the number of jobs that will be developed by any project under the act and the housing situation in the community. There must be a finding that any plan comports with local, state and regional development plans and "that the project will contribute to the economic welfare of the municipality and the state." As noted, "distressed municipalities" are given special preference with regard to planning and development grants without regard to how this will affect business interest. And § 8-195 (d) indicates the DECD commissioner can allocate funds under a prioritization system that can take into account the municipalities' relative needs for development projects — not the needs of businesses already within project areas or desirous of moving in or near them.
In conclusion, the court finds nothing in the language of Chapter 132 authorizing use of eminent domain power for the purpose of accomplishing economic development in designated project areas violative of the federal CT Page 3105 or state Eminent Domain clauses of their respective constitutions.[12]
 C.
Because Chapter 132 on its face and as regards its indicated mode of operation does not raise constitutional concerns that does not mean that in its application there might not be sufficient reason to enjoin a taking pursuant to a project plan created under its auspices. Even the majority in Poletown had the following to say:
 "Our determination that this project falls within the public purpose, as stated by the legislature, does not mean that every condemnation proposed by an economic development corporation will meet with similar acceptance simply because it may provide some jobs or add to the industrial or commercial base. . . . The power of eminent domain is restricted to furthering public uses and is not to be exercised without substantial proof that the public is primarily to be benefitted. Where, as here, the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced," 304 N.W.2d at pp. 459-460. (Emphasis added by this court.)
The article on eminent domain in Am.Jur. underlines the deference courts give to that body's declaration that a use is public. But after that deference is given . . . "inquiries for judicial review are whether the expressed use is a public one, and whether the condemnation results from bad faith or arbitrary and capricious motives," 26 Am.Jur.2d at p. 503.
In Gohld the court said:
"It is, of course, conceivable that the power of eminent domain granted by the act may be abused in isolated instances. There may be attempts to use it for some ulterior purpose not contemplated by the act. See Farist Steel Co. v. Bridgeport, 60 Conn. 278, 292. . . . Such a possibility does not militate against the constitutionality of the act, which very clearly delimits to the purposes for which property may be condemned. When taken for those purposes, property will be subject to the public use. There is CT Page 3106 nothing in the stipulation of facts in the present case to indicate that the Hartford Redevelopment Agency will condemn land in the Front-Market area for any ulterior purpose. If, in some other case, it should be urged that a proposed taking is not in reality for a public purpose, we will have to consider that claim when it is made," 141 Conn. at p. 145.
Barnes, discussing the exercise of eminent domain power, said the primary question despite the fact that certain individuals may be benefited by a project is the "question whether it primarily serves, in a reasonable manner, to promote the public welfare,"140 Conn. at pp. 14-15.
Discussing the Redevelopment Act, the court in Graham said: "The determination of what constitutes a Redevelopment area and what property is to be taken is primarily a matter for the redevelopment agency, and its decision is open to judicial review only to discover whether it has acted unreasonably or in bad faith, or has exceeded its powers,"147 Conn. at p. 328. For this proposition, see also Water Commissioners v.Johnson, 86 Conn. 151, 159; Bahr v. O'Brion Corp., 146 Conn. 237, 250;C.L. P. v. Huschke, 35 Conn. Sup. 303, 306 (1979). See Broadriver,Inc., where the court used the same test to determine whether Stamford Redevelopment Agency was unreasonable and in bad faith because in part the plaintiff's property was taken for a private purpose favoring preselected developers, 158 Conn. at p. 531.
Many of the plaintiffs' objections to these takings can be discussed within the framework of these cases and principles — that is, were the takings unreasonable and done in bad faith or were they capricious and arbitrary?
 1.
One of the main issues raised by the plaintiffs is that the Fort Trumbull project has been controlled by Pfizer and major decisions on its progress have been made to satisfy Pfizer demands and interests.
 (a)
A related concern is whether, in fact, the development plan is of primary benefit to Corcoran Jennison, the developer, and private businesses which may eventually locate in the plan area, and in that regard, only of incidental benefit to the city. The court will first discuss Pfizer. CT Page 3107
This particular issue raised by the plaintiffs is related to a broader complaint that they have with the use of eminent domain power for what the plaintiffs characterize as pure economic development." Such a use would not be a "public use" because then, nothing would then be a private use. Every residence would be subject to condemnation because it does not generate jobs or taxes as a business does. In other words, the plaintiffs argue "`Public Use' must have some meaning or it would not appear in the constitution. It cannot encompass all private commercial endeavors, "(p. 31 of first plaintiffs' brief). In other words, if pure economic development is permitted, there is a complete lack of criteria for determining whether the economic development in a particular case benefits the public or in reality is of primary benefit to private interests with the public benefit being merely incidental.
From that perspective the alleged Pfizer control and running diktat over this project is just an extreme example of the problems created when eminent domain is used to foster economic development by private businesses. The plaintiffs, as they have throughout these proceedings, raise valid concerns, but the argument goes too far. There are, in fact, limits on the constitutional propriety of using the power of eminent domain for what the plaintiffs have called "pure economic development" and there are limits and criteria to determine whether in a particular instance a company like Pfizer has so directed the formulation and operation of a development project as to make such a plan of paramount benefit to that private interest.
In fact, insofar as there are such limits "public use" does have a meaning. One such limit adopted in the case law is the so-called "heightened scrutiny" test to determine the validity of a taking where eminent domain power benefits specific private interests. The Poletown
court suggested such a test is appropriate in a case where economic development was the justification for condemnation which would benefit a large corporation. 340 N.W.2d 459. In Bugryn, our Appellate Court held that it need not apply such a test and said "our Supreme Court has not applied a heightened standard of review in previous disputes about the nature of a taking." 63 Conn. App. at footnote 7. But where private interests will be benefitted by condemnation it would appears that our courts look closely at the taking to see if it passes constitutional muster. See Gohld Realty Co. v. Hartford, supra, Conn. 421, 428 (1913). Such close examination is peculiarly appropriate in fact when the taking is for the stated purpose of economic development because the danger is presented that powerful business groups or companies will exercise their influence to gain their ends with the prospect of little corresponding benefit to the public. The slum clearance cases are "easier" in the sense that even if private developers move into cleared land, the area that has CT Page 3108 been cleared was in fact a slum or blighted and its removal is of obvious benefit to the public.
Where the purpose, however, is economic development and that development is to be carried out by private parties or private parties will be benefitted, the court must decide if the stated public purpose — economic advantage to a city sorely in need of it — is only incidental to the benefits that will be confined on private parties of a development plan. As said in 26 Am.Jur.2d, § 56, p. 501, "Eminent Domain," "The controlling question is whether the paramount reason for the taking of the land, to which objection is made is the public interest, to which private benefits are merely incidental, or whether the private interests are paramount and the public benefits are merely incidental."
What considerations do the courts take into account in deciding this issue? Only two Connecticut cases touch on the problem directly. Katz v.Brandon, 156 Conn. 521 (1968); and Bugryn v. City of Bristol,63 Conn. App. 98 (2001). Katz arose under the Redevelopment Act. Plaintiff homeowners claimed the initial purpose of the redevelopment project was not to benefit the general public but to provide a large Hartford corporation with a private parking lot at a price much lower than it would have to pay in the open market. The court first found that the area to be condemned met the criteria of the act for redevelopment, id., 527, and rejected the plaintiff's argument that there was a bad faith reason for the exercise of eminent domain power. The court said: "There is nothing in the record to indicate that any conveyance of land has been made to Olivetti or that any agreement or understanding exists which would provide it with any advantage which is not available to others as redevelopers. Id., 534.
In Bugryn the plaintiff claimed the underlying purpose of the condemnation was to retain a particular manufacturer, Yarde Metals, within the city. The court rejected the claim by adopting the trial court's finding that: "Although the city had numerous discussions with and made plans to have Yarde Metals as an anchor tenant in the proposed industrial park no agreement or contract, written or oral, was made with Yarde Metals. Furthermore, and more telling, the evidence shows (that) the city plans on developing the industrial park whether or not Yarde Metals indeed becomes a tenant." The court went on to conclude that even if Yarde Metals were later on to become a tenant . . . "a consequence that would be neither undesirable to the defendants nor adverse to the goals if the park plan seeks to achieve, that fact would not support the plaintiffs' claim in light of the ample evidence in the record concerning the plan as a whole. `Where the public use which justifies the taking of the area in the first instance exists, an element over which there is no CT Page 3109 controversy in the present case, that same public purpose continues even though the property is later transferred to private persons.'" Id., 103-04.
In other jurisdictions the court has found two cases that offer interesting tests to determine whether the purpose of a taking wasprimarily to benefit the public and, therefore, constitutionally acceptable. In Wilmington Parking Authority v. Land with Improvements, etal, 521 A.2d 227 (Del., 1986). There, at p. 624, the court said, referring first to two of its earlier decisions:
 "Taken together, the Ranken and Randolph decisions indicate that a primary purpose determination in a constitutional context will normally turn upon the "consequence and effects" of a proposed project. However, those decisions also suggest that a reviewing court may consider evidence concerning the "underlying purpose" of a public authority in proposing a project. A recent Florida case, decided on constitutional grounds, also supports the position that evidence concerning the views of persons intimately involved with the initiation of a project is relevant to determining the "true purpose" of a taking. See Baycol, Inc. v. Downtown Development Authority, Fla. supr. 315, So.2d 451 (1975). In rejecting the alleged public purpose of a taking, the Baycol court found "interesting" the testimony of a witness for the authority which suggested that he was unfamiliar with the public parking aspect of a multi-purpose project. Id., 458."
In the Wilmington Parking Authority case, the court upheld the trial court's finding that the taking was improper. The primary purpose was not to provide parking for the city; the record made clear that the primary purpose of the project was to benefit the city by retaining a specific corporation as a corporate citizen and primary beneficiary of the project would be that corporation which has a need for parking.
In Merrill v. City of Manchester, et al, 499 A.2d 216 (N.H., 1985), at p. 217, the court said:
"In determining whether the purpose for which property is being condemned is a public use, we must accordingly consider the extent to which the proposed project will benefit the public. . . . The net benefit to the public will consist of the benefits of the CT Page 3110 proposed project and the benefits of the eradication of any harmful characteristics of the property in its present form, reduced by the social costs of the loss of the property in its present form. If the social costs exceed the probable benefits, then the project cannot be said to be built for a public use. In such a case, the true benefits of the project will accrue only to its private sponsors and participants, and the use of the power of eminent domain will violate the public use requirement of part I, article 12 of the State Constitution."
Katz and Bugryn in a rough way adopt the motivational test and weighing of benefits tests used in these out of state cases.
The court has reviewed the record and will discuss the Pfizer involvement in the project first. Was benefit to the public the paramount object or was any public benefit merely incidental to benefitting Pfizer?
In this case, the record is a mixed one if not rather confusing. The general counsel for Pfizer testified. He said Pfizer made a decision to build its global research facility in New London at the end of 1997 and made an announcement to this effect in February, 1998. Pfizer only had three conditions for locating in the city — that the sewer treatment facility be renovated, that the park be restored and that the city leverage the coming of Pfizer to its own advantage. Pfizer never made demands as to the location or formulation of potential uses according to this witness, not even as to a hotel and conference center. On the other hand, certain Pfizer functions would benefit or create opportunities for the city — high level employees would want upscale residences and various guests would come to Pfizer for business purposes. The latter factor might indicate extended stay facilities or a hotel would be a feasible prospect for the city. Pfizer itself could live without the prospect of a hotel and never took a position on use of the eminent domain power according to this witness.
On the other hand, the executive director of NLDC wrote Dr. Milne, president of research at Pfizer, on December 15, 1997 and mentioned commitments the NLDC was prepared to make to Pfizer. She said the commitments are "to enable you to decide to construct a Pfizer Research facility in New London." The "development of mixed retail and residential space" was talked about in the letter. Based on commitments from the state "residential and commercial properties will be acquired." No mention is made of a hotel or office buildings, however, or any direct link between new residential construction and any need by Pfizer executives for CT Page 3111 upscale housing. Ms. Gaudiani's letter did conclude with the following, however: "Thank you very much for your consideration of this proposal. We will work with you to refine this proposal to meet Pfizer's requirements." Apparently at about the same time New London's city manager wrote to Dr. Milne; the subject of this letter was "Commitments of the City of New London. The letter talked of transferring to Pfizer the land area on which their facility would be built — the land is not included in the MDP. Zoning regulations would be changed and Mr. Brown said New London would prepare a Redevelopment Plan for the Fort Trumbull area. Transfer of naval property to the city was discussed and enterprise zone tax benefits for Pfizer. No mention was made of a hotel office space or upscale housing.
In July, 1998, the NLDC hired a planning consulting team for a final environmental assessment under our Environment Protection Act. They worked on the preparation of an environmental impact statement which led at the same time to the creation of the Municipal Development Plan.
Mr. Mahoney was the former director of the NLDC from April, 1992 to November, 1998. He was asked if representatives of Pfizer were involved in the formulation of or discussion of development plans for the Fort Trumbull area. He said during his time there were such discussions. Pfizer representatives were involved in the initial stages including the drafting of the environmental impact statement. From Mr. Mahoney's perspective, Pfizer had already committed to come to New London; the discussions being referenced here occurred after that Pfizer announcement in February, 1998. Mr. Mahoney said the NLDC was attempting a market analysis of the most profitable uses for the development area so that was a reason to learn of Pfizer's uses and requirements. He denied that Pfizer made demands as such but Pfizer did say they had a need for a hotel and conference center. The company also said that they had relationships with other companies that might support a need for biotech office space.
Mr. Hicks also testified he was a part of the planning and consulting team that worked on the environmental impact statement and prepared the MDP. He said Pfizer's coming was a unique chance for New London — companies like that usually go to the suburbs not "brown sites" like New London. Two factors drove the planning, Pfizer's coming and the availability of the Naval Undersea Warfare Center (NUWC). The big goal was to take advantage of Pfizer's arrival; a company like that attracts other users, people who provide services to the Pfizer operation. Hicks turned to the Pfizer site to see what its needs were. Pfizer did say they wanted a four-star hotel and conference center. Hicks also noted that New London's housing stock did not include much in the way of upscale housing. Pfizer created a need for more diversified housing which under CT Page 3112 the plan eventually adopted translated into expensive attached housing to be built on one of the MDP parcels.
During the course of the preparation of the MDP, James Serbia, a Pfizer employee, sent a communication to Pfizer's Milne. Serbia was apparently a contact person between Pfizer and the NLDC and the group formulating the MDP. The e-mail or letter says "Importance: `High.'" Mr. Serbia tells Milne that he left three drawings that depict the NLDC's latest concept plans. It goes on to say "There seems to be some confusion regarding the expectation that Pfizer (you in particular) has regarding the development of the peninsula." (i.e. the Fort Trumbull area.) Serbia says the NLDC indicates an original conceptual plan was used at two key meetings — one involving Milne, the state and the city — and this plan indicates the commitments to Pfizer. It then goes on to say
 "I think what it boils down to is whether or not Pfizer is flexible regarding the development plans — I believe the answer is yes per all our previous discussions on this — as long as some key components are included:
 — a residential component which would be attractive to professionals.
— a hotel/conference component.
 — treatment plant upgrades/state park/etc. and commercial or retail development to make the area an attractive place to visit/work.
The communication indicates the state has difficulty supporting upscale residential developments in a flood plain area and having such a development replace existing businesses and residences. Serbia then asks Mr. Milne to "clarify the following" — would 70-80 high end residential units "fit with your expectation; is the plan for a hotel with 250 units, currently shown on the plans, `high, low or ok?'" In fact, the final MDP and current plans for the area do include a "high end" residential area with the approximate number of units referred to by Serbia and with a hotel with the approximate number of rooms indicated in his communication to Milne. It should be noted that there is no mention in the Serbia communication of the need, for example, to clear the entire Fort Trumbull area of residences and no reference to the need to erect office buildings — those buildings which according to the MDP would require the removal of those properties of the plaintiffs' located on parcel 3. CT Page 3113
The hotel under the MDP is to be located in parcel 1, the residential units in parcel 2; Serbia does not mention parcel 3 where the office buildings are to be under the MDP nor does Serbia refer to parcel 4A. In fact, nothing in the record by way of communications to Pfizer or by Pfizer or by testimony by witnesses who refer to or represent Pfizer mentions directly parcel 3 or 4A except, perhaps, the Gaudiani letter which is somewhat vague.
It should also be noted that the team appointed by the NLDC and working on the environmental impact study which led to the MDP while Serbia was communicating with Milne did consider six possible development alternatives. One proposed no changes to the Fort Trumbull area except the development of the park — under this proposal no property would be taken by eminent domain. Two other alternatives considered permitted retention of a portion of the residential and commercial property. The writers of the MDP felt it necessary to include a fairly detailed discussion as to why they chose an alternative or actually an alternative representing a combination of proposals that contemplated the acquisition of all residential properties within the Fort Trumbull area and there was no reference to Pfizer or its needs or desires in this regard.
But in considering this issue, the court will not only rely on tidbits of information to try to guess motives or purposes. It would be entirely one sided to go through the record and catalogue contacts and communications between the private party, here Pfizer, and the public officials formulating a development plan. Evaluation of the goals, motives and interests of public officials regarding such a plan must also take into account the social and economic realities facing them as they embarked on a project under Chapter 132. To do this properly, the Fort Trumbull area cannot be considered in isolation but must be viewed in the context of the community in which it is located — that community is the City of New London.
What is New London's situation? New London has been designated a "distressed municipality" by the state Office of Planning and Management. Since 1970 the population of New London has been declining. It has a higher rate of unemployment than the region where it is located and than the state. The Naval Undersea Warfare Center has closed down along with two other uses supported by NUWC, which delivered a substantial blow to the city's economy. Housing starts are almost nonexistent and there has been little reinvestment in the city. The housing stock itself is largely lower cost housing and Mr. Hicks testified that there is a need to diversify the housing stock to include higher income housing. Mr. Hyde who is director of real estate for the city testified that the "distressed municipality" classification takes into account all these just mentioned factors — age of the housing CT Page 3114 stock, lack of economic growth, and population growth, a high percentage of poverty and of subsidized housing. New London is a small city with relatively little open land to develop. It also has a high degree of non-taxable property — 56 percent.
The people preparing the MDP had available to them information in several reports corroborating the foregoing bleak picture. The Environmental Impact Evaluation (EIE) completed in November, 1998, reported the city's population had not been lower since 1930. Its unemployment was 7.6 percent, whereas Norwich was at 6.3 percent, Groton at 4.7 percent, and the state at 4 percent. Over the past twenty years, the city's economy has been outperformed by the region and the state. The regional labor market was up 45 percent, the state 40 percent and New London 17 percent. Sixty-one percent of the city's housing was built before 1950 with a high percentage of vacant housing. Six alternatives for the area were examined — the EIE estimated the impact on job production and housing of each alternative in some detail. As regards the Fort Trumbull area itself, there was an 82 percent vacancy rate for non-residential buildings and a 20 percent rate for noncommercial property. The tax revenue for this entire 90-acre area is only $325,000, which is considered low. A building inventory dated December 11, 1998, indicates that 50 percent of the construction in the Fort Trumbull area was pre-1950. Non-residential buildings were in poor shape with only two ranked high in long-range market potential. Less than 12 percent of residential buildings were on average or better condition in December, 1998. Since 1990, the report says existing buildings in the area have undergone minimum private investment with some sections of Fort Trumbull suffering from disinvestment and owner neglect. This certainly cannot be said of any of the plaintiffs' properties, however. They all seem to be in fine condition and many of these plaintiffs have spent considerable time and resources in maintaining their property and the court so finds. But this latter observation does not detract from the general picture of the condition of the Fort Trumbull area at the end of 1998 which was illustrated by the previous discussion.
Given all of these factors and returning to the earlier discussion of the Katz, Bugryn, Wilmington Parking Authority and Merill cases, how should the court decide the issue of whether the primary purpose of this project was to benefit Pfizer or at least whether that will be the predicted result? What are the benefits to the city? What are the benefits to Pfizer? How should these matters be weighed?
As just indicated, Pfizer made clear that it wanted upscale residential housing and the MDP did provide for such housing in one of the parcels. Pfizer also wanted a four star hotel with conference facilities and an athletic club, all of which were included in the MDP. On the other hand, CT Page 3115 even Professor Mullin, the plaintiffs' expert and a man of impeccable credentials, testified that he liked the idea of a hotel — New London has a need for a high end hotel. A hotel would be very appropriate for New London given Pfizer's growth and its desire to have that use. He also noted that the hotel would be on the water — a tourism factor, and Pfizer was, in fact, backing the hotel — Pfizer agreed to in effect subsidize a large number of rooms. Professor Mullin's testimony just states the obvious. In the communications with Milne from the city manager and the director of the NLDC prior to Pfizer's announcement of its development plans there is no commitment to build a hotel. Pfizer made the specific demand after it had already decided to come to New London so it is hard to make a quid pro quo deduction — Pfizer's general counsel said if there were to be no hotel Pfizer visitors could use other hotels in the area. Also, it would appear that for the hotel to be built Pfizer had to agree with the developer that it would subsidize the occupancy of up to 100 rooms in the projected 200-room facility. That appears to be an odd twist — New London could use a fine hotel, New London will not get such a hotel unless the big corporation subsidizes its operation to a certain extent — who is doing the favors for whom? In any event, hotel construction will create construction jobs. The operation of a hotel will ensure the employment of many people in various positions from unskilled workers to management personnel. Insofar as a four star waterfront hotel will draw in tourists, this will foster the city's goal of tying in the Fort Trumbull area development with attempts to rejuvenate downtown.
What are the prospective benefits to Pfizer or the city with regards to so-called high end housing? The record is mixed on this question. High end residential housing was not specifically alluded to in the city manager and Gaudiani, December, 1997 communications prior to Pfizer decision to come to the city, but it is certainly true that Pfizer appears to have strongly advocated for their construction, even requesting a certain number which reflected Pfizer's needs. There was testimony that the nature of New London's housing stock was generally not good in the sense that there was little in the way of high end housing. But there was little elucidation as to why 70, 80 or 90 high end attached residences would have a significant effect on the housing picture and why that is so important, and how it could be so important when all this high end housing is concentrated in one small area of the city as opposed to being distributed throughout the city — where is the multiplier effect and without that the only consequence of such construction will be an increased tax base.
Who benefits from the plans for parcel 3 or parcel 4A? The plaintiffs' properties are located in parcel 3 and parcel 4A. In parcel 3, office buildings are planned. As previously discussed, in no communication or CT Page 3116 testimony that the court is aware of did Pfizer express a demand for office space nor was Pfizer promised anything in that regard. Pfizer indicated that biotech companies that dealt with it might be interested in office space, but there was no indication that this was an interest Pfizer had. It seemed to the court that it was presented as a suggestion by Pfizer that could assist the NLDC or developer in deciding on the feasibility of having such a use or perhaps the extent of such a use. As to parcel 4A, Pfizer expressed no interest or desires as to its potential use and there is nothing on the record as to how any proposed use of this parcel will benefit Pfizer, especially in light of the vague nature of the suggested use at least as set forth in the MDP.
Given the fact that Pfizer was not involved in any ascertainable way in pushing for office buildings on parcel 3 and will only tangentially benefit from such a use, if at all, since the developer determines tenants for the offices, not Pfizer, given the just mentioned total lack of involvement of Pfizer in anything to do with parcel 4A, and added to the fact that the hotel use will benefit Pfizer but also has the substantial possibility of benefiting the city the court cannot conclude that the primary motivation or effect of this development plan as regards parcel 3 and 4a was to benefit this private entity. It would seem to the court that the primary motivation for the city and the NLDC was to take advantage of Pfizer's presence. Also turning to the economic realities of the situation, this project could not to the present have gone forward nor will it advance in the future unless the state funds it. The state has already contributed over $70 million to the project. What possible motive would the state have in catering to Pfizer and being primarily concerned with that company's interests as opposed to New London. There is no indication, for example, that Pfizer was entertaining the idea of building its research facility out of state, let alone that if it could not count on the fact that the Fort Trumbull area would be developed some other state would get the facility. Under § 8-195 (d), the state, acting through the DECD, can set priorities in awarding development grants to our cities and one of the considerations is the development needs of a city. There is nothing to indicate the DECD had anything else in mind than helping this "distressed municipality" when it approved the MDP and bankrolled it. Not a surprising conclusion, given the city's distressed condition as previously discussed.
It is certainly true that at least the city and the NLDC made great efforts to attract Pfizer to New London and accommodate its needs in ways that also benefitted the City of New London apart from Pfizer. But as said over thirty years ago in Katz v. Brandon, supra, quoting from an earlier case:
"In this day of keen competition to attract industry CT Page 3117 and business to a state or to a particular locality, public officials are expected to cooperate in helping an industry to locate in their community. They must be at all times alert in providing for future as well as present needs," 156 Conn. at p. 533.
This observation is especially to the point when those public officials represent a "distressed municipality" with the economic problems and limited development opportunities of a city like New London.
 (b)
What about the other aspect of the private-public benefit issue in this case as to who is the primary beneficiary of the development project? That is, is there indication here that overall, especially as it relates to parcel 3 and office building construction, the project will primarily benefit the developer and the businesses who might be induced to locate in this area and only benefit the public incidentally?
There is nothing in the record to indicate that as regards this project as a whole or considering parcel 3 and its planned office building separately that the city or the NLDC were motivated by a desire to aid particular private entities. The developer was chosen from a group of applicants. Space in the projected office buildings has not been rented yet. There is indication that there will be an attempt to link this development project to rejuvenation of the downtown area. The state has poured money into this project being aware of all of these factors. Also,Gohld Realty Co. had no problem with the fact that after the exercise of eminent domain resulted in the clearing of a slum area, the area. could be turned over to private persons — this will prevent the project area from reverting to its slum status, 141 Conn. at p. 143. The court fails to see a relevant constitutional distinction between redevelopment cases and a situation such as this where the very fact of permitting economic development by private entities permits an economically struggling city to attempt to rejuvenate its downtown area, increase its job market, improve its housing stock and give it sufficient tax money to meet its needs.
All of this is not to say that implementation of the MDP will not entail a heavy social cost. An old New London neighborhood with all its memories, in effect, has been destroyed. People, like the plaintiffs, have been or might yet be removed from homes they love and in some cases from homes where their families have lived for generations. On the other hand, considering this against the economic benefit to the city that it is hoped will be effectuated by this plan, a benefit all the plaintiffs CT Page 3118 say they are in support of, it is also true that the Fort Trumbull area had a high residential and business vacancy rate. The prospect of economic development in the Fort Trumbull area, as it existed prior to the MDP, would not have appeared to have been great and really no direct evidence was presented on that point.[13]
In any event, the court concludes that the Pfizer connection to this plan or the fact of a private developer involvement or future private business occupation of the site does not dictate a conclusion that the condemning authority acted in bad faith or unreasonably or that therefore in this particular case the taking was not for a public use.
 2.
The plaintiffs also argue that the takings here were arbitrary and unreasonable and therefore not reflective of seizure for public use for another reason related to the unbridled power of the NLDC in administering this plan. The plaintiffs point to the fact that changes were made to the MDP without city approval. The plaintiffs focus on the fact that the city council has apparently left it up to the NLDC to decide what changes to the plan are minor and what changes are substantial or major. If a change is substantial under § 8-200 (a), the development agency cannot modify the plan but the "modification must be approved in the same manner as the development plan." Insofar as some of the objections raised by the plaintiffs are dealt with in the earlier discussion on delegation to the NLDC, the court would refer to that discussion. The main thrust of the plaintiffs' argument in this section can be summed up in a statement in their brief to the effect that minor changes are the ones the NLDC wants to make and major changes are the ones it does not. The possible effect on public use simply is not part of the calculus." But what relevance, strictly speaking, all of this has to the "public use" question is unclear to the court. If the NLDC made a change to the plan which was, in fact, "substantial" and not minor in violation of § 8-200 (a) that does not mean ipso facto that the plan no longer expresses a public use or indeed that the particular modification is not itself a public use or in any way contradicts the purposes of the already approved MDP. The plaintiffs refer to a variety of changes in the MDP — various uses were shifted from parcel to parcel, buildings were allowed to remain that were not scheduled to do so in the MDP, effect on intensity of use was not taken into consideration, road alignments were changed. But not addressed is how all of this affects whether the MDP as modified does not comport with the requirements of a public use. If a use is intensified, for example, does that make it no longer a public use?
Is the plaintiffs' position rather something to the effect that if CT Page 3119 § 8-200 (a) is not complied with procedurally the whole MDP and attempts to act under it are invalidated? If a change has been made by the NLDC that it regards as "minor," but the change in fact is "substantial" or major does that invalidate the whole MDP or more exactly condemnations under the MDP that have nothing to do with that change? The MDP has a saving clause to the effect that if any portion of it is held to be invalid that will not invalidate other aspects of the project. In other words, office buildings under the MDP have been planned for parcel 3, that is still the plan.
None of the changes to the MDP made by the NLDC, whether characterized as major or minor, affect the planned upon use for parcel 3, i.e. office buildings. And it is this use which the defendants claim requires the takings. If the premise is accepted that pure economic development can provide a basis for exercising eminent domain power, especially given the circumstances this city finds itself in economically and with respect to the need for development and if the erection of office buildings is an appropriate mechanism to help achieve such development, then NLDC decisions as to minor versus major changes to the plan or aspects of the plan unrelated to these buildings or the purposes for which they are to be built have nothing to do with the "public use" question regarding these office buildings.
The plaintiffs also point to the fact that the attorney for the NLDC in trying to decide if a change were minor or major did not turn to the city council but contacted the DECD who sent him a document defining those terms which he used as a guideline. This document was not a regulation or an official DECD publication. In several pages of their brief, the plaintiffs go on to say that even if this DECD document is used as a reference, the suggestions in it were not even followed by the NLDC attorney in making his ultimate decisions as to modifications.
This is an interesting observation, in part, dealt with in the court's earlier discussion on delegation of power to the NLDC, but the point remains: what does the major-minor distinction and the way it was arrived at by counsel for the NLDC have to do with the separate analytical question of whether, in fact, the original MDP reflected a public use or whether the plan with the NLDC modifications still reflects a public use or if the modifications themselves can be defined as a public use. The point being that the major-minor decision procedure may present a problem regarding the issue of procedural compliance with the act and the issue of delegation with the act, but it is not directly related to the analytically separate issue of whether a modification will result in a use that is not public, even as regards the modification, let alone invalidating the public use characterization of the plan as a whole with the modification. CT Page 3120
On this whole issue of approval of changes to a development plan by a development agency, instead of a city council, the court could find only one case that has any bearing, Tierney v. Planned Industrial ExpansionAuthority, 742 S.W.2d 146 (Mo., 1987). In that case, the Tierneys, called the relators under Missouri procedure, owned land in downtown Kansas City which contained a structurally sound and usable building. The Planning Industrial Expansion Authority (PIEA) of the city instituted condemnation proceedings in accordance with Chapter 100, RS Mo. of the state statutes, the Planned Industrial Expansion Act. The act provided for the establishment of an agency, such as the PIEA "having the authority to acquire land in `blighted,' `insanitary,' or `undeveloped industrial' areas." The owners filed suit against the authority and others seeking a declaratory judgment that the condemnation proceedings were invalid and also damages on account of "condemnation blight," id. pp. 148-149. One aspect of the suit was the modification of the plan by the PIEA and the Tierneys', that is, the relators, `claim that this was improper.' At p. 154, the court said the following:
 Modification of the Plan "Relators complaint that, even if the PIEA plan approved by the council complies with the statutory requirements, that plan was substantially modified by the proposals of the private contractor ultimately adopted by the PIEA. The proposal changed the configuration of several streets and called for an office building on relator's property rather than a hotel as originally contemplated. The argument fails to take account of the time sequence established by the statute. The city council approval of September 28, 1982, furnished the jurisdictional basis for acquisition of the property in the blighted area. This came before the plan was made available to developers for bidding. Jurisdiction is not lost because of what PIEA and the developers may later agree upon. Nor are the owners specially aggrieved by changes made after their property has become subject to condemnation.
It could hardly be expected that all details for the planned development could be spelled out at the time of council approval, or even at the time the initial contract is agreed to. There is no way to determine which potential developers might show interest, or what kind of development they might consider CT Page 3121 economic. Changes may be necessary to meet changing economic conditions, if uses contemplated in the initial plan are adequately provided by other new construction. We will not read the statutes in such a way as to frustrate their effectiveness, especially in view of the legislative command that they be construed "liberally to effectuate the purposes.' Section 100.610. We are not persuaded that the modifications relied on by the owners represent a significant departure from the plan approved by the council. A "substantial modification' as described by Section 100.400.1 (10), such as to require council approval, should be read as to referring to a modification which would substantially alter the nature of the contemplated development. We find nothing of this sort in the record.
 The city council retains ultimate control over the plan and any modifications. Section 100.400 (10). The circumstances relied on by the owners do not divest the circuit court of jurisdiction over the eminent domain proceedings.
What the Missouri Supreme Court said about the modifications in that case can be said of the modifications here. They simply do not "substantially alter the nature of the contemplated development" let alone invalidate the public use for the development plan as a whole or as considered in themselves. The plaintiffs will surely note that the Missouri court said under their act the city council retains ultimate control over the plan and any modifications. As noted in the delegation discussion, although here the city is not a signatory on the development agreement, the state acting through the DECD is a signatory and through that status and their ongoing funding of the plan can monitor NLDC actions or failures to act. The DECD is one of the entities the NLDC would have to go to under § 8-200 (a) to seek approval of a modification if it were substantial.
Also, the modifications were filed with the city council. If the council does not approve of NLDC's actions, it can terminate its relationship with that agency at any time — the ultimate control mechanism. In fact, what was to prevent the city council, being made aware of the modifications from disagreeing with the NLDC's characterizations of the modifications as not minor but substantial and in effect initiating the approval process envisaged in § 8-200 (a) — nothing in the MDP, the city charter or Chapter 132 that the CT Page 3122 court is aware of at this point.
Suffice it to say that the court does not adopt the plaintiffs' position that the changes to the MDP by the NLDC somehow affects the public use characterization of the plan or in some way forestalls the exercise by the NLDC of any powers under the act, including eminent domain, on aspects of the plan having nothing to do with the modifications and their effect.
 3.
The plaintiffs discuss two issues regarding the future use of this property both of which are related to the question of public use. On the one hand, the plaintiffs argue that restrictions on future use are not enforced by the city. They also argue the unrelated proposition that the condemnations lack necessary assurances of future public use.
 (1)
The court will first discuss the claim that the restrictions on future use are not enforced by the city. The basic thrust of the argument is that "decisions about compliance with the MDP are decidedly not made by the city council, the body from whom the power of eminent domain flows" . . . "only the city council can decide if a use is public." Pp. 26-27 of first brief.
To support this argument, at one point the plaintiffs say: "The developer is supposed to abide by the purposes of the MDP, but the decision about whether those purposes are, in fact, being followed is made by a private property — the NLDC. The process for ensuring future conformity with the MDP is through `design review'. . . . A committee, including one representative from the city's planning and zoning department makes a recommendation . . . that recommendation then goes to the NLDC and the DECD, the state agency funding the project; they make the final decision." At a later point, the state is left out but the same theme continues: "As it stands, however, the NLDC and the developer decide future uses, even though they cannot make the decision that those future uses are public ones.
In answer to the plaintiffs' position, the court does not agree that the City of New London or its city council is the source of eminent domain power — that power does not "flow" from the city council. Nor does the city council decide, except in an implementary sense, if a use is public. The state acting through the legislature is the source of eminent domain power and the state can and has defined in § 8-186 of Chapter 132 the "public use" at issue in this case. Referring to the CT Page 3123 state legislature, our court said:
 "Under our form of government the sovereign people act, in determining the existence and extent of the public need (for the taking of property), through the legislative department, which . . . may act directly or through the medium of delegated power. Whether or not there shall be such delegation, and the scope of it, is a matter for legislative decision," Water Commissioners v. Johnson, 86 Conn. 151, 165 (1912).
Likewise, in Gohld, where the Redevelopment Act delegated eminent domain power to the local agency of a city, the court said:
 ". . . the determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power. When the legislature delegates the making of that determination to another agency, the decision of that agency is conclusive. . . ." 141 Conn. at p. 146.
The Bugryn court quoted this language and said the principle is "well settled," 63 Conn. App. at p. 107. This seems to be the law generally, 26 Am.Jur.2d, "Eminent Domain" at §§ 17 and 19. Also see Northeastern GasTransmission Co. v. Collins, 138 Conn. 582, 586-587 (1952), cf. City ofSan Francisco, et al v. Ross, 279 P.2d 529, 531 (Cal., 1955).
As mentioned in the Johnson case, the state can determine the scope of eminent domain power given to a municipality and as stated in the Am.Jur. article: "In delegating the power of eminent domain, the state may exercise a certain control. . . ." § 19, p. 464, cf. Joslin Mfg.Co. v. Providence, 262 U.S. 668, 674 (1923). The point is that under our statutory scheme, the state has retained for itself powers to ensure compliance with the MDP which the state and the city must approve before any development goes forward and there is nothing constitutionally wrong with that.
Here, the DECD must sign the development agreement which is the mechanism by which the MDP and its goals are accomplished, the state provides the funding without which nothing goes forward. "Design review" is the control mechanism which ensures compliance with the MDP which the city council had to approve in the first place. The court will not repeat the observations it made in the delegation section discussing the CT Page 3124 innumerable ways that city and state control the NLDC and the whole MDP process. Furthermore, as indicated in that section, the NLDC is not some independent "private" entity in the sense that the plaintiffs use that term.
Also, as pointed out by the defendant city in its brief, there are "definitive assurances of future public use" in accordance with the MDP which the city had to approve for it to be operational. The MDP states:
 The MDP and/or any modification hereof shall be in full force and effect for a period of thirty years from the date of first approval of this MDP by the City Council of the City of New London. Exhibit 38, MDP Section 12.0"
There are also "restrictions on the use of each parcel" as the defendant points out. Each redeveloper has to agree for itself and any successor in interest that any conveyance deed contain a covenant that:
 "The Parcel shall be devoted principally to the uses contemplated by the Plan, and shall not be used or devoted for any other purpose, or contrary to any of the limitations or requirements of said Plan. All improvements made pursuant to the Plan and this Agreement shall be used in accordance with the Plan . . .
 The Parcel shall not be sold, leased, or otherwise disposed of for the purposes of speculation . . .
 Redeveloper shall not sell, lease or otherwise convey any interest in, or permit use or occupancy of, the Parcel unless the transferee agrees to bind itself to the Redeveloper's obligations under this paragraph. Exhibit 38 MDP Section 6.2.1."
If a developer or assignee of a developer were to violate the terms of its agreement, the NLDC could turn to the courts for relief and perhaps the city could also do so or terminate the NLDC that refuses to take such action and appoint a new development agency. In any event, what was said in the Northeastern Gas Transmission Co. case applies here where there were also concerns about ensuring future use of seized property as a public use. The court, at 138 Conn. p. 589, said:
"Any legal obligation may, of course, be dishonored. That is one reason why courts exist. CT Page 3125 Should the plaintiff breach its duty in the manner suggested, there is ample judicial machinery available to the defendants to rectify the wrong. A claim of the nature under discussion can be made in almost every condemnation case. It amounts to nothing more than a legal bugaboo. By exercising the power of eminent domain granted by the act, the plaintiff becomes bound to devote the property acquired to the purpose for which the legislature has authorized the taking, namely, the transmission of natural gas for sale as specified."
 (2)
The plaintiffs have a more general concern regarding assurance of public use beyond what entity can or will ensure that use. They say when property that is taken "will be owned by a private party, courts require that there be assurances of future public use. Although lack of assurance of public use is a subset of lack of public use, it can be a separate legal basis for rejecting a condemnation." The Connecticut formula is easier to understand in this regard; that is, in a particular case does the lack of necessary assurance of future public use make the condemnation unreasonable, capricious, and in bad faith.
The plaintiffs cite several cases for the proposition that "property cannot be condemned without advance assurances that it will be employed only for specified public uses." But the argument is confusing because the cases involve situations where there was no plan for public use set forth to justify the taking or the taking was clearly done to benefit a private interest. Thus, Cincinnati v. Vester, 281 U.S. 439 (1930), involved a situation where the Ohio constitution gave municipalities the power to condemn land in excess of that necessary for a public use if such excess condemnation was "in furtherance of such public use." A state statute said that the municipality must define the purpose of the condemnation. The court did not reach the constitutional issues presented but observed that the municipality provided no reason for the condemnation which was therefore not compliant with statutory authority, id. pp. 441, 447-448. As the court said, property could not be taken for some independent and undisclosed public use," id. p. 448. State ex relSharp v. 0.62033 Acres of Land, 110 A.2d 1 (Del., 1954) is somewhat similar to Vester at least in its particular application to the facts before it. This trial court cited the well-accepted principal that eminent domain power "shall not be exercised unless the property taken is to be devoted to a public use within a reasonable time after taking," Id., p. 6. This was a highway condemnation case and as to a certain parcel of property the court held eminent domain power could not be used CT Page 3126 because the highway "Department had no present plans for utilizing most of the land and is unable to state positively that it will ever use the land for the purpose for which it is sought" Id., p. 7. That is, no real reason was given for the need to take the property. Krauter v. Lower BigBlue Nat. Res. Dist., 259 N.W.2d 472 (Neb., 1977), is like Vester. It involved an excess condemnation issue. The Natural Resource District wanted to condemn land in excess of that actually needed. It argued it could condemn land if there is only a probability or even if there is only a possibility that it might be needed for a public purpose in the future. Technically, the court did not reach the propriety of that argument but referred to limiting statutory language. It said: "The Legislature has clearly limited the exercise of the power of eminent domain by a natural resources district to situations in which the condemning agency has a present plan and a present public purpose for the use of the property to be acquired," id., p. 475. In Mayor of Vicksburgv. Thomas, 645 So.2d 940 (Miss., 1994), the court upheld the property owner's objection to the taking in a situation where the property was going to be turned over to a private party. The court characterized the situation before it to the taking of land not for a public use but to benefit a private party. The competitive bidding statutes required by state law in awarding the property to this private party were not followed. He was free to develop the property or not develop it as he saw fit. There were no covenants, restrictions or conditions in the contract between the city and this private party, id., p. 943. Alsip Park Dist.v. D M Partnership, 625 N.E.2d 40 (Ill., 1993), is much like the Sharp
case in its statement of the law; a party opposing a taking should prevail if the condemning authority has "no ascertainable public need or plan, current or future, for the land," id., p. 45. CRDA v. Banin,727 A.2d 102 (N.J., 1998), is a trial court opinion. There, the court dismissed a petition to condemn people's property brought by a state casino development authority. Trump was to be the beneficiary of the condemnation. "When, how and if the property is developed in the future will be outside the control of [the authority] except for the fact that Trump, a casino hotel operator, will have to develop and use the property consistent with the business in which it is already engaged," id., pp. 110-111. (Emphasis added by this court.) The court at p. 111 went on to note that when a public agency acquires property to turn it over to a private developer "absent appropriate restrictions in the agreement between the public agency and the private developer, there are no assurances that the public interest will be protected." City of SanFrancisco, et al v. Ross, 279 P.2d 529 (Cal., 1955), was a case where the court held the taking by the city of property for a private party to run a parking facility was merely a private exercise for someone's private gain. The city chose not to proceed under various special acts that might have been used to acquire property that could then be leased to a private party. The city just purported to act "under its general power of eminent CT Page 3127 domain," id., p. 531. The city admitted it would not control rates at the facility or its method of operation. The statutes the city could have used, but did not indicate "a clear legislative policy requiring government control of rates and charges to assure fulfillment of a public need," id., p. 532. The court was also concerned about the fact that although the city had said the facility was needed to relieve congestion and facilitate traffic, a portion of the seized property was to be used for retail stores; that in itself would not invalidate the whole plan but "it aids in characterizing the whole operation as a private one for private gain," id., p. 53
The plaintiffs also cite In re New Haven Water Co. v. Russell,86 Conn. 361 (1912). In that case, the water company was authorized to take water from a stream so far as it was necessary. The defendants objected. The plaintiffs cite the case in their brief for the proposition that like the foregoing cases, they referred to, this state "also holds that the use of condemned property must be known prior to condemnation [which] suggests the necessity of assurances of future public use," p. 36 of first brief of plaintiffs. A close reading of the case does not support such a rigid interpretation, however. At p. 369, the court says: "A private corporation engaged in furnishing a water supply to a community owes it the duty of providing an adequate supply of water at all times." The court then goes on to discuss the various contingencies which would have a bearing on any prediction as to future water use. The court at p. 370 then says:
 "It cannot be foretold when the contingencies of which we have spoken may be expected, nor can the future requirements and prospective needs within a reasonable time be estimated with exactitude; it is necessarily a matter of judgment based upon knowledge of the present and experience of the past. The reasonableness of the necessity must be ascertained from the facts of each case; and a reasonable discretion in reaching this conclusion will not be interfered with."
Like the Connecticut case just discussed, the other cases just referred to are really not applicable to the present set of circumstances and not supportive of the plaintiffs' argument.
Vester, State ex rel Sharp, Mayor of Vicksburg Alsip and Banin all involved situations where the condemning authority had no plans or even set requirement that the seized property be used for any particular purpose, including a public purpose, and this was true of cases where the property was to be turned over to a private developer. Krauter involved an CT Page 3128 interpretation of a particular statutory requirement, as did in part theCity of San Francisco case. The latter case was also concerned in part that part of the use — retail shops — was not a use which in any way could be characterized as a public use which motivated the taking.
Here, as said numerous times before the public use as dictated by the statement of purpose statute (§ 8-186) of Chapter 132 was economic development. The MDP and the development agreement being worked on by NLDC and the developer to carry out the MDP and the millions poured in by the state to carry out the MDP, which both state and city council approved, had as their goal the economic development envisaged by Chapter 132. The vehicle of this economic development, under the MDP, was to be the erection of office buildings. As also said before, economic development authorized by legislation can be a public purpose especially if the object of the development is a disadvantaged community. Like seized land in a slum area can, under Gohld, be turned over to developers to prevent the recurrence of slum conditions, why cannot such land be utilized for that development which attempts to lift a city out of its economically disadvantaged condition and keep it at that plateau? This is especially so when it is clear, as here, that the area where eminent domain is to operate cannot and will not serve that development function.
Can situations arise where that plan can still be speculative, certainly, and the court will discuss that shortly. But so can any development plan be speculative even if its object a la Gohld is to prevent the recurrence of a slum.
A plan can be speculative if there is little or no prospect for its realization or if there is no real development plan at all. Speculative taking issues as to parcels 3 and 4A are better analyzed under the test of whether there is a necessity to take particular land to accomplish a public purpose and the court will try to address that problem in the next part of this decision.
 4.
The most telling argument, at least for the court, is raised by the plaintiffs' claim that there is no necessity to take their property. The court will discuss the takings on parcel 3 in this portion of the decision. Parcel 4A will be treated separately in section 5.
As to parcel 3, two positions are set forth: (1) the MDP and its goals can be accomplished as to this parcel without tearing down their houses; (2) if the court were to decide the planned use for parcel 3 were a CT Page 3129 public use despite private involvement the takings would be unreasonable because the development planned is entirely speculative with no reasonable assurance that it will be accomplished.
The cases often treat the question of whether the planned exercise of eminent domain power is a public use as a separate question from whether the taking of particular land is necessary to accomplish the public use. The position is often framed in the terms set forth in Gohld. There, the court said:
 "Whether the purpose for which a statute authorizes the condemnation of property constitutes a public use is, in the end, a judicial question to be resolved by the courts . . . but in resolving it great weight must be given to the determination of the legislature." 141 Conn. at p. 141.
Then at p. 146, the court said:
 "The determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power. When the legislature delegates the making of that determination to another agency, the decision of that agency is conclusive; it is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred."
cf. Falkner, et al v. Northern States Power Co., 248 N.W.2d 885, 894
(Wis., 1977), cf. Nelson Drainage District v. Filippis, 436 N.W.2d 682
(Mich., 1989), where the court of appeals said: "In reviewing whether a taking is necessary, the consideration is not the advantage to the public, but whether the project needs the property involved," id. p. 685.
But the dichotomy between the public use determination and the necessity question cannot be pressed too far — for one thing judicial intervention at some level is involved in deciding both issues. Also on the necessity question the nature of the public use is directly related to whether a particular taking is necessary. or to put it another way, if it is not necessary to take particular property under the guise of accomplishing a public purpose, the taking in any real sense cannot be for a public use.
Some cases seem to recognize this: thus, in State Highway Commissionv. Curtis, 222 S.W.2d 64 (Mo., 1949), in an excess condemnation case, the CT Page 3130 state Supreme Court said: "Even in the absence of actual fraud, a taking of property in the ostensible behalf of a public improvement in excess of what by any possibility could ever serve any public purpose would to that extent be a taking for a non-public use . . ." to the same effect isWoolard v. State Highway Comm., 249 S.W.2d 564, 566 (Ark., 1952).
In any event the court will, of course, as it must pursue its discussion along the lines suggested in Gohld to decide the necessity questions raised by the plaintiffs. First, the court will discuss parcel 3 and the takings in that parcel.
 (a) (1)
As noted, one of the positions the plaintiffs advance is that there is no need to condemn their property since the goals of the MDP can be accomplished in general and the development specifically planned for parcel 3 can go forward as planned even if the homes of the plaintiffs on parcel 3 are allowed to remain.
The testimony of Professor Mullin was presented by the plaintiffs. He teaches at the University of Massachusetts in the planning department; his areas of teaching are economic development, industrial development and planning history and theory. Professor Mullin is a highly qualified and obviously knowledgeable individual. He testified that it is uncommon for land to be entirely cleared for new development and it is not reasonably necessary to take the four homes in parcel 3 to accomplish the goals of the MDP in that parcel. In fact, it really was a "no-brainer" to him, especially in light of the fact that the homes occupy a minuscule proportion of the area of the parcel. Retention of the Italian Dramatic Club (IDC) is a good example of how an existing structure can be retained on a parcel without being detrimental to the whole project. Professor Mullin noted that the four units are reasonably clustered — three of them are lined up in a row and one is located next to the IDC. It is not desirable to have residential units standing alone but to have them remain in clusters if they are to be retained. Professor Mullin testified about an alternative that he prepared with office buildings and parking; the IDC and the four homes were to remain standing under his alternative.
On cross examination, it was brought out that his alternative would place a projected office building overlooking a sewer treatment plant. Ideally, the professor admitted it would be more desirable to put parking areas next to such a plant, but "methods" can be devised to make it perfectly acceptable to locate a building near such a plant. Such uses can CT Page 3131 be mixed.
In general, Professor Mullin thought the MDP was fine with the exception of the housing issue. In fact, this was the position of the plaintiffs who own homes in parcel 3.
The defendants presented much in the way of testimony and exhibits on this aspect of the necessity issue. The court will now try to discuss that evidence. The decision to prepare a development plan under Chapter 132 required the preparation of an environmental impact study.
Jimmy Hicks testified for the defendants. He is an executive vice president and principal in RKG Associates; this firm is an economic development consulting firm that involves itself also in real estate planning. The firm has offices in New Hampshire and Virginia. Mr. Hicks says his firm does a lot of planning related to communities; they have done much work in upstate New York and Maine. Mr. Hicks has been involved in land use development for almost thirty years. He was hired by the NLDC to be part of the team entrusted with preparing the MDP. Initially, the contract between the NLDC and RKG focused on real estate and economic and financial planning. As part of the effort to prepare an MDP and contributing to the formulation of that plan, the NLDC team also prepared a statutorily required economic development plan. In preparing that plan, six alternatives were considered for the development of the Fort Trumbull area. In choosing the final alternative that was embodied in the MDP much was received in the way of public comment. Also, the primary consideration was the desire by the team preparing the MDP to take advantage of Pfizer's decision to come to New London. This was a unique opportunity for a city with New London's economic, housing and development problems which Mr. Hicks alluded to in his testimony and generally reflects the court's previous observations concerning those factors.
In weighing the six alternatives, the team, as to each, examined the environmental impact and the job and general economic impact. The goal of all this was, as said, to help New London to take advantage of Pfizer's arrival on the scene by increasing the city's tax base and employment prospects.
At least two of the alternatives provided that single-family houses would be retained and the team even considered the rehabilitation of existing housing. Mr. Hicks had a problem with this solution because he believes it is hard to turn residential space into office space, economic development being the goal of the plan.
Mr. Hicks spoke of the need to clear the whole Fort Trumbull area of private detached housing which was the solution incorporated into the CT Page 3132 MDP. He gave the reasoning behind that solution and the implications of choosing a private developer to carry out the project, which the court will now set forth.
"What they finally adopted was they would get a private sector developer to come
in. What that basically means is a common redevelopment approach as you prepare the site. You give them raw land with the necessary infrastructure, and the developer makes an investment. This site, though, has a lot of risk. It's got hazardous waste. It's got constrainment. It's got a lot of regulations dealing with it, and it's in an urban setting. That's not the most attractive for investment and that's the reality you have to face. There's not a lot of people coming and investing in New London. So if you're gonna attract a private developer to this type of site setting, you've got to try to minimize as much uncertainty as much as possible. Most developers are good at understanding risks, but not uncertainty. If you said we'll give you something that looks like a spotted leopard
Q What's the spotted leopard?
A It's where a leopard has spots, spots are things that stay the same and you've got to work around them. Spotted leopard is just a way to refer at the configuration of land uses. If you're gonna attract developers, if you're gonna put out what you call requests for proposals and get them interested in the site, and after they overcome all the inherent problems with redevelopment, say to them also, well, you've got to work around this contingency, you greatly diminish your ability to finding competent capable people to come in. You take things that would possibly risk and turn them into uncertainty. Developers operate with very short time frame financial conditions, and it was our recommendation that because the housing wasn't adaptable and a long-term use to the office related things, and that three, four kinds of the hodgepodge of certain things that we recommended, that most of those facilities be demolished." These remarks indicate the reasoning behind the MDP decision to remove all residences at a time all were still in place and the MDP had not yet been approved.
But what about the necessity to condemn the plaintiffs' properties in parcel 3 at the present time, apart from what was envisaged in the MDP, as necessary months before the actual taking?
The court will discuss this more fully, but it is said in the cases that: "The necessity of taking property for public purposes in eminent domain proceedings must be determined by the conditions existing at the CT Page 3133 time of taking," Luccock v. City of Norman, 578 P.2d 1204, 1206
(Okla.Sup.Ct., 1978).[14] Accepting that proposition, Mr. Hicks also felt that Professor Mullin's plan providing for retention of these homes at the present time was not compatible with the goals of the MDP. He said the planning team was trying to create a "housing village" in an urban context (referring apparently to the new housing planned for parcel 2 and the associated retail and hotel development in parcel 1). Single family housing defeats that purpose and diminishes the atmosphere sought to be created by the MDP.
Perhaps more to the point Hicks said although retention of the present private housing in parcel 3 was compatible conceptually with having an office building use, it presents problems in the real world when you are trying to foster private development. It is not worth the risk that would have to be run. Retention of these homes could, in fact, make private development more problematical. Hicks said in response to questioning:
"Q — is if a directive came down from wherever and said these properties that these people own that are marked in red on that map have to stay, would it be feasible to go forward with this plan? Could it be done?
A (Hicks) And your question to me is: Could you make it happen?
Q I'm asking you, could it be done?
A It would be much more difficult. Probably what would happen, because once again you've got the private sector firm, is that developer would come in and renegotiate the deal and cherry pick the good sites out. And by that 1 mean we'll take this portion and this portion and the sites — it's more difficult to develop, the more uncertainty about we'll let you keep those. What happens in that cherry picking process, the site gets broken up. Some gets developed; some doesn't get developed. That's a real problem when you're trying to change things. And then the developer comes along and you're left with things that are more difficult to develop. They stagnate. It just makes it a harder process.
Q But at the end of the day, you just don't know whether it would still be feasible, do you?
A My professional opinion based on my experience, it would make it much, much more difficult for NLDC and probably would lead to a situation that certain parts of the site would probably have a much higher degree of difficulty in being developed."
Finally, Mr. Hicks said there is much more flexibility before a CT Page 3134 development plan, such as the MDP here, is adopted. Changing the plan now to allow single-family houses would be a major change requiring the amendment of the environmental impact study, the MDP, and a possible change in the city's land use ordinances which were modified to accommodate the MDP.
Admiral Goebel also testified on this subject. He said allowing the plaintiffs' properties to remain in parcel 3 did not fit in with the MDP. Retention of single-family structures was not envisaged as part of the MDP so that if they were to be kept onsite, it would be necessary to go back to square one in the planning process. He also referred to the fact that several alternatives were considered prior to the adoption of the MDP. Eventually one plan was selected after public comment which tried to incorporate suggestions that were made and certain aspects of several of the alternatives considered into the final MDP.
A portion of the deposition testimony of Marty Jones was presented. He is the president of the private developer selected by the NLDC to develop the site under the MDP. The following testimony was elicited from Mr. Jones concerning this issue.
 "Q In order to market this property is it — would that job be made harder or easier if the plaintiffs were to win their lawsuit and their properties were to remain where they are presently situated? . . .
A It would be more difficult.
Q Why?
A In order to attract commercial tenants to, and again, for this discussion I'm presuming we're talking about properties that are on parcel 3, it would be difficult to attract a commercial tenant to these commercial office buildings without a full site available for the development of an office building and the associated parking.
Q Why is having a full site important?
A First of all, to be able to develop the amount of parking needed for economic feasibility, and also to have a site that — that the grading issues in parcel 3 — the grading issues in parcel 3 are very complicated and the retention of isolated properties within that area could make it very difficult to develop this sort of property.
Q In order to do adequate grading do you need to have access to the entire parcel 3 to properly grade it? CT Page 3135
. . .
A Yes.
Given these facts, let us in more detail return to what our cases say as to this aspect of the necessity issue. The previously quoted test set forth in Gohld is straightforward:
 "The determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter of the legislative power. When the legislature delegates the making of that determination to another agency (in Gohld a redevelopment agency), the decision of the agency is conclusive; it is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred," 141 Conn. at p. 146, see often cited Water Commissioners v. Johnson, 86 Conn. 151, 160-161 (1912).[15]
As noted in West Hartford v. Talcott, 138 Conn. 82 (1951): "`Necessary' in legislative acts, according to the right of eminent domain, does not mean an absolute or indispensable necessity but only that the taking provided for is reasonably necessary," id. at p. 91.
The latest pronouncement of an appellate court in our state on the appropriate test is Bugryn v. City of Bristol, 63 Conn. App. 98 (2001), which repeats the Gohld test cites Talcott for its application and cites and quotes from Graham v. Houlihan, 147 Conn. 321 (1960), for another variation on the theme being now discussed:
 "While we recognize that the state should not condemn any more property than is necessary to satisfy the legislative mandate, courts are not well suited to second guess determinations of this nature. `Where it appears that an honest judgment has been reasonably and fairly exercised after a full hearing, courts should be cautious about disturbing the decision of the local authority' . . . Graham v. Houlihan, 147 Conn. 329."
Connecticut law on this subject seems to be substantially similar to the law in other jurisdictions, City of Waukegan v. Stanczak,129 N.E.2d 751, 756 (Ill., 1955); Nelson Drainage District v. Filippis, CT Page 3136436 N.W.2d 682, 684 (Mich., 1989); Luccock v. City of Norman,578 P.2d 1204, 1206 (Okla., 1978); also see Levitsky v. Prince George'sCounty, 439 A.2d 600, 603 (Myd., 1982)[16]
No Connecticut case speaks directly to this, but a necessary corollary of the cases we have been discussing would seem to be that this special deference should be given the agency when considering the necessity of a taking where it makes an honest choice among possible alternatives. InBoswell v. Prince Georges County, 330 A.2d 663 (1975), the court succinctly said, "Landowners when faced with a proposed acquisition fo their land for public improvements, whether by way of easement or in fee simple, have often suggested to the courts that they saw a better way to do the improvement than that proposed by the condemning authority. . . . They have been uniformly unsuccessful in this court," id. pp. 664-665; also see Levitsky v. Prince Georges County, supra at 439 A.2d p. 603, cf. City of Tacoma v. Welcker, 399 P.2d 330 (Wash., 1965), where the court says: "Action when exercised honestly, fairly and upon due consideration is not arbitrary or capricious, even though there be room for a difference of opinion upon the course to follow or a belief by the reviewing authority that an erroneous conclusion has been reached, "also see Central Louisiana Electric Co. v. Brooks, 201 So.2d 679, 681 (La., 1967), where principle supported even where condemnation was by private company, also see Transcontinental Gas Pipe Line Corp. v. CalcoEnterprises, 511 S.E.2d 671, 677 (N.C., 1999).
Keeping these principles in mind, the court cannot say that in light of this record that there is no necessity for the taking of the plaintiffs' properties in parcel 3 based on an argument that the goals of the MDP can be accomplished even if their properties were not to be taken.
This argument in effect, would permit the court to choose an alternative to development different from the alternative chosen by the agency appointed to prepare the MDP — an alternative substantially different from the plan approved by the city council and the state. And the change would be substantial by any definition since it would involve permitting a use in parcel 3 not authorized by the MDP — i.e., single-family residences.
This the court cannot do for a variety of reasons set forth in the case law. For one thing, there is no evidence, credible or otherwise, that the condemnations in parcel 3 as originally envisaged in the MDP or at the time of the taking were done in bad faith, or not with an honest motive, or based on pretext given any reasonable definition of the word.
Much time and effort went into the choosing of the alternative that was to become the MDP, several highly qualified people worked on the plan for CT Page 3137 several months. Alternatives were considered which would have allowed private residences to remain. Public comment was received. Study was even given to the possibility of moving some residences without having to condemn them. Marketability studies were made before the MDP choice was arrived at as well as an environmental impact study. The court does not conclude there is an absolute necessity to take the property at the present time, but believes and, at the least, has no basis to doubt the reasonableness of the testimony of Mr. Hicks and Mr. Jones that development would be more difficult if these residences were allowed to remain. Professor Mullin is a highly qualified individual, but his study of the problem of alternative development choices cannot have been as thorough and intense as that of people like Mr. Hicks and the other members of the consulting team that spent months formulating the MDP; Hicks with that background credibly testified that even from the present perspective allowing these homes to remain would make development prospects more difficult. Furthermore, experts can differ, believing stoutly in the correctness of their respective positions, but as a separate ground for its conclusion the court notes Mr. Jones, the president of the private developer of this land area, including parcel 3, believes allowing these homes to remain would be detrimental. His perspective is as practical as can be since his company has a strong financial interest in development options and possibilities.
Certainly there are cases where courts have found no necessity for a taking. Two examples are Alton v. Wabedo Township, 524 N.W.2d 278, 282
(Minn., 1994) (taking based on road width greater than actual public use); Nelson Drainage District v. Filippis, supra (taking by way of easement for construction of "enclosed box drain" not necessary). cf.Conn. Light Power Co. v. Huschke, et al, 35 Conn. Sup. at p. 308. But this is not a situation where a discrete land use for a select well-defined purpose is involved. The decision on which the necessity for the takings as set forth in the MDP and the present need for the takings of these particular properties involve the weighing of factors for which courts are not well equipped and which reflect broad "legislative" type judgments which are best left to the appointed agencies of legislative bodies at state and local level and experienced state agencies all of which were involved and are involved in this taking process and the decisions which have led to it.
 (2)
There is another aspect to this facet of the necessity issue as it affects parcel 3 that must be discussed which is not directly addressed in the case law. As the court just mentioned, the general rubric is that necessity is to be evaluated by the courts at the time of taking. This principle is easy to understand and apply for the courts when the question CT Page 3138 presented is whether, for example, a public utility should be allowed an easement over someone's property of 75 feet as opposed to 50 feet whether a swath of 300 feet should be given to a highway department requiring the condemnation of particular property, or even where the need to plan for future water supply needs requires a taking.
The problem becomes more difficult after cases like Berman v. Parker,348 U.S. 26 (1954); Poletown Neighborhood Council v. City of Detroit, 304 N.W.2d 455 (1974); Canata v. New York, 182 N.E.2d 395, app. dismissed371 U.S. 4 (1962), permitted whole areas of cities to be cleared and set aside for future private development.
Chapter 132, "Municipal Development Projects" sets forth a "Declaration of Policy in § 8-186 and that section talks in terms of encouraging and assisting the development of "unified land and water areas." Webster's Third New International Dictionary says "unified" is the "past of unify" and "unify" is declared to be a synonym — "integrate, consolidate, compact, concentrate, agree with unify in meaning to gather or combine parts or elements so as to form a close mass or coherent structure." Professor Mullin and Bruce Hyde who is employed by the city and is its director of real estate and a certified planner indicate also that the word unified land area is a word of art in their profession and indicates an assemblage of parcels into one land parcel.
In other words, the legislature envisaged under Chapter 132. that whole discrete areas would be developed and the courts have and must pay deference to that decision. But once unified areas are the subject of a project plan certain consequences follow and West Virginia's Supreme court had interesting things to say on that subject. In Charleston UrbanRenewal Authority v. The Courtland Company, 509 S.E.2d 569 (W.Va., 1998), the court said:
 "By contrast in the instant case Courtland is not challenging the validity of the initial determination of blight and slum conditions in the project area. Rather, Courtland is asking the circuit court to make a new factual determination, based on allegedly new and changed circumstances. Moreover, Courtland's request comes over a decade after the project area was properly designated as a slum and blighted area.
Courtland does not point us to any provision of law that authorizes a circuit court to make such a de novo determination. It appears to us that asking a circuit court to make such a determination under an CT Page 3139 appropriate standard of review, raises substantial issues of exhaustion of remedies, separation of powers, and similar concerns.
 Additionally, as the Supreme Court held in Berman, supra, the viability of an incremental, multi-year, integrated plan for the overall redevelopment of a slum or blighted area would be fatally compromised if challenges to the continued need for and legitimacy of the plan based on allegedly changed circumstances were allowed as defenses to a condemnation petition — each time an urban renewal authority seeks to acquire property to accomplish the purposes of the plan. We are not directed to nor have we found any cases or statutes suggesting that such challenges are, have been or should be allowed.
 Urban renewal plans and their long-term goals would be crippled in their intended purpose of economic revitalization, if they could be interrupted and short-circuited just when the conditions that gave rise to the plan have arguably begun to be abated. Again, we are not directed to any cases or statutory language suggested that such interruption or short-circuiting has been or should be permitted.
 As the Supreme Court stated in Berman, supra: `Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.' 348 U.S. at 35-36, 75 S.Ct. at 104, 99 L.Ed. at 39. (Emphasis added.) Our approach to this question is further shaped by our understanding of the deference that our case law has stated must be afforded to legislative determinations of the need by a public body to exercise eminent domain for a public use, and the limited role of courts in reviewing such determinations. See discussion infra at III.B.
We conclude that absent extraordinary circumstances, the authority of an urban renewal authority acting under the provisions of W. Va. Code, 16-18-1 to -29 to implement an approved and CT Page 3140 ongoing redevelopment plan by using the power of eminent domain under W. Va. Code, 16-18-8 (1951) may not be challenged during the period of the plan simply on the basis that the slum or blighted conditions which provided the initial basis for the adoption of the plan no longer exist.
 Therefore, the circuit court did not err in denying Courtland's challenge to the condemnation petition based on Courtland's contention that there were no longer slum or blight conditions in the project area." Id., p. 576, see Apospros, et al v. Urban Redevelopment Commission, (S.C. 16450, Ct. Sup. Ct., 3/5/62).
Similarly, the court in State of Missouri ex rel U.S. Steel CarnegiePension Fund, 811 S.W.2d 385 (Mo., 1991), the court said:
 "It is apparent that the owner of each tract of land in a blighted area cannot be permitted to resist redevelopment programs on the ground that his property is not being taken for a public use. If each property owner were allowed to contest, as relator does here, that his property was being taken for a public use, redevelopment plans for blighted areas would be hopelessly bogged down in a marsh of litigation that could prolong the acquisition of property in the area so long that the redevelopment plan could become useless. This would obviously defeat the purpose of redeveloping blighted areas." Id., p. 389.[17]
See also W G Company, et al v. Redevelopment Agency of Salt Lake City,802 P.2d 755, 770 (Utah, 1990); City of Phoenix v. Superior Court,671 P.2d 387, 393 (Ariz., 1983), cf. Rosenthal v. Rosenthal, Inc., supra; also see Oliver v. City of Clairton, 98 A.2d 47, 52 (Pa., 1953).
All of this is not to say that the necessity argument cannot be raised insofar as it says — you do not need to take my land to accomplish your public purpose. It does not say that when considering this argument, at least in cases of development schemes in unified project areas, the focus should be on what the necessities were when the development plan was first formulated or at least before there was a substantial acquirement of properties in the project site.
In any event for the reasons set forth above and in the immediately CT Page 3141 previous section, together and independent if considered, the court does not accept this aspect of the necessity argument as to parcel 3.
 (b)
There is another argument as to necessity with regards to parcel 3. The plaintiffs argue that it is not necessary to take their property because the development plans are speculative, not definite, and there is little prospect they will be accomplished within a reasonable amount of time. Under circumstances such as this, it would be entirely unreasonable to take their property, argue the plaintiffs.
As is often the case, the language of an ALR article focuses on the problem presented and discusses many of the cases. In "Eminent Domain for Future Needs," 80 ALR 3d 1085, it states:
 "Whether in the context of the `necessity' requisite, or in the context of a commonly recognized requirement that the taking have a public purpose, a number of courts have expressly or impliedly taken the position that a condemnation for a future use is permissible, where it otherwise satisfies applicable requirements, so long as the future use is planned to be made within a reasonable time. Separate from, although in the circumstances sometimes related to, the time factor, is the matter of the specificity or definiteness of the future plans. The absence of such plans has sometimes, but not inevitably, resulted in the invalidation of appropriations of property for future uses.
Further on, the article says in opposing a development plan or any exercise of the power of eminent domain:
 ". . . it would seem that counsel's chance for success is greatest where it can be shown that the intended use for the condemned property is so remote in time and speculative in nature as to render the condemnor' s determination of necessity an abuse of discretion.
Conversely, counsel for the condemnor, in demonstrating that no fraud, bad faith, or abuse of discretion was involved in its determination of necessity, should show that there are definite plans to devote the property to a specific public use CT Page 3142 within a reasonable period of time. While what constitutes a reasonable period of time is obviously a question of fact and depends upon circumstances which differ from case to case, the shorter the anticipated period between appropriation and utilization, the greater the chance of it being found reasonable. Counsel may rely, with a relative assurance of success, on the argument that the condemnor's determination of necessity was made on the basis of fairly anticipated future needs."
As is true with many topics in eminent domain law, the problem with the article and with many of the cases brought to the court's attention on this particular issue is that a case, pro or con, can be found for any proposition or nuance of the law. What must be kept in mind when reviewing the morass of cases is that whether a particular project is speculative, requires fairly detailed plans, assured funding or is too remote to be reasonable in large part depends on the nature of the project — easement for public utility versus highway construction needs, airport expansion versus expansion of school facilities or economic development in unified land area. And of course all of these matters must be decided in the context of the social and economic conditions of the community where the project is to be carried out for example, a court may be willing to find a need for a taking for airport expansion where definite plans have not been worked out and the construction date is far from imminent when the facility is planned for a rapidly growing community where vacant land is rapidly disappearing to private development thus reducing the desirable locations for such expansion as opposed to a community in a slowly developing economic hinterland. Under these circumstances, cases do not helpfully cross reference each other because their results are based on particular needs and social and economic situations of separate communities and not on reasoned deductions from agreed upon legal principles.
So much for abstractions, now let us try to decipher the cases.
The court could not find any Connecticut appellate case discussing the exact question presented here — whether a particular taking can be found not to be necessary because done pursuant to a development plan that is too speculative and/or with no prospect of being accomplished within a reasonable time. Our courts have certainly held that there must be a necessity for the exercise of the power of eminent domain and have said: "`Necessity' in legislative acts according the right of eminent domain does not mean an absolute or indispensable necessity, but only that the taking provided for is reasonably necessary," West Hartford v.Talcott, 138 Conn. 82, 91 (1951) (acquisition of land for school site). CT Page 3143 And this same general test has been adopted for economic development cases. Bugryn v. City of Bristol, 63 Conn. App. 98, 108 (2001), cf. NewHaven v. East Haven, 35 Conn. Sup. 157, 168 (1977) (airport); also seeChicago Great Western Rr. Co. v. Jesse, 82 N.W.2d 227, 231 (Minn., 1957); City of Miami Beach v; Broida, 362 So.2d 19, 20 (Fla., 1978);Alsip Park District v. D M Partnership, 625 N.E.2d 40, 47 (Ill., 1993).
Other jurisdictions have dealt with the problem and certain general principles can be garnered from reading them.
Some cases have held that because reasonable necessity does not mean absolute necessity, a condemning authority need not for example, "present evidence pinpointing the need for the specific property, rather, it is sufficient to show that the taking is necessary for the accomplishment of an overall plan of development. . . . Funds need not be on hand, nor do plans and specifications need be prepared for a condemnor to determine the necessity of a taking, in fact, it is the duty of public officials to look to the future and plan for the future. . . . There, there need not be an immediate need for the property sought to be taken," Test v.Broward County, 616 S.E.2d 111, 113 (Fla., 1993) (airport expansion).Test relied on an earlier Florida case involved in the propriety of using eminent domain power for airport and port purposes. The court rejected the plaintiff's claim of fraud in that case, Carlor Co. v. City ofMiami, 62 So.2d 897 (1953), saying at p. 902:
 "It is strongly urged by the appellant that fraud existed at the time of the adoption of the resolution because the development could not take place in the immediate future and the lapse of time, about seven years, had shown and demonstrated that the city officials did not intend to proceed with the project. This contention is without merit. It is not necessary that a political subdivision of the state have money on hand, plans and specifications prepared and all other preparations necessary for immediate construction before it can determine the necessity for taking private property for a public purpose.
Also see City of Miami v. Broida, supra, where the trial court's finding of lack of necessity was reversed concerning the taking of property for a civic convention center complex where the court said:
"The record discloses that the city does have a plan and that the plan has been partially completed. The CT Page 3144 Horowitz property lies within the boundaries of the plan. More than one use has been proposed for such property, but one of the city's witnesses explained that master planning is a process that evolves overtime, and must be flexible and subject to change as conditions warrant. As stated in Wright v. Dade County, 216 So.2d 494, 496 (Fla. 3d DCA, 1968),
. . .
 it is not necessary that the officials proceed to make immediate use of the property thus acquired or that they have' plans and specifications prepared and all other preparations necessary for immediate construction before it [the county] can determine the necessity for taking private property for a public purpose.' Carlor Co. v. City of Miami, Fla. 1953, 62 So.2d 897. 362 So.2d at p. 20.
Other states have appeared to adopt the Florida view, see Rueb v.Oklahoma City, 435 P.2d 139, 141 (Okla., 1967) (airport expansion), cf.Alsip Park District v. D M Partnership, supra at 625 N.E.2d pp. 47-48
(park); City of Charlotte v. Rousso, 346 S.E.2d 693, 694 (N.C., 1986) (park).
It could be argued that these just cited cases go too far in the sense that detailed plans being seriously discussed or ready to be put into effect are a good indication that a universally recognized aspect of the law in this area will be complied with.
 "One of the fundamental principles of eminent domain is that it shall not be exercised unless the property taken is to be devoted to a public use within a reasonable time after taking," State of Delaware, et al v. 0.62033 Acres, 110 A.2d 1, 6
(Del., 1954).
As the Delaware court goes on to say, this reasonable time doctrine "prohibits the condemnor from speculating as to possible needs at some remote future time." Id.
Also, where private development is the goal of any plan requiring the use of eminent domain the reasonable time rule helps ensure appropriations are not made for speculative, monopolistic, or other improper purpose having nothing to do with the goals of the purported public use, see Indiana v. Michigan Electric Co., 504 N.E.2d 301, 306
CT Page 3145 (Ind., 1987); U.S. v. Certain Parcels of Land, 215 F.2d 140, 148 (Ca. 5, 1954).
Therefore, a required corollary of cases, like Carlor Co. and Rueb orBroida, should be that absent detailed plans ready to be put into effect immediately, there should be some indicia of a real intent to accomplish the decided upon public use — itself some assurance that the use will be accomplished in reasonable time. Thus, in rejecting a condemnation, a Pennsylvania court said, "Of course the acquisition of land not presently needed cannot be for real estate speculation and future sale. Unless the property is acquired for an authorized public use and after a suitable investigation leading to an intelligent, informed judgment by the condemnor, the condemnation is invalid," In re SchoolDistrict of Pittsburgh, 244 A.2d 42, 46 (1968). If there is such an investigation and an informed judgment even without a formal plan to be acted upon immediately, this should have a bearing on determining what is a reasonable time for accomplishing the public use and extend its running depending on the nature of that use. This would seem a logical implementation of the universally recognized principle that deference be given to the legislative authority and its designates on the issue of necessity. cf. Pidstowski v. South Whitehall Township, 380 A.2d 1322,1324 (Pa., 1977).
The problem in In re School District of Pittsburgh was that the school board moved to condemn property where there had been no plans for future buildings drawn up and the board had not formally authorized the drawing of such plans; "the plans for building expansion are unfounded and only in the conversational stage," id., p. 43.
Thus, there has to be some outer time limit on when the purported public purpose must be accomplished or some indication what that goal is. In City of Phoenix v. McCullough, 536 P.2d 230 (Aug., 1975), the city was not allowed to condemn land for airport purposes; the court said at p. 237:
 "We might hesitate to hold that 15 years in the future was not a reasonable time for future planning (however, we would have less hesitancy about 46 years), but coupled with the prospect that even this 15-year use may change, we are drawn to the conclusion that if the condemning body is uncertain when future use shall occur, the future use becomes unreasonable, speculative and remote as a matter of law and defeats the taking."
In State of Delaware, et al v. 0.62033 Acres of Land, supra, the court CT Page 3146 rejected one seizure by the highway department saying: "A mere contemplation of a road improvement at some indefinite time within the next thirty years is too speculative and too remote to justify the exercise of the power of eminent domain," 110 A.2d at p. 7; the decision was upheld at 112 A.2d 857 (1955), cf. Aposporos, et al v. UrbanRedevelopment Commission, 259 Conn. 563 (2002).
There is not necessarily a predictable pattern in the cases, however, even where the condemnation is for a particular type of use. Thus, the court in In re the Matter of Condemnation of Real Property of King,556 A.2d 527 (Pa., 1989), barred condemnation by a school district that presently needed only 15 acres for athletic facilities but seized 102 acres of Mr. King's farm based on long-range enrollment projections showing a need for new school construction over the next five to twelve years. The projections were based on possible housing development and assumptions and possibilities in enrollment which were challenged.
On the other hand, in Anaheim Union High School v. Viera, 51 Cal.Rptr. 94
(1966), the trial court was found to have erred in barring condemnation where the school district did not intend to begin construction for four years. These then are some of the general principles used by the court to determine whether the accomplishment of the public use is too speculative or cannot be effectuated in a reasonable amount of time.
But it must be kept in mind that: "There will always be some possibility that a planned improvement will not be completed and put to the use intended. The test cannot be whether it is possible, whether it is conceivable that the project would fail. The test must be whether there is a reasonable assurance that the intended use will be to pass,"Falkner v. Northern States Power Co., 248 N.W.2d 885, 893 (Wis., 1977).
A "reasonable assurance that the public use will come to pass" test has its problems, however, since it is the very thing that has to be decided and this area of the law is confusing enough without having to ride subjective merry-go-rounds that pose as guidelines.
Perhaps more helpful is the observation that what is a reasonable time for the accomplishment of the public purpose, whether the effort is speculative in a particular case depends to a great extent on the nature of the public use involved; that is: "What is reasonably necessary to accommodate the future needs of the public use is also to be tested by the nature of the use," New Haven v. East Haven, 35 Conn. Sup. 157, 171
(1977).
The court will now discuss the facts of this case as they concern this issue. CT Page 3147
If a taking is based on a public purpose or use which is speculative and cannot be accomplished in a reasonable time, there can be no necessity for the taking. The taking in such circumstance could have been made in bad faith or it could simply be unreasonable, arbitrary or in excess of the condemnor's authority under the Gohld test.
There is no evidence in this record to indicate that any speculative aspects of the parcel 3 aspect of the project were the result of bad faith assessments. The MDP was months in the making, numerous consultants worked on it and at least one development alternative was considered that did not require the removal of all the buildings in parcel 3 or the erection of office buildings. Public meetings were held during this time and after the MDP was approved, the private developer had neighborhood meetings with people in the affected parcels. The NLDC director, Admiral Goebel, made himself available at biweekly city council sessions. Much of the plaintiffs' speculation claim is based on a report prepared by Jay Hooper for the private developer, Corcoran Jennison. Other information that could be used to support such a claim can be found in the MDP itself, a public document. The DECD had to approve the plan prepared by the NLDC consulting team as did the city council. The state Office of Policy Management and the Department of Environmental Protection reviewed it for their own purposes. The MDP was also approved by the Southeastern Connecticut Council of Governments. The MDP of course projected the erection of office buildings in parcel 3. Nothing in the foregoing recital provides any basis to conclude that the NLDC had some concealed bad faith motive in formulating the plan for the parcel 3 aspect of the project, which because it was based on such a motive, made the parcel 3 plans merely speculative. Too many entities would have to have been involved in the conspiracy to make it a rationally conceivable one.
Leaving aside "bad faith," what evidence is there in the record concerning the issue of whether the public use here is speculative or cannot be accomplished within a "reasonable time"?
For one thing, there has been no development agreement signed between the private developer, NLDC and DECD, for parcels 1, 2 or 3. Such an agreement is a necessary engine to start any development project. Site plans are not working documents to initiate actual effectuation of a plan. However, it is true that the three interested parties have been working for many months to prepare a development agreement. Numerous site plans have been drawn up for the purposes of preparing the final agreement. Admiral Goebel testified at trial that he thought the preparation of the agreement was imminent. At his June 22, 2001 deposition, Mr. Jones, who is the president of Corcoran Jennison, said he could not predict when the development agreement would be completed, but CT Page 3148 he was optimistic that it would be soon. It is apparent that much time and effort has gone into this phase of the project; site plans have moved the location and size of the planned hotel in its parcel, the same is true of the projected office buildings in parcel 3. All of this does not appear to be makework activity. Rather, it seems to be motivated by a belief that office development in project 3 is a viable element in the overall plan for economic development.
Corcoran Jennison is motivated by the desire for profit from a project it believes can be successful — a necessary engine to produce profit. The court can take this into account in deciding the viability of plans for parcel 3. The court should also be able to take into account the fact that the city has spent thousands of dollars planning a new road infrastructure that in part will be required because of the prospective office construction in parcel 3 and the very existence of which will make the site more attractive to prospective tenants. The state has fed over $70 million into the project, the NLDC spending $31.3 million from January, 1988 to August 2001. All of these funds have not been directed toward parcel 3, but some have. Money has been spent to acquire most of the property east of the railroad tracks, acquired property had to be razed. Money had to be allocated for relocation expenses for the whole project area. The foregoing facts do not of course, ipso facto establish that parcel 3 development is not speculative and can be accomplished in reasonable time. But they do represent a reason for the court to give some deference to the condemning authority on the question of necessity which the cases uniformly indicate is a prerequisite in these cases.Pidstowski v. South Whitehall Township, supra; Alsip Park District v. D M Partnership, supra; City of Charlotte v. Rousso, supra; U.S. v. CertainParcels of Land, supra; City of Miami Beach v. Broida, supra.
But the protections afforded by the eminent domain clauses of the federal and state constitutions would be hollow indeed if the analysis could stop with various layers of evidence to the effect that a taking is not speculative because the condemning authority and various supportive government agencies thought and acted as if it were not so.
The court must examine the underlying facts as presented in the record to see if it is practically and economically realistic to conclude that the development envisaged for parcel 3 under the MDP can take place in a reasonable amount of time. But these facts must be reviewed with the admonition set forth in Falkner v. Northern States Power Co.,248 N.W.2d 885 (Wis., 1977), kept in mind. The Falkner court set forth principles our court has agreed with. See State v. McCook, 109 Conn. 621
(1929). The Michigan court said:
"Notwithstanding its legislative character, the CT Page 3149 determination of necessity by the legislature by its delegate is not completely immune from review. There is a limit beyond which the legislature (or its delegate) cannot go, and the issue of necessity is one that the court can review in an owner's action under § 32.06(5), Stats. However, the scope of review is narrow. Our decisions establish that a court will not disturb a determination of necessity the absence of fraud, bad faith or gross abuse of discretion; the determination of the necessity of taking will be upheld if there is reasonable ground to support it." 248 N.W.2d at p. 894.
Is office space for parcel 3 speculative, can it be accomplished in a reasonable amount of time? These questions must be reviewed in the larger context of the public use this court has already found to be the goal of Chapter 132 and which in the appropriate case could justify the exercise of eminent domain power. That use and public purpose is the economic development of a distressed municipality struggling with a downtown in need of development poor job creation performance, population decline, and a limited tax base. Office development would provide immediate economic stimulus through construction jobs, if ultimately successful would help employment and add to the tax base and be part of a development project which also aims to revitalize the downtown area.
What does the record say? The MDP itself says that as of the date of its preparation its studies show that rent levels at Class A office buildings have stabilized but are below the level needed to support new speculative construction. In fact, historical values of Class A office buildings have not recovered sufficiently to justify new construction except for end users. The MDP does say that the city is at the threshold of major economic revitalization and the key catalyst is the Pfizer research facility. The proposed office space for the MDP would thus be close to a globally significant research and development facility and the office space proposed could be available to high technology users. Based on projections available at the time the MDP was prepared, however, the MDP did predict a significant shortage of office space by 2010 and said land in the Fort Trumbull area should be reserved for future development of office buildings. Another Fort Trumbull area study was presented to the court. Mr. Jones, president of the private developer, presented a report to the officers of his firm. It was entitled "Commercial Office Study." It was prepared in January, 2001 by Jay Hooper and discussed the feasibility of office building construction at that time. Mr. Hooper said New London is still recovering from the recession of the early 1990s and while rental rates and occupancy trends "have been positive for over the past few years, market values are still well below replacement cost and CT Page 3150 new construction is generally not feasible." Other testimony was received to the effect that the demand for Class A office space in New London at the present time is "soft" and he and others noted, for example, that the Shaw Cove office buildings have not been able to rent in fact, they are considering ground floor rental due to greater demand for this type of commercial activity.
On the other hand, Hooper did note the Class A market is "quite healthy with only 4.6 percent not leased." He refers to an appraisal report indicating a positive demand for Class A and B office space over the last four years. Although Hooper said rental brokers noted only a few inquiries "from companies representative of Pfizer related demand," he did say "nonetheless, one source of future demand for commercial space may be the result of doing business with Pfizer that desire proximity to the new Global Development Facility." Hooper went on to say that the biotech-bioscience office market is in its infancy in our state and "at this time" it is difficult for New London to compete with New Haven, but it is not economically feasible to develop this type of office space "at this time without an end user in hand that will pay the rent to support the cost." Mr. Hooper focuses attention on Building 2 which can be used for office space and will not be condemned as initially planned. Talking of the projected office buildings on parcel 3, Hooper says: "Given the uncertainty regarding demand/feasibility of biotech-bioscience space, as well as the fact that any additional office development, in all likelihood, will be subsequent to completion of Building 2, any design should be kept flexible to accommodate various types of demand." Hooper generally concludes that "market conditions do not justify construction of new commercial space at Fort Trumbull on a speculative basis." He does go on to say that thought should be given to "the possibility of developing a small `flex' building capable of being built out for office or biotech-bioscience space and capable of being expanded to accommodate future demand." Hooper talks about marketing strategies for Building 2. He does recommend the hiring of a brokerage firm and says: "Preliminary marketing materials, including conceptual schemes, should be prepared for the future commercial development space in the event sufficient excess demand is generated that cannot be accommodated in Building 2, and/or an end user is identified for a building-to-suit development."
As noted, Mr. Jones testified for Corcoran Jennison and he said office buildings "will be developed as market conditions warrant," buildings are not built without tenants and as of June, 2001, there were no tenant commitments as to Building 2 and the new proposed office buildings.
It is interesting to note that despite Hooper's internal report to Jones completed before trial, Corcoran Jennison spent several months thereafter working on site plans and with NLDC to formulate a development CT Page 3151 agreement that projected office buildings on parcel 3. Also, Hooper's report and many of the MDP observations are in place studies focusing on conditions and projections made at the time they were prepared. The whole point of the MDP and the motivation for its preparation was to capitalize on the Pfizer decision to build a research facility; the MDP, for example, mentions the development of high technology office space as a goal. But Pfizer did not even start building its facility until April, 1999 — several months after the MDP was prepared — and people did not even start moving into that Pfizer facility until the beginning of 2001 when Hooper had already prepared his report and it was being presented to the developer. In light of all that it is not surprising that to this point the developer or NLDC has not been inundated with requests for office space or that New London "at this time" cannot compete with New Haven for biotech or bioscience users. In fact, Bruce Hyde, New London's director of real estate, testified that since the Pfizer announcement there has been an added interest in New London for development purposes. And it does not appear to be contested that Pfizer has business relationships that could represent a demand for biotech office space in the Fort Trumbull area. Mr. Hicks, who was on the consulting team that prepared the MDP, envisaged that office space would probably initially be occupied by firms who had business relationships with Pfizer.
Given all of these facts, the objection that here the type of economic development planned for parcel 3 is too speculative and cannot be accomplished within a reasonable time is in effect an argument that such development for distressed or economically suffering communities under Chapter 132 cannot be permitted. If a community is in fact not economically well off, with the higher than average unemployment, and an undiversified housing stock, a declining population and not much in the way of vacant land for development, it will of course be difficult to market a development site and develop it immediately or according to some accepted norm set down in school district expansion, utility line and water company pipe placement eminent domain cases. But it seems to the court at least that in selected cases cities like New London, given its economic situation, should be given time to develop a site which has built in features that would be attractive to users — here, we have a city just beginning to come out of the economic doldrums, with a major international company alighting in its midst that has the ability to attract other businesses, developing an office site next to a planned four star hotel with the site located near a state park and enjoying a waterfront view.
Also, as noted, Mr. Hooper said the possibility should be considered of initially a smaller office building that can be expanded over time. As Mr. Hicks said in his own way, "master planning is a process that evolves CT Page 3152 over time and must be flexible and subject to change as conditions warrant." City of Miami Beach v. Broida, 362 So.2d at p. 20, referring toCarlor Co. v. City of Miami, supra. The MDP itself said there will be a substantial demand for office space in 2010. Is that too far away even if that is the end point? We live in a capitalist economic order not a planned economy. Some commissioner of planning will not awake on January 1, 2010 and order that office buildings be built. Private businesses can avail themselves of economic forecasting just as do the preparers of development plans. Expanding economies drive the need for office space not vice versa as Mr. Jones implied; prospective users of this site will start planning to occupy new or additional office space long before the 2010 date for any projected utilization of the office space. In large development cases of this type, it is neither necessary or possible in all circumstances that as the court quoted previously, "a political subdivision of the state have money on hand, plans and specifications prepared, and all other preparations necessary for immediate construction before it can determine the necessity for taking private property for a public purpose," Carlor Co. at 62 So.2d, p. 902.
The court cannot say that under the circumstances of this case that the planned development of parcel 3 is too speculative given the purpose of the MDP — economic development of an economically distressed community. Local and state authorities have contributed great amounts of time and monies to prepare this area, including parcel 3, as a springboard for economic activity. Section 8-186 of Chapter 132 contemplates government intervention where "improvement often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost." The intent of Chapter 132 would be crippled if government intervention would only be feasible if immediate project development is possible — economically distressed communities are the very ones where, despite state intervention, project accomplishment might be difficult. Yet the case is most appealing for defining pure economic development as a public use when directed toward such communities.
In fact, the legislature was concerned with the time within which projects ought to be developed under project plans. Section 8-200 (b) says:
"(b) If after three years from the date of approval of the development plan the development agency has been unable to transfer by sale or lease at fair market value or fair rental value, as the case may be, the whole or any part of the real property acquired in the project area to any person in accordance with the project plan, and no grant has CT Page 3153 been made for such project pursuant to section 8-195, the municipality may, by vote of its legislative body, abandon the project plan and such real property may be conveyed free of any restriction, obligation or procedure imposed by the plan but shall be subject to all other local and state laws, ordinances or regulations.
Section 8-195 refers to development grants from the DECD commissioner. Three years have not passed from the approval of the MDP; in any event the municipality could not terminate the project even after three years due to the state grants made in this case. The legislature recognized then what is apparent economic reality that for economic development policy to be practical — years might have to pass before a project plan can be accomplished.
In any event the court does not find the development plans for parcel 3 as speculative and therefore that the takings of the properties on that parcel are not necessary.[18]
 (c)
A complete discussion of the necessity issue, especially as it relates to parcel 3, requires the court to discuss a case decided by our Supreme Court while this opinion was being written, Pequonnock Yacht Club, Inc.v. City of Bridgeport, et al, 259 Conn. 592 (2002).
In that case, the court affirmed the trial court's judgment that granted a mandatory injunction against the city, its redevelopment agency and port authority ordering the plaintiff's property to be reconveyed to it after it was taken.
The court based its decision on the "ground that the defendants' failure to consider integration of the plaintiff's property into the redevelopment plan was unreasonable and, therefore, the taking of the plaintiff's property by eminent domain was not necessary."
The predicate of the court's ultimate conclusion seems to be based on its reference to the specific language of the Redevelopment Act which the court will refer to shortly, but which must be set in context of general eminent domain law. The general rule in eminent domain cases has been set forth in West Hartford v. Talcott, 138 Conn. 82, 91 (1951). That case involved a taking for a school site and the court said the "necessity" required for a taking "does not mean an absolute or indispensable necessity but only that the taking for is reasonably necessary." This is the law throughout the jurisdictions, City of Waukegan v. Stanczak, CT Page 3154 supra; Nelson Drainage District v. Filippis, supra; Levitsky v. PrinceGeorges County, supra, (cited in § 4(a)(1) of decision); Washington is the only state that adopts a different view to the court's knowledge, see Beeson v. Phillips, et al, supra.
But a peculiar problem exists when takings are done under the auspices of Redevelopment Acts like our own where the goal is to remove slums and blighted areas and permit redevelopment so those conditions will not reoccur.
Under such acts "unified areas" are designated as blighted, but the problem arises because within such an area fine homes in good condition may be located which are unfortunately surrounded by vacant or truly substandard buildings. Courts throughout the country have struggled with this problem as it relates to the question of the "necessity" to condemn good homes in one of these unified areas.
There is a certain incongruity in the notion of condemning a perfectly fine home just because it is in the midst of substandard ones when the ultimate object of a project under the Redevelopment Act is to make it possible at a later date for fine homes, or retail or industrial enterprises, to come into place.
Our legislature decided to deal with this problem by language in §8-125 (b) of the General Statutes, which on its face and according toPequonnock Yacht Club stiffens the necessity requirement as stated in the usual rubric set forth in Talcott — reasonable, not absolute necessity. The statute says a redevelopment area may include structures . . . "not in themselves substandard or unsanitary which are found to be essential to complete an adequate unit of development." Pequonnock goes on to hold in interpreting this language that "property that is not substandard and that is the subject of a taking within a redevelopment area must be essential to the redevelopment plan in order for the agency to justify its taking." The court cites language from Pet Care Products,Inc. v. Burnett, 150 Conn. 42, 52 (1962), and deduces its operative principle therefrom.
. . . "we also have recognized that the agency must consider `whether [the property] could be successfully integrated into the overall plan for the area in order to achieve its objective. If [the property] could not be, then the acquisition of the property was essential to complete an adequate unit of development even though the property was not, in itself, substandard.' . . . Conversely, if the property can be integrated it is logical to conclude CT Page 3155 that the acquisition is not essential."
The case now before the court lies under Chapter 132, a municipal development act, not under Chapter 130, our Redevelopment Act, §§ 8-124
— 8-169. In Chapter 132, the statement of purpose section, §8-186, and the definition section, § 8-187, do not contain any language to the effect that structures may be included in the development area which are not themselves substandard if they are "essential to complete an adequate unit of development (§ 8-125b). Section 8-187 of Chapter 132 just says, "real property . . . means structures." Structures are not further defined or qualified as in § 8-125 (b). Why the difference? In slum areas, for reasons already suggested, the legislature was concerned about destroying perfectly good homes when the object was eventually to allow that type of use when the slum was removed. Furthermore, the public could be benefitted just by the removal of only actual slum properties even if redevelopment were not likely to occur in the very near future. Where an economically distressed city is involved, apparently the legislature did not believe those considerations should apply especially after the detailed investigation and approval process required by Chapter 132, a city and its development agency had concluded condemnation was reasonably necessary even if not absolutely necessary (or essential) to complete a development project. As a trial court, one feels a certain amount of reluctance to amend Chapter 132 by importing "essentiality" language from the Redevelopment Act into the chapter now before the court. And the court is aware of no case and none has been cited which mandates the "essential to the project test" as constitutionally required, Pequonnock certainly did not allude to that possibility.
Interestingly, even under the Pequonnock test deference to the legislative decision is still recognized as operative under the Redevelopment Act. The court cites two cases. Pet Care Products, Inc. v.Barnett, supra; and Broadriver, Inc. v. Stamford, 158 Conn. 522 (1969). In Pet Care, the court upheld the agency's finding that it was essential to take the plaintiffs' cinder block buildings — among other things street layouts, set back lines and the boundaries of the plaintiff's property with its block were pertinent problems facing the agency in its planned redevelopment of the area," 150 Conn. at p. 53. In Broadriver, the court said the agency had a "responsibility" to consider such matters as street layouts and the relation and significance of the plaintiff's property to the entire area." Even if the Pequonnock standards were to apply to this case, the type of concerns referred to in Pet Care andBroadriver were considered by the city, the state and the NLDC and for reasons previously discussed those entities determined a clear site and the removal of residential properties were crucial for development. Mr. Hicks said retaining the plaintiffs' residences would make development CT Page 3156 "more problematical," it would be "much more difficult." "Probably" a developer would come along "renegotiate the deal and cherry pick the good sights out." In contrast Pequonnock noted that "the agency provided no reasons to explain why the present condition and use of the plaintiff's property was detrimental to the development plan. The city provided no specific reasons other than to enhance the desirability of the area to investors, as to why the plaintiff's property, which both parties stipulated to be in good condition, is essential to the accomplishment of the redevelopment plan."
It is important to understand the background to these comments by thePequonnock court. In Pequonnock the original plan was adopted in 1970, thirty years before the trial court hearing, and had been revised seven times. The original plan did not even call for the condemnation of the plaintiff's property. A developer, Conroy, who joined the project around 1988 decided the plaintiff's property should be taken. After testimony in front of the trial court, but before a decision, the court learned the city had dismissed Conroy and might abandon the whole project. A post-trial hearing was held and the defendants presented one witness, the city's redevelopment director. He said the project was not being abandoned and said Conroy had withdrawn from the project (after twelve years trying) because it was difficult to obtain investors. Therefore, the city would make the development commercial rather than retail.Pequonnock is not this case, it is not Pet Care, it is not Broadriver,Inc. In Pequonnock or even of a plan actively being worked on, there was no worked-out plan, no specific reasons therefore could be offered why condemnation was necessary to accomplish a plan that had lingered thirty years and had a change of purpose at the last minute. There was just some vague thought that taking the plaintiff's property would "enhance the desirability of the area to investors."
Pequonnock imports another refinement into its analysis. It cites NewYork. N.H. H.R.R. Co. v. Long, 69 Conn. 424, 438 (1897); and WestHartford v. Talcott, supra, 138 Conn. at p. 89 for the proposition that: "It is incumbent upon the condemnor to exhaust `all reasonable efforts to obtain the land it desires by agreement.'" It is difficult to ascertain whether this requirement is now to be made applicable to all takings under eminent domain law or is to be confined to takings under the Redevelopment Act or other takings defined by statutes, which specifically require negotiation. In the Long case cited as authority by the court, a railroad wanted to take land and the specific statute authorizing this § 3464 of the General Statutes explicitly said:
". . . when any railroad company shall have the right to take real estate for railroad purposes, and cannot obtain it by agreement with the parties CT Page 3157 interested therein, it may apply to any judge of the Superior Court for the appointment of appraisers to estimate all damages, etc." "See Long
at 69 Conn. p. 434) (emphasis by this court).
Similarly, Talcott, which involved a taking for school purposes, was concerned with a statute, § 7181, which "by its express terms applies only `in case those desiring to take such property cannot agree with the owner upon the amount to be paid him (sic) for any property thus taken,'"138 Conn. at p. 89.
There is nothing in the Redevelopment Act requiring negotiation, but the language of the court suggests it was applying the negotiation concept to takings under that act. It cited Pet Care and Broadriver,Inc. for the principle it adopted and said in those cases:
 ". . . we also established that a redevelopment agency must make reasonable efforts to negotiate and consider the integration of the property that is not substandard into the overall redevelopment plan." (Emphasis by this court.)
This reflects the same concern with the destruction of non-standard property that lies behind the legislative determination that to condemn such property it must be found that the taking is "essential" to the overall development plan. It leads this court to believe the Pequonnock
negotiation requirements are directed only to takings under the redevelopment act or takings under statutes specifically requiring negotiation.
But even if this reading is too narrow, let us consider the facts ofPequonnock that led to the court's conclusion and compare the facts in this case to see if, in any event, the Pequonnock purposes regarding attempts to negotiate or reach agreement have been met.
In Pequonnock the trial court found that the
. . . "plaintiff had made numerous efforts to discuss with the defendants the integration of its property into the Steel Point redevelopment plan. The plaintiff had clearly indicated that it was willing to invest in its property and work with the developer to assimilate the property into the overall plan. The city routinely and consistently rejected the plaintiff's efforts to negotiate and maintain that it needed to take the plaintiff's CT Page 3158 property."
At a later point the court notes:
 "Further, the plaintiff had communicated on multiple occasions its desire and willingness to make changes to its property in order to have the property incorporated into the final redevelopment plan. Indeed, in order to have the property integrated properly the plaintiff was amenable to building whatever was necessary on its property and to opening its waterfront areas for public access."
At the post-trial hearing, previously mentioned, the redevelopment director indicated that "the defendants had not considered allowing the plaintiff to remain on its property or assimilating the property into whatever proposal might be approved."
That is not what happened here. A plan, the MDP, has been approved. The process to create that plan commenced in May, 1998 and was finished in December of 1998. A team appointed by the development agency considered various development proposals all of which did not require the removal of all residences in the Fort Trumbull area. During this initial period, public comment was received and seven public meetings were held, and Mr. Hicks, who was on the team, said the final plan incorporated some of the public concerns. After the plan was approved, a further forty-five-day public examination period ensued. The final plan was not voted on by the NLDC until January, 2000 and was approved by the city council in the same month. Public comment opposing the plan and its aim to remove private residences was received at the public hearing statutorily required before the NLDC could approve that plan. At that hearing, Admiral Goebel said it was unlikely that the plan could be modified to save buildings, but it was something that could be considered. At a public meeting in April, 2000, the president of the developer and the president of the NLDC referred to that agency the question of whether residences could be retained in the development area. As late as possibly 2001, although he could not remember if it was 2000, Mr. Jones, the president of the developer, was asked by the NLDC if retaining buildings besides the IDC could be accomplished without endangering the plan. The NLDC looked into the possibility of physically moving residences and had cost estimates done.
Public meetings throughout the Fort Trumbull area were held after the MDP was adopted concerning its terms. Mr. Hemmerdinger, an NLDC official, said he had met with the plaintiffs who had raised their issues concerning the MDP. CT Page 3159
Each of the plaintiffs testified they were not opposed to development and the court believes these assertions because they are highly credible people. They just want the development to go forward without taking their homes. The plan they offer to accomplish this end was presented by the plaintiffs' witness, Professor Mullin, a highly-qualified expert in the development field. But there is no evidence his plan was presented to the defendants over a period of time and not considered or summarily rejected. Most of the houses in the area have been demolished, a development agreement was about to be signed at the time of trial, twenty months passed between the inception of the process that led to the formulation and approval of the MDP, the time of trial is too late to present negotiating alternatives even if the Pequonnock requirements as to negotiation and consideration of alternatives were held to apply to Chapter 132 development projects.
 5.
The court will treat the exercise of the power of eminent domain as to the properties on parcel 4A separately.
First, the court will discuss whether the condemnation of the parcel 4A properties are necessary to accomplish a public use set forth in the MDP. Then the court will discuss whether the condemnations are independently justified in order to complete road infrastructure work that the MDP requires.
 (a)
First it should be noted that there is no evidence in this record that to develop parcel 3 as envisaged in the MDP and its modifications the power of eminent domain must be directed against the plaintiffs' properties on parcel 4A. There is, for example, no testimony from Mr. Hicks, the Corcoran Jennison president, Jones or Professor Mullin that the clear site requirements for parcel 3 development have anything to do with parcel 4A, that is, that allowing the plaintiffs' properties to remain on that parcel will have anything to do with the attractiveness of parcel 3 for developers. Thus, any attempt to justify the takings on parcel 4A based on the development requirements of parcel 3 would clearly be a case of excess condemnation, cf. Conn. Light Power Co. v.Huschke, et al, 35 Conn. Sup. 303, 308-309 (1979); State v.0.62033 Acres of Land, supra, at 112 A.2d p. 860; In re Matter ofCondemnation of King, 556 A.2d 527, 529, 531 (Pa., 1989); State ex relHighway Commission v. Curtis, 222 S.W.2d 64,68-69 (Mo., 1949); Alton v. Wabedo Township,524 N.W.2d 278, 282 (Minn., 1994); Nelson Drainage District v. Filippis,436 N.W.2d 682, 685-686 (Mich., 1989). CT Page 3160
Whether the takings on parcel 4A are for a public purpose and/or are necessary to
achieve that purpose must be addressed on its own merits. It is so elemental that a host of cases need not be cited that despite the deference owed to the decision of the legislature or its duly delegated authority (1) "Whether the purpose for which a statute authorizes the condemnation of property constitutes a public use is, in the end, a judicial question to be resolved by the courts . . ."; Gohld, at141 Conn. p. 141; and (2) "The determination (of necessity for a particular taking) is conclusive unless and until it is successfully attacked for unreasonableness, bad faith or abuse of power. . .", McCook
at 109 Conn. at p. 628 — the forum of attack being the courts. These are constitutional predicates to the government's power to exercise the right of eminent domain. If the taking clause of the state or federal constitution are to have continuing viability, the court must be offered some intelligible information on which to base a decision as to public use and necessity for a particular taking. The court here does not believe it can fairly perform that function which the plaintiff citizens who own property on parcel 4A have a constitutional right not only to expect but to demand.
The language of the MDP is itself confusing at least to the court. At one point it says: "A portion of parcel 4A will be redeveloped for uses that support the state park such as parking or for uses such as retail that will serve park visitors and members of the community." At another point it says: "Parcel 4A is intended to accommodate the development of support facilities for a marina, or a marina training facility, to be developed south on parcel 4B and the Fort Trumbull State Park to the east. Any development of ancillary buildings that may be located on these two parcels shall be orientated to help define their edges, in particular those of Walbach and East Street. Surface parking developed on either of these parcels shall be appropriately screened."
As to parcel 48, the MDP says that it "is intended to accommodate a mix of water-dependent uses centered around the rehabilitated Fort Trumbull Marina, which will provide boat slips and upland support. The Marina may be developed as a working marina training center, with facilities designed in conjunction with improvements made to parcel 4A." This latter language is a study in circularity. Besides, what on earth is a marina training facility" and is this marina intended to be open to the public, rented to private parties or to parties already having privileges at the current unrehabilitated marina and will parcel 4A have anything to do with "marina support" in any event and what does that mean and why is the marina not even mentioned in the first described use for parcel 4A set CT Page 3161 forth in the MDP and quoted above? And what does "park support" mean? Professor Mullin, certainly a man of great experience in this area, "never heard the term before." He said he gathered it meant parking, storage warehousing," but where he garnered the information as to storage and warehousing is a mystery to the court, does not otherwise appear in the record and, in any event what is being stored and warehoused? Mr. Hemmerdinger also testified. He is a part-time consultant to the NLDC, but has been a full-time consultant and in the later role served as the director of real estate development for the NLDC.
"Park support" was not a statutory term that he was aware of; when asked whether it was intentionally a broad term, he said that he did not author the term and does not "know what was being thought about." Claire Gaudiani, president of the NLDC, also had no notion of what park support meant.
Parking is mentioned as a use for parcel 4A — it is also true that the state park and a marina will generate a need for parking. But as Professor Mullin said on the parking issue as it relates to parcel 4A: "How much and for what use? It . . . simply stood there as a big nothing." There is no indication how much other parking was reserved for these uses. Besides, on this parcel the plaintiffs' property only constitutes .76 acres out of a total of 2.4 acres. Under these circumstances, how can the court perform its function of determining the necessity for the taking or whether there is a problem of excess condemnation even if a portion of the parcel is to be used for parking?
But the notion that the parcel is being actually considered for parking is further belied by the fact that the more recent notion advanced as a hopefully possible use for this parcel is a Coast Guard museum. Then what about the parking which the court was to somehow guess would be needed for park visitors and users of the marina on parcel 4B?
The problem presented here is not that faced by the court when discussing parcel 3. The very nature of economic development type projects is such that their accomplishment are based on financial predictions and possibilities that cannot be certain and dependent on equally uncertain competitive factors. Because of this, because of the deference owed to the legislature and its selected agencies, if economic development programs are to be at all permitted and encouraged, the courts must recognize the constitutional propriety of allowing development agencies flexibility even as to the completion time of such projects.
But there is a point beyond which the court cannot go. The Florida courts have gone quite far on the matter of deference to legislative CT Page 3162 authority where economic development schemes are involved. The court has referred to the Carlor Co. case and the Broida case. Wright v. DadeCouny, 216 So.2d 494, 496 (Fla., 1968) succinctly the view of those courts:
 ". . . it is not necessary that the officials proceed to make immediate use of the property this acquired or that they have `plans and specifications prepared and all other preparations necessary for immediate construction before it (the county) can determine the necessity for taking private property for a public purpose,'" (emphasis added by this court).
But Broida (civic convention center complex) which relied on Wright
noted that in the case before it, "The city does have a plan and that the plan has been partially completed. The (condemnees' property) lies within the boundaries of the plan." Here, Corcoran Jennison has not been selected for anything to do with regards to parcel 4A; they are just trying to develop parcel 3. Admiral Goebel testified that there is of yet no development plan for this parcel, no site plans are being prepared, no development agreement is being negotiated, no developer has been designated to work on any plan for this site. The MDP statements regarding the use for parcel 4A are too vague and uncertain to allow the court to conclude the takings here are necessary and would not be unreasonable.
More recently, there has been some optimism that the Coast Guard would place a museum on the parcel. Admiral Goebel expressed only as optimistic hope. Claire Gaudiani said the Coast Guard was "extremely interested" in the parcel. But then Gaudiani said the people she met with are moving down an "appropriate pathway . . . toward an ultimate site decision."
No criticism is meant of the NLDC or its officers in their efforts to get the museum to locate in the city — they only can be commended for that. But the hopes they have in this regard are too speculative to justify these condemnations. Beyond that elemental consideration it is also true that with regards to any museum on this parcel there are, because there cannot now be, any site plans being worked on or development agreements in place or anything known even about the nature of this museum relative to size and location that would permit the court to determine whether if the museum is a possibility on this site its location thereon would necessitate the condemnations. Even if the court were prepared to give the legislative agency all the deference in the world under these circumstances, it cannot perform what is a constitutionally mandated function. In other words, this is not a case CT Page 3163 where if we are going to have an airport, it has been decided we need plaintiffs' land (Carlor Co.) or if we are going to build a convention center, the condemnors' land must be taken (Broida); or if GM is going to build its assembly line, its width and length required the seizure of a whole neighborhood (Poletown) or the pipeline has to go through Mrs. Jones' house if we are going to access reservoir water; or the highway expansion means we need to take the nice house in the valley — this is a case where the court just cannot make the requisite constitutionally required necessity determination based on the information before it.[19]
The court could find no case directly on point but the uses here are so vague, shifting and noncommittal that the general language of Krauter v.Big Blue Natural Resources District, 259 N.W.2d 472 (Neb., 1977), is of some interest. There, the court at p. 476 said: "The landowner's right to own, possess and enjoy his (sic) property free from an unlawful and unconstitutional exercise of the sovereign power of eminent domain may best be insured by requiring specific pleadings and proof. We hold that in a condemnation action under the power of eminent domain, the condemnor must allege the specific public purposes for which the condemnor seeks to acquire and use the property sought to be taken." In State Hwy. Comm. v.Yost, 384 P.2d 277, 282 (Mont., 1963), the court held that the condemning authority must in the first instance produce sufficient evidence to establish facts indicating the taking is necessary. There, the court found that the highway commissioner merely alleged the taking was necessary for a public use and produced no evidence to establish such necessity.
 (b)
Independently of any purpose of carrying out the development goals for parcel 4A set out in the MDP or any accretions to it — whatever those might be — the NLDC argues that it has the right to exercise the power of eminent domain in order to carry out the road infrastructure improvements envisaged in the MDP.
The MDP did state as one of its purposes that improvements would be made to the roads involving widening them, providing for a planting strip and adequate sidewalks. The defendants maintain that the plans they have for the roads would bring them up to the regulations established by the city before the MDP was formulated. The defendants maintain that in order to establish an appropriate turning radius at the intersection of Trumbull and Smith Streets with a 20-foot sight line for vehicles making a turn, it is necessary to use the power of eminent domain against the Kelo residence. On East Street, two bus pullovers are planned for which will require a widening of the road. The reasonableness of this does not seem to be questioned since bus pullovers will be necessary as an CT Page 3164 ancillary service to the planned upon state park. Also, Walbach Street is a so-called "collector" street — that is a designated wider street to accommodate traffic feeding into it from other site areas. The plaintiffs do not seem to contest the fact that Walbach is to be a collector street, one of their experts agreed with the designation. The road widening planned for Smith Street along with the other just mentioned plans would provide a basis for using eminent domain power to against the Dery house at the corner of Walbach and East Street and Guretsky homes in parcel 4A along Smith Street.
It should also be noted that Smith Street, as it runs along the side of parcel 4A, is bordered on the opposite side by a regional water pollution control facility.
By the time of trial, the city had spent a fairly large sum of money to develop working plans for these road improvements and a final plan had been submitted to the planning and zoning commission of the city, which must approve any such plan before work can begin on a road project.
The affected plaintiffs make a two-pronged attack on the use of the power of eminent domain against their properties based on the road infrastructure plans. They first argue that the city has no power to widen roads that are already established. And secondly, they maintain that the city's objectives could be achieved "without encroaching on the plaintiffs' homes and buildings" so there is no need to condemn these homes. Even if the road widening plans were justified the city could only take limited easements over portions of the plaintiffs' properties to accomplish its goals and need not condemn the whole property.
The plaintiffs also appear to make an equal protection, due process and certainly a pretext argument. They say the street widening plan is full of "inconsistences and anomalies." The defendants seek to condemn the plaintiffs' properties to comply with sight line and curb radius standards that are routinely ignored elsewhere in the city. The hyper technical enforcement of sight lines, curb radii, sidewalk widths and other requirements under these circumstances is a "shabby, transparent pretext for the real goal of the defendants — emptying the Fort Trumbull area of existing residents to make room for new ones," cf. AvalonbayCommunities, Inc. v. Town of Orange, 256 Conn. 557 (2001). As will be seen shortly, the court is quite sympathetic to the first two arguments of the plaintiffs. But the last mentioned due process, equal protection and pretext arguments appear to be somewhat short on substance. For one thing, the MDP itself, which was formulated many months before the eminent domain power was authorized, envisaged much of the road widening and sidewalk work that is now pointed out as pretextural. Page 5-55 of the MDP planned for "widening and improvement, including larger curb CT Page 3165 radii at intersections, as necessary" . . . including Walbach, Smith, Trumbull and East Streets. Sidewalks and street scape amenities were planned also, p. 5-56. It is somewhat of a stretch to argue that all of these road widening plans and other infrastructure work was meant to be a preemptive strike based on the possibility that these plaintiffs or any other property owners eventually would oppose the exercise of eminent domain power.
Also the fact that other areas of New London are not made to comply with city requirements as to curb radii, etc., only underlines the fact that these requirements predate the MDP and any plan to condemn the plaintiffs' property. The MDP in § 5 shows an understandable preoccupation with the design of roads and sidewalks and the amenities to be associated with them in the project area. The whole point was to make the MDP an attractive place for the hoped for tourists visiting the site and businesses who might be induced thereby to locate in parcel 3. All of this provides motives for the city's actions which are not discriminatory or arbitrary. Furthermore, the court has some difficulty understanding the argument that all of these road plans were a shabby and transparent pretext to remove present residences of the Fort Trumbull area to make way for new residences. As to parcel 4A, the court has no firm idea of what is planned for parcel 4A, certainly not residences.
The plaintiffs do make substantial arguments concerning these road work plans which the court will now attempt to address.
The first question to be addressed is whether the defendants have the power to "widen, alter and/or reconfigure the roads" as they affect the properties in parcel 4A.
The defendants first argue and the court agrees that NLDC has that power under Chapter 132. Parcel 4A is within the project area and §8-193 (b) states a development agency shall use all powers necessary or convenient to undertake and carry out development plans and development projects including the power to . . . install, construct or reconstruct streets . . . necessary for carrying out the objectives of the development project." Section 8-189 requires the project plan to include "a description of the types and locations of present and proposed streets, sidewalks, . . . and the types and locations of other proposed site improvements." The project plan then must be approved by the city council and the DECD. And under Chapter 132, a municipality can issue bonds (§ 8-192) to advance the development project and toward that end also receive planning and development grants from the state (§8-190, § 8-195). The MDP as noted has always contained plans for widening and altering roads within the project area. As discussed in an earlier portion of this decision, the city, under its charter as CT Page 3166 presently worked, can proceed under state statute and rely on the eminent power granted in Chapter 132 to accomplish project goals including work on the road infrastructure for such a project.
Even apart from the MDP and Chapter 132, a town appears to have the power not merely to establish or lay out new roads (§ 13a-61), but can alter and thus widen existing roads (§ 13a-84). As said in Woodbridgev. Merwin, 27 Conn. Sup. 469, 473 (1968).
 "The fact that § 13a-61 is interpreted not to include power to alter an existing highway does not militate against § 13a-84, which provides for the selectmen to appeal to the court to ascertain benefits and damages if the selectmen and any person interested in the "layout . . . or alteration of any highway" cannot agree as to the damages sustained. The authority of the latter statute to selectmen to pay damages in connection with an alteration of a highway could well contemplate that such an alteration was intended by the legislature to be authorized by town meeting action as distinguished from action solely by the selectmen."
Furthermore, § 13a-103 states that citizens may bring a complaint to superior court alleging that a town failed to maintain a highway. The court shall set a time where interested parties can be heard on the "propriety . . . of making such alterations and improvements. If the court finds in favor of the citizens on the issue of road alteration or improvement it can order the selectmen or select women to make such alterations and improvements.
Also, § 13a-63 where the town refuses to lay out or alter a highway an action can be brought to superior court which can appoint a committee to determine the merits and report its finding to the court. The committee itself can survey and lay out the alteration if it finds it would be a public convenience and estimate damages and benefits caused by its actions.
These statutes make no sense unless the municipality in the first instance does not have the power to not only lay out streets, but alter them and widen them. In fact, as the defendant city points out, § 7-148
(c)(6)(C)(i) states that: "Any municipality shall have the power to do any of the following, in addition to all powers granted to municipalities . . . (i) Lay out construct, reconstruct, alter, . . . streets, alleys, highways, boulevards . . . sidewalks, curbs, gutters, public walks and parkways." CT Page 3167
No matter what the city charter says standing alone about the city's power or lack of power to alter and widen streets, given the court's previous analysis of the charter, the city can rely on Chapter 132 for a development project coupled with the power given it by the state under § 7-148. There is certainly no need to go back to the city council seriatim for approval whenever work on the road infrastructure in a development project may dictate the need to exercise the power of eminent domain as the plaintiffs seem to suggest. Such a position would bar, for all practical purposes, economic development programs in developed area requiring site clearance since such programs often require work on road infrastructure.
But just because the city has the power to alter and widen streets and determine sidewalk widths, that does not in itself justify a particular taking to accomplish those purposes. The court must still decide whether the taking was necessary; as noted before, deference must be given to the legislative authority, acting through a designated agency, but its decision on such matters can be rejected by the court if it is arbitrary, unreasonable — in a word, clearly unnecessary.
First certain basic principles must be reviewed. As to parcel 4A, the municipality claims it has the right and power to widen streets due in one case (Walbach) to the fact it will be handling more traffic under the MDP and to ensure that parking on the streets is provided for. Also, East Street is slated to have two bus pullovers which will enable the public to have easy access to the state park.[20]
As stated in Nichols, at § 7.06(4), p. 7-119:
 "The taking of private property for a public highway has long been considered a valid public use. Long before the American Revolution, this was the only use authorized by eminent domain.
Also, it has been held that "parking is a proper use of the highway, and, if necessity therefor exists, the right of eminent domain may be exercised to establish or widen highways adequate for this purpose. The taking of land for highways is not limited to that necessary for actual travel." City of Grand Rapids v. Barth, et al, 226 N.W. 690, 691 (Mich., 1929).
Furthermore, as mentioned in a previous footnote, establishment of public parks is recognized as a public purpose and providing convenient bus access to such parks certainly appears to be an ancillary public use. CT Page 3168
To turn to the necessity requirement for taking a particular piece of property to accomplish the public purpose, another quote from Nichols is appropriate, especially as it relates to a condemnation for highway purposes.
At § 5.01(3), p. 5-14 of his third edition, the author notes:
 "Although the public use requirement may have been eroded by recent judicial decisions . . ., it is still incumbent upon most potential condemnors to show that it is reasonably necessary to acquire both the estate in and the amount of property sought in order to accomplish the public purposes as justification for the taking." (Emphasis by this writer.)
It is true that the necessity requirement does not mean absolute necessity, it means reasonable necessity. But in road infrastructure cases, as in other taking cases, there can be no finding of necessity if the taking is made in bad faith, or is arbitrary or unreasonable, Stateex rel Highway Commission v. Curtis, 222 S.W.2d 64, 69 (Mo., 1949). Interestingly, there is not much Connecticut law on the necessity issue as it applies to takings for public highways. But our case law does seem to recognize that as a matter of practice, only an easement over a portion of property may be necessary as opposed to taking the whole property. In Tyler v. Darien, 115 Conn. 611, 613 (1932), the court said: "When a town lays out a highway, it takes an easement for public passage, leaving the fee in the person over whose land the highway is laid; but except as modified by statute, the easement so taken includes the right to make any changes in the highway which the changing needs of traffic may thereafter render necessary, without compensation to the owner of the fee; thus, it may alter its grade or the location of the traveled portion or it may subject it to new and more burdensome uses, and may do any act necessary to accomplish these purposes." In Kratochuilv. Cox, 129 Conn. 246, 249 (1942), the court said: "In the case of highways laid out by towns, all that is taken is an easement for highway purposes. . . . This is a less estate than the fee obtained by warranty deed." In fact, one older Connecticut case, while of course recognizing that highways are a public use, showed a sensitivity to the rights of property owners whose land might have to be acquired. Canastota Knife Co.v. Newington Tramway Co., et al, 69 Conn. 146 (1897), involved a situation where the owner of land demanded compensation because an electric railway was to be located in the public highway. The owner claimed this was an additional service on its fee. The court rejected the claim, but at p. 156 said: CT Page 3169
 "The best definition of a public easement is often that given by public use. A highway is a way over which the public at large have a free right of passage. It is constructed and maintained in their interest. This liberty of passage may always be exercised in such a manner as may, at the time, be customary and reasonable, having in view both the convenience of the public and the proprietary rights of the owners of the soil. As to what is reasonable under these limitations, every age, speaking by its common law, must of necessity judge by its own standard."
On the easement issue, the court has found a case outside our state which, although not a highway case, had a bearing on the issue before the court. In City of Charlotte v. Cook. et al, 498 S.E.2d 605 (N.C., 1998), the Supreme Court of that state held that a city could take a fee simple to the landowner's property thus not allowing him to conduct his business as a dairy farmer and was not required to only take an easement. The city acted so that a power company could construct a pipeline at the depth of forty feet. Frankly, the dissent in this case seems more convincing — it strongly argued no necessity was shown for the fee simple taking. But even at that, the majority in reaching its decision reviewed the evidence and did not merely rubber stamp the city's condemnation decision. It said the credibility of the expert the city relied on was for the city council and the trial judge to pass upon. The expert said, by way of affidavit "that it was necessary to acquire a fee simple title to the property because of the depth at which the line would be laid, the facilities that will be constructed close to the line, and the need to have effective control over all uses of the pipeline route. Mr. Vandeventer also said that [the power company] had experienced difficulties in other places where facilities were within easements rather than on property owned in fee," id., p. 608.
The court went on to hold that: "The city does not have to show it would be impossible to construct a line using an easement. If the city can show that it needs a fee simple to construct and operate the line under optimum conditions, that is proof of necessity (for the taking)," id. p. 608.
Similar in its reasoning is the case of Woolard v. State HighwayCommission, 249 S.W.2d 564 (Ark., 1952). There, the court held that the condemnation of a right of way 250 feet wide was not arbitrary or capricious. The dissent believed a 200-foot right of way was all that was required, but the majority, after noting the deference that should be CT Page 3170 given to legislative judgment, pointed to the "testimony by experienced engineers that a 250-foot right of way is needed in this instance," id., p. 566. In City of Charlotte and Woolard, the deference to the political decision-making body seems to rest on the deference the respective courts gave to expert opinion in each case that the width of the particular easement or right of way would result in optimum use or was needed for the appropriate exercise of the particular public use.
Before turning to the specific facts of this case regarding the issue of the need to take the properties in parcel 4A for road infrastructure purposes, the court would make one observation. As noted previously, it is a mantra repeated in the commentators, out of state cases, and our cases that the need to take property for a particular public use is a "legislative" prerogative. Great deference must be given to the decision of the legislature, its authorized agency or municipality. But room must be left for the viability of the taking clauses of the state and federal constitutions. It seems to the court that the degree of deference in part is defined and determined by the ability of the court as a court to appropriately and intelligently decide the necessity issue in a particular context as opposed to the legislative body or agency or municipality.
In deciding the necessity of condemning property under a statutory scheme, like Chapter 132, and whether a particular taking is necessarily broad and often complicated social and economic issues and predictors are involved requiring a certain amount of expertise and familiarity with local and regional conditions. The legislature acting through agencies or city councils familiar with their towns are often better able than judges to marshal the evidence and considerations necessary to make the appropriate decisions.
But in taking cases where the issue is whether a road need be so wide, or the turning radius at an intersection be so many feet or whether a five or an eight-foot sidewalk or a one and one-half foot or five-foot planting strip is best — it seems, at least to this court, that judges are better equipped to pass on necessity issues in these type of situations. Judges make decisions like this in many situations involving, for example, suits for injunctive relief brought by private parties in land use disputes.
This is not to say deference must not be given to the legislative or political authority in making decisions on road taking matters, but it at least says that the courts are better able to decide whether the decision of such authorities is arbitrary or unreasonable.
In deciding the issues now before the court, it will rely on the foregoing discussion. CT Page 3171
Turning to the specific infrastructure plans as they affect the properties in parcel 4A. A very experienced expert testified for the defendant city, Mr. Mascia. He is a civil engineer and for the past two years has been developing plans to complete the infrastructure for the project area. He has worked closely with city officials in developing these plans. Mr. Mascia reviewed the MDP as a basis for completing these designs which include roadways, broadly defined, and utilities. Basically, he has been overseeing the design of construction documents that are used to solicit bids from contractors. The MDP, as noted, called for the widening and improvement of various streets and intersections and classified streets as to appropriate width. When asked how streets are put into the classification, Mr. Mascia said, "[i]t would depend upon the proposed use of the land that the streets would be serving." Mr. Mascia consulted with city authorities and learned that the streets in the MDP had to be improved to minimum city standards — the MDP complies with those standards. When the final plans are submitted, the city planning and zoning commission must approve or can disapprove of them. The commission under statute, however, has an advisory role to the city council which has final say on road layouts. Two of Mascia's plans were withdrawn for insufficient detail, but during the trial, Mr. Mascia said he had submitted what he hoped would be the final construction documents to planning and zoning.
In parcel 4A, the plaintiffs' properties are located on Smith, Walbach, East and Trumbull Streets. Walbach under the MDP is designed as a collector street, while the other streets are local streets. The city's minimum standards for local streets provide for a 50-foot right of way with a paved curb-to-curb width of 34 feet. Eight feet would lie on either side with five feet as sidewalk and three feet of the eight-foot width designated as a planting strip. City standards also require a 25-foot turning radius at intersections so as to avoid cars hitting the curbs when they turn. Subdivision regulations also require a visual clearance of 20 feet from the intersections for sight lines. Mr. Mascia said this was a safety feature so that a driver can see other cars approaching the intersection at right angles to the driver. Safety is an important consideration because Mr. Mascia testified people would be attracted to the area who are not familiar with it.
The MDP also designates some streets as collector streets and Walbach has that designation. It currently has 34 feet of pavement, but three 12-foot travel lanes are planned. Under the MDP a collector street is to have a right of way of 56 to 68 feet — Mr. Mascia's plan calls for a right of way of 63 feet. A street is given collector street designation because local streets feed into it and it will thus have more intense use. CT Page 3172
Mr. Mascia's plans would require the condemnation of each one of the plaintiffs' properties in parcel 4A. It would be necessary to take the Kelo residence at 8 East Street to provide for a 25-foot radius at the intersection of Trumbull and East Streets while maintaining plans for an appropriately wide sidewalk and a 20-foot sight line at that intersection. Mascia's plan would result in the roadway going through the Kelo home.
On East Street two bus pullovers are planned — a reasonable accommodation for visitors to the state park. Mascia's plans for East Street would also require the taking of the Dery property at Walbach and East.
Road widening plans and an appropriate turning radius at the Smith Street and Walbach intersection would also justify the condemnation of the VonWinkle and Guretsky properties along Smith Street and at its intersection with Walbach.
Mr. Mascia is a highly qualified individual and, like the plaintiffs' expert, Mr. Aubrey, the court found them both to be very candid and straightforward witnesses. The problem the court has with much of the defendants' position on road infrastructure work in parcel 4A is oddly enough similar to the problem it had with the general "development plans," or lack thereof, as to this parcel. In other words, from the information provided, it is difficult for the court to decide the necessity question if due regard is to be paid to the rights of the plaintiffs. That is, the court understands it must defer to decisions of the legislative body on questions concerning road work and takings for such work. But land seizures for such purposes do not thereby fall into some special category of taking that allow municipalities or development agencies to take land by way of fiat. The party who is about to lose his or her property still has a right to claim the seizure is not necessary because it is arbitrary or unreasonable. Even cases like City ofCharlotte v. Cook, supra, (pipeline easement); and Woolard v. StateHighway Commission, supra, which give great deference to legislative discretion make a point of relying on expert testimony presented by the condemning authority in finding the seizures were not arbitrary but necessary for the accomplishment of the public purpose. The universe in which the reasonableness determination is made by the court of course requires deference to the original legislative determination on that score, but the court has to also make that determination with regard to the effect on people whose property is being taken — if not why go through the exercise at all and what do the constitutional protections mean? CT Page 3173
Mr. Mascia felt his task was to carry out the road infrastructure requirements of the MDP. There certainly is nothing wrong with that, but in doing so, he said that he took no account of the possibility of carrying out those plans in a satisfactory way without having to encroach on the residences of the plaintiffs. It is as if when preparing his designs, he was working on a clear field or lot without regard to the existing properties. The problem for the court arises because as to parcel 4A, the plaintiffs, through their expert, are saying that with only slight modifications of Mr. Mascia's plans, New London can accomplish its infrastructure goals without taking their property.
It is also true that the MDP itself, whose dictates Mr. Mascia says he is putting into effect, has not been interpreted by the defendants as requiring rigidity of application even as to road widths, the need for sidewalks, etc. To cite two examples, under the MOP collector streets as noted, can have a right of way between 56 and 68 feet. Nothing dictates the planned right of way of 63 feet for Walbach. Local streets are to have 34 feet of pavement to permit parking. But East Street, for good reason, at certain points will have 28 feet of pavement to accommodate two bus pullovers.
The court will move from the general to the specific and review the takings in parcel 4A. The Mascia plans call for the taking of the Guretsky property at 21, 23 Smith Street the VonWinkle property at 27, 31 Smith Street and the VonWinkle property at 33, 35 Smith Street which is at the intersection of Smith and Walbach Streets.
As the plaintiffs point out the existing right of way allows for the defendants' proposed 34-foot curb-to-curb pavement which would allow on-street parking with a 5-foot sidewalk on the east side of the street and a grass strip on the west side of Smith Street along the sewage treatment plant property. This all could be accomplished if the defendants' proposal to move the existing pavement line toward the plaintiffs' property is not put into effect, but the eastern edge of the pavement is kept where it is. Mr. Aubrey's testimony to this effect was not specifically rebutted and, if accepted, 21, 23, 27 and 31 Smith Street do not need to be taken. Insofar as the court can ascertain, Mascia's questioning of Aubrey's testimony centers on 33-35 Smith Street and the assumption that Walbach Street cannot be expanded to the north into parcel 2. If that supposition is correct, then the 25-foot turn radius with the 20-foot sight line cannot be accomplished and that would also affect the street alignment of Smith Street just to the south of the intersection and the right of way estimates made by Mr. Aubrey. If Walbach is expanded to the north and not as Mascia envisages to the northand south, the turning radius and sight line requirements in the MDP for intersections can be met without taking the VonWinkle property at Smith CT Page 3174 and Walbach or, in fact, the Dery property at Walbach and East Streets.
The court cannot ascertain why Walbach cannot be expanded north into parcel 2 to accommodate all of Mr. Mascia's proposals as to street and sidewalk width and amenities, thereby avoiding the need to take the VonWinkle and Dery properties because of intersection requirements. Apparently, even Mr. Mascia's current plans require some encroachment into parcel 2. The parcel, owned by the Navy, has been leased to the NLDC presumably on a long-term basis. The NLDC has incorporated the parcel into the MDP to be used for so-called high end housing with the necessary road and utility infrastructure to accomplish that use.
It strains credulity to think that given the planned use of parcel 2 and the fact that some encroachment on it is already envisaged that there could be any practical or legally cognizable objection or problem with providing for Aubrey's suggested movement of Walbach Street, a matter of just several feet to the north. No suggestion has been made that Mr. Aubrey's plan would interfere with the contemplated use for parcel 2 or that any engineering problems would be presented. Also, it would be a peculiar position indeed for this court, having spent page after page on parcel 3 issues and rejecting therein the notion that the NLDC was some free wheeling private entity, to now say the prospective actions or failures to act by the NLDC regarding Walbach Street moving north into its parcel 2 area are not to be included in the calculus of deciding whether these takings are arbitrary or unreasonable actions by the city.
Walbach Street runs west to east on the northern run of parcel 4A. East Street which will now be discussed by the court, runs perpendicularly into Walbach from north to south along the eastern side of parcel 4A, between that parcel and the state park.
Mr. Aubrey also testified that the existing space on East Street could incorporate all the amenities at both 28 East Street and 87 Walbach Street. The latter building is at the intersection of East and Walbach and the court has discussed how moving Walbach to the north would allow the intersection proposals at that intersection without encroaching on 87 Walbach for that purpose. . This building also borders East Street, however, so that the proposal for that street must also be considered in deciding whether it is necessary for this property to be condemned.
Aubrey testified that the right of way between physical objects on East Street is 49.6 feet. The attorney for the city argued it may be two or three feet less than this. Mr. Aubrey did not concede this observation and the court has not been presented with enough information to resolve the point. If the right of way is 49.6 feet or even two or three feet less, it is difficult, for this court at least to understand why it is CT Page 3175 reasonable and not an arbitrary exercise of the eminent domain power to take these properties belonging to Mr. Dery. The amenities that would be compromised, while still maintaining road width, concern sidewalks and a planting strip.
As Nichols notes in his treatise on eminent domain at § 7.06 (32), pp. 7-177, et seq, "Traditionally, eminent domain could not be used to secure aesthetic purposes. However, recent trends permit aesthetic considerations to factor into public use deliberations," cf. ParkingAuth. of Georgia, Inc. v. City of Atlanta,. 450 S.E.2d 200 (1994). Also, as he notes, "Private property taken to develop scenic easements is a valid public use," id. p. 7-179, only Connecticut case marginally on point is Murphy v. Westport, 131 Conn. 292 (1944) (exclusion of advertising signs). But neither side really briefed this issue and, although East Street does front the west side of the state park, two bus pullovers are planned for a stretch of street less than 500 feet in length where it is hoped great numbers of tourists and school children will be dropped off during much of the year — aesthetic considerations do not seem controlling under these circumstances, even if this issue were adequately briefed.
Even if these observations are not valid, the court would note that the plaintiffs' observation that the defendants could, but have not, approached the state for a two or three-foot easement onto the park property is worth taking note of. If the request were granted, then all the amenities planned for East Street could be accomplished. Certainly, the city cannot use the power of eminent domain against state land.
But it is also true that but for state involvement the MDP could not be accomplished. A state agency, DECD, had to approve the MDP. Chapter 132 contemplates state involvement in numerous ways. Without state funding, the plan could not go forward; state funding is so central to the MDP that as previously discussed, Admiral Goebel considered that the NLDC was an agent of the state. All this street widening results from an attempt to accomplish the purposes of the MDP as Mr. Mascia concedes. Even if it is true that the city, apart from the MDP, has a right to do all this infrastructure work, no one would suggest the city spent all the time and money it did on Mascia's plans on some lark to have Fort Trumbull streets comply with city regulations. The state approved and financed MDP is the engine that motivates the city to try to meet the regulations. Also, the street widths and amenities under the MDP were decided upon after a traffic analysis which indicated apparently that MDP use required the road infrastructure work. The MDP is clearly the driving force behind the road infrastructure work on Smith, Walbach, Trumbull and East Streets.[21]
CT Page 3176
Under these circumstances, and given the state's involvement can the state refuse to grant an easement of a few feet on state park land to save these homes on a street already scheduled for bus pullovers where aesthetics of the park cannot be a major concern? Can the state refuse such a request without having to show at least that it is reasonably necessary to use all of the land presently allocated to it for park purposes?
This issue has not been litigated or briefed and the court could find no case dealing with these precise questions which are raised in the context of a statute that gives eminent domain power to a municipality to be exercised by a public agency but where the state still retains controls, practically speaking, about when and whether that power is to be exercised.
The court will now discuss the 8 East Street property. It is at the southern end of East Street and lies at the intersection of that street with Trumbull Street.
This property is owned by Mrs. Kelo at 8 East Street. The existing 51-foot right of way permits a 34-foot curb-to-curb pavement and an 8-foot sidewalk on the south side of the street with a five-foot sidewalk on the north side. This would allow space for the city's minimum 1 1/2-foot planting strip and six-inch curbs on each side. Mr. Aubrey pointed out all of this could be accomplished without encroaching on the Kelo property. The only change from the Mascia plan would be a reduction in the defendant's proposed total width for sidewalk and planting strip on the north side of Trumbull Street from 10 feet to 6 1/2 feet.
The court believes it would be unreasonable and arbitrary to condemn this property for a 3 1/2-foot reduction in a sidewalk and planting strip where road widths can be maintained and in light of the fact that these amenities have reduced in other MDP locations when it was deemed appropriate. This is not a case like City of Charlotte where an expert has come in and said that to optimally maintain our pipeline we need an easement of such and such a width, or a case like Woolard where highway engineers testify that in order to have the proposed and needed highway, a 250-foot easement is required. An eight-foot sidewalk would be retained on the south side of Trumbull Street which is the side closest to any water view if aesthetic considerations are a concern.
But apart from the issue of amenities along Trumbull Street another matter must be discussed with regard to the Kelo property. This involves the question of intersection layout plans.
The 8 East Street property lies at the intersection of Trumbull and CT Page 3177 East Streets. Aubrey testified that the existing space allows for a 25-foot turning radius at the intersection, but not a 20-foot sight line. Under Aubrey's plan, there would not be a 20-foot sight line and the sidewalk on the north side of the intersection would have to be curtailed at the intersection to achieve a 25-foot turn radius. But this curtailment[22] would not go past the actual intersection. Mr. Aubrey testified that the curtailment and the existence of a stop sign at the intersection would adequately lay to rest any safety concerns about not having a 20-foot sight line. He testified rather convincingly to the court that in any event a 20-foot sight line is not considered the minimum sight line necessary for safety; ten feet is the minimum based on the fact that a driver approaching an intersection obviously is placed somewhere near the middle of his or her vehicle. Mr. Mascia merely testified that a 20-foot sight line is a safety consideration without going into very much detail as to why that was so. Certainly, if one were to approach an intersection with a building on the corner that has no traffic control sight line, considerations are paramount and one could speculate that a 20-foot sight line, if not more, is needed to allow drivers to see cars approaching the intersection perpendicular to your car. But instead of removing the building, the rational answer might be to put in traffic controls.
Also as noted, the court, for reasons previously stated, does not accept the equal protection and due process arguments based on the following observation, but it is relevant for this immediate discussion, that in several other New London (non-MDP areas) the 20-foot turning radius is not met. This makes it difficult for the court to accept by way of fiat 20-foot sight line as something needed for safety just because it is included in some city regulation and where the proposition is not supported by sufficiently detailed, let alone convincing expert testimony, compare cases of City of Charlotte and Woolard.
In any event based on the evidence presented, the court finds it would be unreasonable for the city and/or NLDC to take the plaintiffs' property in parcel 4A under the power of eminent domain as authorized by MDP and Chapter 132 or other state statutes.[23]
 Equal Protection
In the final part of this decision, the court will discuss several constitutional arguments made by the plaintiffs. These arguments are not related directly to the arguments raised under the taking clauses of the state and federal constitution and, if correct, provide added reason to support the court's decision to bar the takings in parcel 4A, but also would invalidate the court's conclusion that the takings in parcel 3 are permissible. CT Page 3178
First the court will discuss the argument the plaintiffs who have or occupy homes in parcel 3 make under the equal protection clause. This claim involves the treatment given to the Italian Dramatic Club (IDC) by the NLDC. The IDC is a long-standing social club in the Fort Trumbull area. Membership is limited to descendants of people who arrived here from a certain geographic area in Italy. Dinners are held at the club to which members can bring their guests. Originally the IDC was slated for demolition under the MDP, but in October, 2000, the NLDC decided the club could remain in parcel 3. The plaintiffs in parcel 3 argue that: "By permitting the IDC to remain permanently in parcel 3, while denying similarly situated plaintiffs . . . the equal right to retain their property, the NLDC has denied similarly situated people equal protection of the laws in violation of both the Connecticut Constitution (Art. 1, Sec. 20) and the Fourteenth Amendment of the U.S. Constitution" (pp. 78-79 of initial brief).
First the court will attempt to set forth some general principles governing the application of the equal protection clause, then it will discuss the relevant facts of this case. In this regard, some discouraging observations have been made. In Louisville Gas Co. v.Coleman, 277 U.S. 32, 37 (1928), the court said: "The equal protection clause, like the due process of law clause, is not susceptible of exact delineation. No definitive rule in respect of either, which automatically will solve the question in specific instances, can be formulated." And as said in that eminent source of black letter law: "The phrase `equal protection of the laws' has never been precisely defined. In fact, the phrase is not susceptible of exact definition," 16B Am.Jur.2d "Constitutional Law, § 778, p. 298.
Certain general principles, however, have emerged. The protection afforded by this clause of the constitution applies, of course, to the actions of municipalities or their agents.[24] Navarro v. Block.72 F.3d 712, 713 (Ca. 9, 1995), see § 796 of Am.Jur. Article at 16B Am.Jur.2d. The NLDC acted under Chapter 132 and there is no claim here that that statutory scheme in any way deprived these particular plaintiffs of their right to equal protection; but "it is well established that discriminatory application of a facially neutral law also offends the constitution," Navarro at 72 F.3d, p 716.
What interest does the clause protect? In Coleman the court said:
". . . the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances . . . and that it applies to the exercise of all the powers of the CT Page 3179 state which can affect the individual or his (sic) property." 277 U.S. at p. 37.
In New York City Transit Authority v. Beazer, 440 U.S. 558, 587-588
(1979), the court said, "Only when a governmental unit adopts a rule that has a special impact on less than all the persons subject to its jurisdiction does the question whether this principle (equal protection of the laws) is violated." On the other hand, "The law is clear that: `The Constitution does not require that things different in fact be treated in law as though they were the same. But it does require, in its concern for equality, that those who are similarly situated be similarly treated. The measure of the reasonableness of a classification is the degree of its success in treating similarly those similarly situated,'"Johnson v. Smith, 696 F.2d 1334, 1336 (Ca. 11, 1983)
How is an equal protection claim analyzed? First the foregoing language establishes the predicate proposition that "a claimant wishing to assert an equal protection claim . . . `must establish that he (sic) is similarly situated to members of the class who are treated differently from him' (sic). . . . If that point cannot be established, there is no need to continue with an equal protection analysis," Lowe v. State,482 S.E.2d 344, 345 (Ga., 1997); Johnson v. Smith, supra, at 696 F.2d, p. 1336. This then is a "preliminary step" requirement for an equal protection analysis.
If this preliminary step is met, how is it determined whether a classification between those who are similarly situated is a "reasonable classification." Selective application of a statute or government policy or regulation might offend equal protection rights "if it rested on grounds wholly irrelevant to achievement of the regulation's (or statute's or policy's) objectives," Kotch v. Pilot Commissioners,330 U.S. 552, 556 (1946). Or, as put in Asbury Hospital v. Cass County,326 U.S. 207, 214 (1945): "The ultimate test of validity is not whether the classes differ, but whether the differences between them are pertinent to the subject with respect to which the classification is made," also see Coleman at 277 U.S., p. 37.
Thus, in conducting an equal protection analysis, the purpose of the governmental action for which any classification is purportedly made is a paramount consideration. For this court, at least this is necessary because of the need for judicial restraint and the right of other branches of government to act as they see fit within their assigned spheres. Any other rule would, in effect, encourage judicial legislation — judges would be deciding reasonable classification based on what they see as reasonable goals or purposes as opposed to the legislature's vision of appropriate objects of legislation. CT Page 3180
In any event given this analytical framework, what level of evaluation and criticism should courts use to determine if classifications are in fact reasonable and not based on some invidious purpose to favor one class for a reason having nothing to do with the purported government goal or to prejudice another class?
Am.Jur. succinctly sets forth the standards of review. At 16B Am.Jur.2d, § 812, p. 344, it says that "Three degrees of scrutiny are applied by the courts in analyzing statutes (or governmental application of statutes) challenged under the Equal Protection Clause:
 • if a legislative classification disadvantages a "suspect class" or impinges upon the exercise of a "fundamental right' then the courts will employ strict scrutiny and the statute must fall unless the government can demonstrate that the classification has been precisely tailored to serve a compelling governmental interest:
 • if the classification, while not facially invidious, nonetheless gives rise to recurring constitutional difficulties, it will be treated under intermediate scrutiny and the statutory classification must serve important governmental objectives and must be substantially related to the achievement of those objectives in order to withstand such scrutiny; and
 • if neither strict nor intermediate scrutiny is appropriate, then the statute will be tested for mere rationality."
The plaintiffs argue that a strict scrutiny test should be applied. The constitution is unambiguous" in its recognition of the right to private property as "fundamental." State v. Geisler, 222 Conn. 672, 687 (1992), is referred to which says, "The sanctity of the home has a well-established place in our jurisprudence."" They point to Zapata v. Burns, 207 Conn. 496,505 (1988), which says that "a right is fundamental for equal protection analysis if it is explicitly or implicitly guaranteed by the Constitution." Here, it is argued, plaintiffs' right to their homes is fundamental because their right to own private property safe from unauthorized condemnation is explicitly protected by the taking clauses of the state and federal constitution. The argument misses the point however, and is somewhat circular since the whole point of the taking clause is that it underlines the fact that the right to property is CT Page 3181 subject to the government's right of eminent domain — that is, if the property is to be taken for a public use and it is necessary to take the property for that use. The defendants cite two cases for the proposition that the strict scrutiny standard should not be applied in equal protection cases made in the context of eminent domain, Jackson v.Water Works, Inc. v. Public Utilities Commission, 793 F.2d 1090, 1093
(Ca. 9, 1986); U.S. v. 16.92 Acres of Land, 670 F.2d 1369, 1373 (Ca. 7, 1982). The plaintiffs cite no cases directly on point for the proposition they assert, but ask the court to ignore these cases because they are not controlling precedent in our state. Also, they say that these cases do not reflect the Connecticut principle that rights explicitly protected by the constitution are fundamental rights subject to strict scrutiny, citing Frazier v. Manson, 176 Conn. 638, 645-646 (1979). But Frazier did not involve the right to hold property but a prisoner's claim that he was entitled to good conduct credit off his sentence and that its denial violated his right to equal protection because people sentenced before a statutory change received the credit. In fact, Jackson Water Works citesSan Antonio Independent School District v. Rodriguez." 411 U.S. 1
(1973), which rejected an equal protection argument in a claim for educational benefits. The court said educational benefits are very important and significant, "But the importance of a service performed by the state does not determine whether it must be regarded as fundamental for purposes of examination under the equal protection clause,"411 U.S., p. 30. As said in Shapiro v. Thompson, 394 U.S. 618, 642 (1969), "The court today does not pick out particular human activities, characterize them as "fundamental' and give them added protection. . . ." To the contrary, the court simply recognizes, as it must an established constitutional right and gives to that right no less protection than the Constitution itself demands." The plaintiffs' simply pluck out the notions that a person's property cannot be seized or impaired without procedural due process or by compliance with the taking clause and translate those irrefutable propositions into an argument that the right to property, historically and constitutionally important enough to warrant those rights, is also fundamental for equal protection purposes and thus strict scrutiny analysis applies.
As said in Modern Constitutional Law, Antieau, Rich, 2d Ed., Vol. 2, § 30.04, pp. 218-219.
"Equal protection doctrine purports to draw rigid lines around a limited number of "fundamental interests' which trigger increased judicial scrutiny, relegating all other subject matters to the broad category of social and economic regulations. Doing so, they have concluded that interests in welfare assistance, medical CT Page 3182 assistance, food, housing and education, which are of critical importance to recipients and to those denied assistance — do not occupy a special level of constitutional protection. While the court may use other doctrines to avoid the harshness of this approach, they nevertheless insist that deference to government should not vary whether dealing with regulation of gas companies, optical dispensers or with "the stuff that sustains needy . . . dependent children.
The federal Supreme Court has not specifically decided the issue now before the court, but has issued some opinions which are suggestive despite any "police power" tag that is put upon them. The court in SanAntonio School District v. Rodriguez, supra, made the following comment on a case decided only a few months before.
 "Lindsey v. Normet, 405 U.S. 56 (1972), decided only last Term, firmly reiterates that social importance is not the critical determinant for subjecting state legislation is to strict scrutiny. The complainants in that case, involving a challenge to the procedural limitations imposed on tenants in suits brought by landlords under Oregon's Forcible Entry and Wrongful Detainer Law, urged the Court to examine the operation of the statute under `a more stringent standard than mere rationality.' Id., at 73. The tenants argued that the statutory limitations implicated `fundamental interests which are particularly important to the poor,' such as the `need for decent shelter' and the `right to retain peaceful possession of one's home.' Ibid. MR. JUSTICE WHITE'S analysis, in his opinion for the court, is instructive:
`We do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease, without the payment of rent. . . . Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, CT Page 3183 functions. Id., at 74." 411 U.S. at pp. 32-33.
The point is that as noted in "Modern Constitutional Law," supra at § 25.04, pp. 12-13:
 "The primary interests designated as fundamental for equal protection purposes affect the electoral process, the right to travel — identified for equal protection purposes by discrimination against new residents of a state — and access to the courts. State burdens on individual decisions involving personal and family relationships have on occasion also been labeled fundamental in the equal protection context but are generally categorized as liberty interests protected by the Due Process Clause."
Fundamental interests and, therefore strict scrutiny standards, have been confined to the basic requisites of federal citizenship — the right to vote and move freely within the federal union. Also, in some cases, the most personal of rights have been protected — the right to procreate, Skinner v. State of Oklahoma, 316 U.S. 535 (1942), to marry, Zablocki v. Redhail, 434 U.S. 374 (1978), the right to pursue a lawful business, Sail'er Inn, Inc. v. Kirby, 485 P.2d 529 (Ca., 971), but see Pollard v. Cockrell, 578 F.2d 1002 (Ca. 5, 1978).
If the definition of a fundamental interest is expanded to cover interests affected by social and economic legislation even though the legislation touches on very important rights such as medical assistance, education, housing, etc., the required application of a strict scrutiny standard to differentiation of treatment to members of a similarly situated class would hobble the practical implementation of such legislation when disputes arise over its application.
Furthermore, can a strict scrutiny standard operate intelligibly when dealing with equal protection claims in eminent domain cases? The constitutional rights granted under the taking clauses of the state and federal constitution are always tempered by the observation of the courts that great deference must be given to the legislature not only in defining what is a public use but also in determining the necessity of a particular taking.
Honoring that deference would present an interesting analytical tight rope for the courts to walk if on equal protection claims arising from the exercise of eminent domain strict scrutiny were to apply. CT Page 3184
In any event if the equal protection clause applies at all to the facts of this case, given the claim made, the court concludes that the rational basis, not the strict scrutiny test should be applied to test that claim.
The court will now attempt to analyze the claim under the equal protection clause made in this case relying on the foregoing discussion.
The first question that must be addressed or a preliminary step to any equal protection analysis is the issue of whether the plaintiffs and the IDC are similarly situated. The crux of the plaintiffs' position, as stated in their brief, appears to be: "The IDC and the plaintiffs are similarly situated for a very simple reason: both were slated for acquisition and demolition under the Municipal Development Plan even though both wanted to stay. . . . the IDC was saved while the plaintiffs' buildings are slated to be destroyed without compelling or rational justification." It is not quite so simple — it is tantamount to arguing that if two entities are treated differently with regards to government action, they are similarly situated. But that is the statement of the problem, not the solution.
On the other hand, the defendants' argument that the plaintiffs' buildings are private residences while the IDC is a commercial property being retained just like so-called Building 2 and 194 Howard Street which are also commercial buildings is also not convincing. The IDC is not commercial property and there is nothing to realistically support the claim that it is being retained because of any potential for office space use. Unlike the two other buildings, Building 2 and 194 Howard Street, once scheduled for destruction but now being retained, the IDC is a social club.
It makes more sense, at least to the court, to look at the IDC and the plaintiffs' properties qua buildings and to keep the stated purpose of the MOP in mind. If the problem is examined from the perspective of the time when the MDP was first adopted, it is clear that the IDC and the residences on parcel 3 could not be considered similarly situated in the analytically relevant context — i.e. the development goal or purpose for parcel 3.
That purpose was the development of parcel 3 for office buildings. As discussed in other sections of this decision, according to Mr. Hicks who helped formulate the MDP and the president of the developer, Mr. Jones, it would not have been feasible to accomplish that purpose and allow the residences in the Fort Trumbull area, including the plaintiffs' buildings, to remain. Development of a unified clear site was needed not only to encourage development prospects, but to prepare the site for CT Page 3185 development If, on the other hand, the IDC had been allowed to remain under the MDP as a free-standing building, it is difficult to see how its presence would have interfered with that purpose — it would have been one building at the edge of the parcel.
But as noted, the IDC was scheduled to be destroyed and is now to be retained. The plaintiff owners of five pieces of property now come to court after all the other residences have been taken and raise an equal protection claim of now being similarly situated to the IDC even though the claim would not have passed muster when the MDP was first adopted. Assuming the viability of such an argument, what is the validity of the plaintiffs' position that presently the plaintiffs are similarly situated to the IDC, keeping in mind the governing template, the purpose of the MDP. The purpose has not changed and the IDC has not moved. The IDC is still at the border of parcel 3, the Cristofaro and Pataya property, although clustered, go into the parcel. In fact, a street is being done away with under the MDP which provided access to these properties. The developer testified that retaining the IDC would present no problem — it is after all one building. But it seems reasonable to infer that if its retention is used as an opening wedge to retain several other private residential parcels, this would present problems for those seeking to develop the parcel as Mr. Hicks and Mr. Jones indicated and as the court previously discussed. There is good reason to conclude that the IDC and the plaintiffs' properties are not similarly situated and, on that supposition, the equal protection analysis need proceed no further.
But assuming the court's analysis on this point is incorrect, the court will assume the IDC is similarly situated to the plaintiffs. The court has previously decided the rational basis test should be used for this equal protection analysis. Our court has recently set forth that test relying on federal Supreme Court case law. In City Recycling, Inc. v.State, 257 Conn. 429 (2001), the court said as regards social and economic legislation — and Chapter 132 and activity thereunder is nothing if not that — "the equal protection clause is satisfied so long as there is a plausible policy reason for the classification. . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the government decisionmaker . . . and the relationship of the classification to its goal is not so articulated as to render the distinction arbitrary or irrational," id. p. 445. On the next page, the court said, "the presumption of constitutionality can be overcome only by the most explicit demonstration that the classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negate every conceivablebasis which might support it. . ." (Emphasis by Supreme Court), see generally, 16B Am.Jur.2d, § 813, pp. 345, et. seq. In San AntonioCT Page 3186Independent School District v. Rodriguez, 411 U.S. 1 (1973), the court also expounded on the test in the context of reviewing legislation, but the general principles are applicable both to statutory analysis and application of statutory schemes. In San Antonio Independent SchoolDistrict, the court said, "the showing of some inequality or disparate treatment is not enough to make an equal protection claim against a statutory provision p. 50, cf. Abdullah v. Comm. of Insurance, 84 F.3d 18,22 (Cal. 1, 1996). A law will be upheld "if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group," Romer v. Evans, 517 U.S. 620,632 (1996). It has even been said that "the rational basis test does not require the state choose the best or fairest means of advancing its goals," VanRobinson v. Marshall, 66 F.3d 249, 251 (Ca. 9, 1995).
Using these broad tests and relying on the previous discussion in this section and at other points in this decision the court cannot say that there is no rational basis to distinguish between the plaintiffs' buildings and the IDC based on the perceived requirements to develop this parcel in accordance with MDP goals.
But the protections afforded by the equal rights amendment would be shallow indeed if by reference to standards of review of legislation those applying statutory mandates could be insulated from claims that they acted not for the purported goal of advancing legislative policy, but to favor the politically powerful or those having advantages unrelated to the achievement of legislative goals. Even when legislation is being examined under the rational basis test, although declarations of government purposes are accepted at face value, a court will not be so accepting if "an examination of the circumstances forces (the court) to conclude that they could not have been a goal of the classification,"Barket, Levy Fine v. St. Louis Thermal Energy Corp., 21 F.3d 237, 240
(Ca. 8, 1994) (cf. cases giving preference to state residents over nonresidents, e.g. Williams v. Vermont, 472 U.S. 14 (1985). Classifications based on such motives are by definition fundamentally arbitrary and irrational in the sense that they cannot be based on any purpose sought to be accomplished by the legislatively chosen goal — here, economic development under Chapter 132 through the auspices of the MDP.
The plaintiffs have strenuously argued that the true and only motive of the decision to allow the IDC to remain while the same right was not extended to them was based not on any purpose to accomplish the MDP's goals, but to placate important political interests represented by the IDC, its supporters and members. The court will examine the evidence to determine if the plaintiffs can meet their burden of proof on this issue. CT Page 3187
The record is not as clear on the alleged discriminatory favoritism shown to the IDC as the plaintiffs would suggest. Although the court has some concerns regarding what really happened here and the motivations of city and NLDC officials, the problem is that questions that would have been expected to be asked and witnesses who would have been expected to be called were never produced by the plaintiffs.
The city council moved pursuant to Chapter 132 to request $12.5 million from the Department of Economic Development for the Fort Trumbull area project in May of 1998. The NLDC was designated as the development agency in the same month. A consulting team was put together in June of 1998 to prepare an environmental impact study. Between June and November, 1998 several alternatives were considered by this team which was to prepare an environmental impact study. The alternative they selected eventually became the MDP. The consulting team received comments from the public and the public may have been permitted to attend some of their discussions. In any event seven public information hearings were held regarding the environmental impact study from April, 1998 to November, 1998. Alternatives considered by the consulting team envisaged retaining some or all of the residences in the Fort Trumbull area, but several did not and these also would have not permitted the IDC to remain.
James Mahoney was the executive director of the NLDC from April, 1992 to November, 1998 when all of the above was going on. When he first became involved in the Fort Trumbull project, he was told (by whom and exactly when is not clear) that the IDC was a membership club and if its property was taken, there might be political ramifications in terms of the plan's adoption or perhaps it would be something that would be considered in the political process. An Hispanic church presented the same circumstances to the NLDC while no other properties presented a similar problem. Mr. Dunn is the director of real estate acquisition for the NLDC and he testified that the possible condemnation of the NLDC was "politically sensitive."
Given the length of the process and the fact that the public had access to its working one would think IDC supporters and members would have known that the possibility of the demolition of the IDC was being bandied about by the NLDC consulting team. Yet Mr. Hicks on this team said during the time they worked on the project no one from the NLDC told him the IDC had to be retained. No other members of this team were called to testify and no NLDC people were pressed at trial for information concerning any input they or other NLDC employees might have had with the consulting team concerning retention of the IDC.
In any event, the consulting team, appointed by the NLDC, came up with CT Page 3188 a final environmental impact plan in November of 1998, which not only envisaged taking the residential properties on the development area, but also the demolishing of the IDC. After the environmental impact statement to this effect was published in November of 1998, a forty-five day public review and comment period ensued.
A year went by while the political pot had an opportunity to boil, and in January, 2000 with the NLDC under new management and the NLDC voted to adopt the MDP after a public hearing — the very MDP which provided that the residences and the IDC would be removed from the site. Days thereafter the city council was to vote to approve the MDP. This would be a body that by its very nature one would expect to be subjected to political pressure and influence such as could be brought to bear by a purportedly politically connected organization like the IDC. But the city council voted to approve the MDP and the purpose expressed therein to demolish the residences and the IDP. The court will discuss at a later point the plan to contact the Governor's office regarding the retention of the IDC long after the approval of the IDC. But it is interesting to note that a state agency, the DECD, had to approve the MDP along with its evident purpose not to retain the IDC and it did so. Not only did the IDC's prospective removal have no impact on the eventual approval of the MDP by the NLDC, the city council, or the DECD, there was no evidence of any kind presented that in the events leading up to the formulation of the MDP or its approval the IDC attempted to influence the approval process or was actually considered in any way by anyone involved in the process.
A developer was chosen by the NLDC after the MDP was approved. Its president testified. He said the NLDC asked him at some point if it was feasible to retain the IDC as part of the plan. He was asked also about the feasibility of retaining other buildings besides the IDC in parcels 1, 2 and 3. But the latter was a generic request, the IDC request was specific. Yet there was no evidence presented that anything more than a feasibility question was asked — testimony or other evidence was not offered that would suggest that a demand was made that the IDC be retained. It would have been helpful to the court if the person at NLDC who made the request was identified and subjected to examination as to why the question concerning the IDC was asked, how it was exactly phrased and when it was asked in relation to the decision not to take that property.
There is also evidence indicating that the possibility of not demolishing other properties besides the IDC was considered after the MDP was formulated and even after the approval process.
On the night the NLDC held public hearings on the MDP, Admiral Goebel CT Page 3189 said that it was not "inconceivable" that properties scheduled for demolition under the MDP might be saved. He could not "guarantee" this and the plan did not call for that as proposed. Mr. Hemmerdinger, who was once director of real estate development for the NLDC, said in April, 2000 at one neighborhood presentation the IDC was discussed and the present plaintiffs or some of them inquired about saving certain buildings and about whether the plan could be adjusted to accomplish that goal. The president of the NLDC and Mr. Jones, the developer's president, were present and asked the NLDC staff to investigate that request. The investigations were not limited to the IDC and Mr. Hemmerdinger went on to discuss the scope of the investigations made and the conclusion reached — the location of the IDC relative to street frontage, position on the parcel, its elevation were compared to that of the residential property, and on that basis the IDC presented better reasons for retention. The wisdom of those conclusions is not now at issue, but just the fact that they were made can be considered some evidence that discriminatory animus did not drive NLDC decisions on this subject.
The plaintiffs, however, point to two other events that for them underline the fact that the IDC was given constitutionally unacceptable preferential treatment that led to a reversal of the decision to demolish the IDC while permitting plans to proceed regarding the demolition of their homes. In October, 2000, they argue it was decided by the NLDC not to condemn the IDC.[25] But this decision was preceded by a meeting at the IDC on June 23, 2000. The president of the IDC was there, as was Admiral Goebel, Mr. Hemmerdinger and Mr. Milne, president of the Pfizer Global Research Division, and Claire Gaudiani, the NLDC president. The meeting was about the possibility of the IDC remaining. The plaintiffs note that none of the plaintiff homeowners were invited to the IDC meeting. After this meeting, Hemmerdinger received a message from Gaudiani to the effect that Milne was talking to the Governor about the IDC. There was no evidence Milne ever talked to the Governor, but "a little more than two months later the NLDC decided that the IDC, but not any of the homes in parcel 3, could remain." As to this latter event, at trial the plaintiffs argued it was being offered to show the IDC was given special treatment and it shows knowledge on the part of NLDC of a high level conversation about the IDC.
A Scottish philosopher, David Hume, established over two centuries ago that because A follows B that does not mean B caused A. Although that observation may not pass muster in legal circles, there are other problems with the plaintiffs' position on these events. The court is being asked to rely on speculation and conjecture by parties who, after all, have the burden of proof. Why wasn't Milne called to testify or be deposed, or the president of the IDC? If the IDC had all this political clout why did there have to be a meeting? Why did two and one-half months CT Page 3190 have to pass before the IDC saving decision was made? Was Milne's call to the Governor a private venture of his own or something orchestrated by the NLDC? Why weren't NLDC officers cross examined about any results from Milne's planned call or why wasn't there more detail provided at trial concerning what transpired at the IDC meeting itself? In the absence of more directly relevant evidence on the equal protection claim, perhaps the best that could be argued is that all these activities indicate the NLDC was going through the motions of currying favor with a politically-connected organization. But that does not mean this affected any decisions made with regard to the entity. Burden shifting arguments cannot be relied upon by the court to save the day for the equal protection argument since the plaintiffs had access to witnesses, not called, who could have fleshed it out or witnesses called who could have presented more direct evidence concerning how these events influenced any ultimate decision.
Also, the plaintiffs' argument does not take account of another aspect of Mr. Hemmerdinger's testimony. He testified that a meeting was held with the IDC in June, 2000, but similar meetings were held with other property owners. Hemmerdinger was not personally at any meeting where the purpose was specifically to discuss saving the plaintiffs' homes, but he also testified these issues were discussed with him by the plaintiffs regularly in all kinds of settings. The NLDC did not just respond to the IDC concerns. Hemmerdinger noted that various issues were discussed with the plaintiffs, including the possibility of relocating in the development area or outside of it. Admiral Goebel testified the NLDC looked into the possibility of moving residences and did individual estimates of the cost as to each house. This notion was even discussed with the president of Corcoran Jennison. Mr. Jones remembered that the discussion involving moving homes possibly occurred in 2001, the year of his deposition. Also, all of the foregoing was transpiring in the context of other matters already mentioned. The NLDC request to Jones about the possibility of retaining other buildings besides the IDC and the Gaudiani's and Jones' request to the NLDC to make a similar investigation after an April, 2000 neighborhood meeting. Finally, on the subject of the possible call to the Governor, an observation should be made. Between January, 1998 and August, 2001, over $31 million was spent on this project. The great bulk of this money has come from the state. From January, 1998 to the time of the takings of the plaintiffs' property, just one month before the decision to retain the IDC, about $25 million had been spent on the project. The state had already heavily committed to this project, and if NLDC motives are at issue, no evidence was presented that the NLDC had reason to fear a diminution let alone a cut off of funds if the IDC request was not complied with. The court has not been presented with any grant proposals or information about when such proposals were made and approved, all of which could have been keyed into CT Page 3191 the time when the decision was made to allow the IDC to remain.[26]
In any event for the foregoing reasons, the court does not accept the equal protection argument of the plaintiffs.
 Procedural Due Process
The plaintiffs also claim that they were denied procedural due process under the Fourteenth Amendment to the federal constitution. This is so, they argue, because property owners who face eminent domain pursuant to the Municipal Development Act (Chapter 132) are not afforded the opportunity to raise challenges to the constitutionality or legality of the eminent domain proceedings in the condemnation actions that were brought against them. In the condemnation proceedings that the NLDC and the city initiated, the only issue that can be litigated will be the compensation that might be owing to them. Under Connecticut law, the property owner must find counsel and file a separate action for injunctive and/or declaratory relief, pursue litigation in superior court and then in the appellate courts.
The plaintiffs concede that Bahr v. O'Brion 146 Conn. 237, 246-247
(1959), rejected a similar challenge to the Redevelopment Act. They refer to the case as "dated," but seek to avoid its binding effect on this trial court by maintaining that they bring their procedural due process claim under the due process clause of the Fourteenth Amendment to the federal constitution. In fact, as will be discussed, Bahr has been relied upon in more recent Connecticut cases and its underlying principles appear to have been adopted in our appellate court interpretation of federal procedural due process.
Bahr was relied upon in Conn. Light Power Co. v. Norwalk,179 Conn. 111, 119 (1979). The procedural due process claim was raised in a special defense that based the claim on the state and federal due process clauses. The briefs do not refer to federal case law (see Conn. Supreme Ct. Records Briefs, June, 1979 term, part 1). Fishman v.Stamford, 159 Conn. 116, 121 (1970), relied on Bahr on a procedural due process issue arising in an eminent domain case. In Bahr itself, as in the two just cited cases, the court did not indicate whether it was deciding the procedural due process claim under the state or federal constitution or both. The briefs only cite state cases but interestingly, the complaint raises the due process claim under both the state and federal due process clauses (Conn.Sup.Ct. Records Briefs, Feb., 1959 term).
The plaintiffs are correct in noting that Bahr relied heavily on Statev. Vachon, 140 Conn. 478 (1953). The plaintiffs argue that Vachon used an "outmoded" analysis articulated in a 1934 case, Nebbia v. New York,. CT Page 3192291 U.S. 502, set forth at p. 525 of Nebbia: "So far as theFourteenth
Amendment . . . is concerned, it suffices for due process that the law shall not be unreasonable, arbitrary or capricious." According to the plaintiffs, "procedural due process analysis has come a long way since the time of that decision.
Connecticut apparently cherishes the past because Vachon was relied upon for a procedural due process analysis in two fairly recent cases,October Twenty Four, Inc. v. Planning Zoning, 35 Conn. App. 599,608-609 (1994); Danziger v. Demolition Board, 18 Conn. App. 40, 46
(1989). Also, in Ryburski v. State Employees Retirement Commission,173 Conn. 462 (1977), the court quoted with approval the "outmoded" principle reflected in Nebbia v. New York, supra, and went so far as to set it forth in its opinion (see quotation from Nebbia, supra), id., p. 472. Also see reference to Nebbia analysis in All Brands Importers v.Dept. of Liquor Control, 213 Conn. 184, 203 (1989).
In any event Vachon made its procedural due process analysis under the federal due process clause referencing federal case law and found no violation of that clause or the state due process clause based on that analysis, 140 Conn. at pp. 485-486.
On the basis of the foregoing analysis, the court concludes that our appellate courts have, in fact, interpreted federal procedural due process in a way that is consistent with Bahr, even if it can be said that that case rested on state grounds. Being a trial court, this court is bound by that analysis.
But the court, in any event will address the federal procedural due process claim on the supposition that its view is incorrect.
The test for federal procedural due process has been set forth inMatthews v. Eldridge, 424 U.S. 319 (1976). That case held that when a private interest is affected what process is due depends on "the risk of an erroneous deprivation of such interest through the procedure used and the probable value, if any, of additional or substitute safeguards "and" the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail," id., p. 335.
Cases like Connecticut v. Doehr, 501 U.S. 1 (1991), and Memphis Light,Gas and Water Division v. Craft, 436 U.S. 1 (1978), basically follow the direction given by the Matthews analysis.
Two quotes from 16B Am.Jur.2d, "Constitutional Law" nicely sum up the law in this area in their view of the application of Matthews to CT Page 3193 particular cases:
 "The requirements of due process frequently vary with the type of proceeding involved. Procedural due process in the administrative setting does not always require application of the judicial model. Due process is flexible and calls for such procedural protections as the particular situation demands; the quantum and quality of the process due in a particular situation depends on the need to serve the due process function of minimizing the risk of error in decision making." (§ 904, p. 490).
See Hannah v. Larche, 363 U.S. 420, 442 (1960); Dixon v. Love,431 U.S. 105, 112 et. seq (1977); Gilbert v. Homan, 520 U.S. 924, 928, et seq. (1997). The Am.Jur. article makes another pertinent observation:
 "Though the primary function of legal process is to minimize the risk of erroneous decisions, the Due Process Clause does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations." (§ 902, p. 489).
See Mackey v. Montrym, 443 U.S. 1, 13 (1979).
And it is also true that "the due process clause does not . . . require a state to adopt one procedure over another on the basis that it may produce results more favorable to" the party challenging the existing procedure," Heller v. Doe, 509 U.S. 312, 332 (1993), quoting from Medinav. California, 505 U.S. 437, 451 (1992) (§ 908 16B Am.Jur.2d, p. 498).
The plaintiffs rely heavily on Memphis Light, Gas and Water Divisionv. Craft, supra, but nothing in that opinion differs from any of the just stated principles. In that case, a municipal agency cut off the homeowner's utilities. At 436 U.S., p. 20, the court said that "Although utility service may be restored ultimately, the cessation of essential services for any appreciable length of time works a uniquely final deprivation." The court said in some circumstances all prior process can be dispensed with, but found that exceptions to the requirement of some due process are not present here," id. p. 20.
The heart of the court's opinion is set forth at p. 19. There, the court said: CT Page 3194
 "Ordinarily, due process of law requires an opportunity for `some kind of hearing' prior to the deprivation of a significant property interest. . . . On occasion, this court has recognized that where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing' additional procedural safeguards". . . .
The plaintiffs in these cases have had condemnation proceedings filed against their property. This litigation is about whether the takings should stand, but it is quite true that the plaintiffs have had to the present suffered a deleterious effect on their property rights. But federal procedural due process even given these factors does not require a particular type of hearing at a particular stage or, in some cases, a pre-deprivation hearing at all; in Shaumyan v. O'Niell, 987 F.2d 122 (CA. 2, 1993), the court held homeowners were not deprived of their property without due process as a result of the attachment of their homes by a home repair contractor pursuant to our state's prejudgment attachment statute which did not require a pre-deprivation hearing or the posting of bond (paraphrasing 16B Am.Jur.2d at footnote 64, p. 492).
In summary, the process that is due depends, as Matthews indicates, on a variety of factors, such as the property interest affected, the nature of the deprivation, the purpose of the deprivation, the competing interests of all the parties involved with the question of the propriety of the taking, the possibility of error factor. What due process does mandate is that "some kind of hearing is required at some time before a person is finally deprived of his or her property in interest," Wolf v.McDonnell, 418 U.S. 539, 557-558 (1974).
Bahr arose under the Connecticut Redevelopment Act, Chapter 130, and is a good starting point for the analysis of the procedural due process claim given the foregoing observations. Although the court in Bahr did not link it to the due process discussion, the court pointed out that members of the public, including presumably those affected by the agency decision, were given an opportunity to be heard on the redevelopment plan. In this case, a team of consultants was chosen by the NLDC in June, 1998, and over the course of several months, considered several alternative development plans for the Fort Trumbull area, two of which entertained the possibility of retaining all or some of the existing residential property. Comment was elicited and received from the public during this process and the alternative chosen, in part, reflected that CT Page 3195 public comment. The MDP was then available for inspection by interested parties. Section 8-191 of Chapter 132 requires that the development agency shall "hold at least one public hearing" on the plan before it adopts it. The NLDC held such a hearing the evening the MDP was adopted, scores of people attended, the transcript was 47 pages long, notice of the meeting was given to the public. After that approval, the plan was adopted by the city council at a meeting open to the public. Once the MDP went through the approval process, numerous meetings were held throughout the Fort Trumbull development area, some with the plaintiffs in this litigation. Up to this time the actual taking of all residences was contemplated, but the plan could have been modified to preserve residences although this would have represented a substantial modification of the plan requiring a return to what was described as "ground zero" — the whole approval process would have to be reinitiated.
The plaintiffs point to the real effect takings have on their use of the property. An occupancy fee can be charged to the owners, tenants pay rent to the development agency. But the plaintiffs certainly long had notice of the fact that their properties were to be taken and at least the just-mentioned consequences could be forestalled if restraining orders were to be filed against the condemnor to prevent the condemnation, Aposporos, et al v. Urban Redevelopment Commission,259 Conn. 563 (2002). The affected parties are not forced from their property and can seek injunctive relief even after a taking to reconvey the property back to them, Pequonnock Yacht Club, Inc. v. Bridgeport, etal, 259 Conn. 592 (2002). Even if at that point a court decides adversely to their position, the property owners can request a temporary injunction to maintain the status quo while their case is being appealed. Affected parties can also receive compensation for the loss suffered by them as a result of the taking.
The plaintiffs still would understandably complain that even with these liberal equitable remedies, the burden would still be on them to retain counsel and resort to the courts and refer to cases that indicate this impinger on due process rights. But Matthews requires the government interest in the type of procedure utilized to be taken into account and this relates to the government function involved. Keeping in mind the just discussed opportunities given the affected public and these plaintiffs to make their interests and positions known as regards the development plan while it was being formulated and after it is adopted the question becomes how does that bear on the issue of whether all of this constituted procedural due process. The court concludes underMatthews that this inquiry requires an examination of the "government function" involved — i.e. here, eminent domain — and a balancing of these factors. None of the cases cited by the plaintiffs CT Page 3196 involve the exercise of eminent domain power, Luedeke v. Village of NewPalz, 63 F.3d 2d 215 (N.D.N.Y., 1999) (application of snow removal ordinance); U.S. v. James Daniel Good Real Property, 510 U.S. 43 (1993) (seizure of house through asset forfeiture statute); Connecticut v.Doehr, 501 U.S. 1 (1991) (prejudgment attachment on real estate);Kukansis v. Griffith, 180 Conn. 501 (1980) (lis pendens statute application).
Before the concept was embedded in our constitutions, the states exercised the power of eminent domain. In some cases, the people acting through their representatives have to have the effective right to seize property when it is done for a public purpose and compensation is paid to the property owner. In recognition of the importance of some of these public purposes, courts have been willing to give a certain deference to legislative decisions regarding eminent domain. The plaintiffs have not even set forth the parameters of the process they claim is due. Broad economic development and redevelopment projects could be hobbled if full scale hearings had to be afforded as to each piece of property within a redevelopment or economic development area — dozens or even hundreds of people might be affected by a redevelopment or development plan.
Also, in light of the nature of the eminent domain function and the long-recognized deference given to legislative decisions in this area regarding public purpose and the need to take particular property in light of that purpose, why is not the public input allowed in formulating the development plan and the need for a public hearing adequate to satisfy that other goal of procedural due process' "minimizing the risk of error in decision making". In fact, what does that really mean in the eminent domain area and to satisfy it what type of due process hearing would have to be conducted at the pre-deprivation stage? Would affected parties be allowed to bring in experts and witnesses — each affected party — could there be consolidation of such hearings? As far as that goes, there is no evidence the court is aware of that the committee formulating the MDP would have refused or had any policy barring the acceptance of any materials, studies or reports from people in the Fort Trumbull area no matter what their position might be on how the MOP should finally turn out. All of this leads to a final observation about the relationship between the eminent domain clauses and due process clauses of the state and federal constitutions.
The due process clause should not be used in such a way as to defeat the practical operation of another constitutional provision, eminent domain, which in appropriate circumstances — a separate question — can greatly advance the public good. . Memphis Light itself recognizes that practical considerations should dictate the scope and CT Page 3197 operation of procedural due process. One of the reasons due process was held to require some sort of hearing before utilities were cut off was indicated at 436 U.S. p. 21, where the court said: "Equitable remedies are particularly unsuited to the resolution of factual disputes typically involving sums of money too small to justify engaging counsel or bringing a lawsuit." Forcing people to go to court to resolve such matters would be burdensome and in effect mean that it would be likely no challenge to a possibly illegal policy would ever be made. That certainly is not true here; we are not talking about cutting off the electricity or snow plow expenses. People's homes are involved in these types of cases, many people will often be affected by broad socio-economic legislation and singly or together they can be expected to resort to the courts. Given the panoply of remedies available and the importance of the policies behind eminent domain, the court cannot say that balanced against the plaintiffs' admittedly important interest it would violate federal procedural due process to have them resort to those remedies, especially in light of the input allowed during the formulation of development plans and the approval process and the fact that the plan can be amended.
Neither do cases like Connecticut v. Doehr, 501 U.S. 1 (1991), orKukanis v. Griffith, 180 Conn. 501 (1980), alter the court's view of an appropriate analysis under Memphis Light and Matthews. In neither case was an important government interest involved which could be deleteriously affected by formalized pre-condemnation hearings — whatever they may be — and also no input at all was permitted by the party affected before the complained of ex parte action was allowed.
In Kukanis, in fact, the court at 180 Conn. p. 510, made comments concerning federal due process which underline how different the case now before the court is from the unconstitutional procedure authorized by the lis pendens statute under examination in that case. The court said:
"While it is true that a flexible test for determining the existence of due process is used, and that prior hearing is not constitutionally mandated in every case, the Connecticut lis pendens statutes fail to provide even the barest minimum of due process protection. Most conspicuously absent is any provision whatsoever for any sort of a timely hearing. either before. or after the recording of the notice of lis pendens, which would give the property owner an opportunity to be heard or require the party recording the notice to demonstrate in any way the probability of prevailing on the underlying action. The statutes allow the notice of lis pendens to continue indefinitely without any further actionCT Page 3198 on the part of the party recording. during which time the property owner is without recourse to the courts to contest the merits of the underlying claim." (Emphasis added.)
The equitable remedies available to litigants in eminent domain cases in our state remove the concerns emphasized above. It has been said that the "duration of any potentially wrongful property interest under a state's procedures is an important factor" (§ 905 16B Am.Jr.2d p. 495 citing Mackey v. Montrym, 443 U.S. 1 (1979)). Under Connecticut procedure, equitable relief can be resorted to for the purpose of preventing the condemnation itself once it has been approved (previously noted), see Aposporos case, supra.
Finally, when a due process analysis is being conducted, it is often instructive to examine how jurisdictions throughout the nation confront a problem — here, the procedural method of challenging the exercise of the power of eminent domain; cf. Justice Rehnquist's mode of analysis inWashington v. Glucksberg, 521 U.S. 702 (1997), deciding issue of substantive due process, in part, he looked to legal practices and traditions in the states, see also Corn Exchange Bank v. Coler,280 U.S. 218, 222-223. The court has read many cases in this area and, at least as of the date they were decided, several seem to contemplate a procedure similar to what we have in our state under Chapter 132 and other statutory exercises of the power of eminent domain. That is, takings are challenged in court in actions brought by the parties affected. See In reBrown, et al v. McMorran 241 N.Y.S.2d 483 (1963); Cannata, et al v. Cityof New York, 182 N.E.2d 395 (N.Y., 1962); Tierney v. Planned IndustrialExpansion Authority, 742 S.W.2d 146 (Kan., 1987); Grrenup County v.Utilities Commission, 632 S.W.2d 463 (Ky., 1982); Stewart, et al v. ElPaso, et al, 130 S.W. 590 (Tex., 1910); Edens, et al v. City ofColumbia, 91 S.E.2d 280 (S.C., 1956); Hogue, et al v. Port of Seattle,341 P.2d 171 (Wash., 1959); Merill v. City of Manchester, 499 A.2d 216
(N.H., 1985); Griffin v. Bendick, 463 A.2d 1340 (R.I., 1983); Mayor City Council of Baltimore v. Chertkof, 441 A.2d 1044 (Myd., 1982); Adamsv. Housing Authority, 60 So.2d 663 (Fla., 1952); Grubstein v. UrbanRenewal Agency, 115 So.2d 745 (Fla., 1959); Falkner v. Northern StatesPower Co., 248 N.W.2d 885 (Wis., 1977); People v. Pegues, 304 N.W.2d 455
(Mich., 1981); Oliver v. City of Clairton, et al, 96 A.2d 47 (Pa., 1953). More recently Pennsylvania cases reflect a slightly different procedure; a declaration of taking is filed and the property owner commences litigation by filing objections which are then tried, In reMatter of Condemnation of Real Property of Naaman King, 556 A.2d 527
(Pa., 1989); White v. Redevelopment Authority, 607 A.2d 314 (Pa., 1992). For federal cases, see Mid Pipeline Co. v. Lario Enterprises,716 F. Sup. 511 (D. Kan., 1989); Rosenthal Rosenthal, Inc. v. N.Y.CT Page 3199State Urban Development Corp., 771 F.2d 44 (Ca. 2, 1985); Hawaii HousingAuth. v. Midkoff, et al, 467 U.S. 229 (1984); Berman v. Parker, 348 U.S. 98
(1954) (District of Columbia Land Agency was proceeding under act similar in structure to our Chapter 130 and Chapter 132; opponents of plan sought injunctive relief to enjoin condemnation of their property). Connecticut procedure on this issue under eminent domain procedural remedies does not appear unique.
In any event for all the foregoing reasons, separately considered and together, the court does not accept the plaintiffs' objections to the taking based on the alleged violation of their rights to procedural due process under the Fourteenth Amendment to the United States Constitution.
 Substantive Due Process
The plaintiffs have also made a claim of substantive due process relying on Article I, § 8 of our state constitution and theFourteenth Amendment to the state constitution. They cite Daniels v.Williams, 474 U.S. 327, 331 (1986); and Foucha v. Louisiana, 504 U.S. 71,79 (1992), for two basic propositions. Substantive due process protects against arbitrary exercise of government power and it requires government action to bear a reasonable relationship to its purpose.
The plaintiffs rely on the same factual and legal arguments under this claim that they relied upon in making their arguments under the taking clauses of the state and federal constitution. Thus, a taking is unconstitutional if the condemnor acts unreasonably or in bad faith,Bahr, at 146 Conn. p. 250; Gohld, 141 Conn. at p. 146. They argue the defendants acted unreasonably in preparing their road widening plans — taking of the plaintiffs was not reasonably necessary, standards are relaxed concerning planting strips, sidewalks, etc. in certain areas of Fort Trumbull, but not when doing so would save a home of one of the plaintiffs from demolition. The plaintiffs note that our law requires eminent domain to be strictly construed, yet New London exceeded its powers violating state statutes and its own charter. Finally, the condemnation of plaintiffs' homes without future assurance of public use is unreasonable and an abuse of power.
The plaintiffs' argument fails for several reasons. The United States Supreme Court has made it quite clear that "where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Graham v. Connor, 490 U.S. 386, 395; Albrightv. Oliver, 510 U.S. 266, 273 (1994); U.S. v. Lanier, 520 U.S. 259, 272, n. 7 (1997); Portuondo v. Agard, 529 U.S. 61, 74 (2000). CT Page 3200
The court has taken this position because they have been reluctant to expand the concept of substantive due process, County of Sacramento v.Lewis, 523 U.S. 833, 842 (1998).
In Collins v. Harker Heights, 503 U.S. 115, 126 (1992), the court said:
 "As a general matter, the court has always been reluctant to expand the concept of substantive due process because guide posts for responsible decision making in this unchartered area are scarce and open ended. . . . The doctrine of judicial self restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field."
The claims the plaintiffs have made under substantive due process can be accommodated under the taking clauses of the state and federal constitution and able counsel have performed that task very well in their briefs. It would be a dangerous course of action if trial or appellate judges, dissatisfied with the ambit of a particular provision of the constitution drafted by the founding fathers to protect a certain right could use vague concepts of substantive due process to expand, according to their own whim, the protections they deem more appropriate by relying on some notion of substantive due process. Long past should be the days inspired by cases like Lochner v. New York, 198 U.S. 45 (1905), which under the guise of substantive due process struck down as arbitrary social and economic legislation of the New Deal which, whether one agreed with it or not was enacted by popularly-elected representatives of the people. There is a whole body of law in our state, in other states and at the federal level which, under the taking clauses, protects the citizen from unreasonable exercise of the power of eminent domain and there is no need to go beyond the parameters of that protection. Certainly, the plaintiffs offer none in either their initial brief or reply brief.
There is another reason why the court believes substantive due process cannot be relied upon by the plaintiffs. In Sylvia Development Corp. v.Calvert County, 48 F.3d 810, 827 (Ca. 4, 1995), the court set forth apparently generally accepted law (see 16B Am.Jur.2d, § 914, p. 506) when it said: "The protection of substantive due process is indeed narrow and covers only state action which is so "arbitrary and irrational, so unjustified by any circumstance or government interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or adequate rectification by any post-deprivation state remedies."
Our state allows litigants to request injunctive relief to forestall CT Page 3201 condemnation, see Aposporos v. Urban Redevelopment Corporation, supra, and permits such relief to reverse the taking, as here, and to order the property reconveyed to the property owner, Pequonnock Yacht Club, Inc. v.City of Bridgeport, supra.
The court can ascertain no reason, and none has been offered, as to why our state constitution should be interpreted any differently than the federal constitution on this issue.
Therefore, the court concludes the plaintiffs cannot make a claim of a violation of substantive due process under the state or federal constitution.
 Temporary Injunction
The court has granted the request for permanent injunctive relief as to the plaintiffs' properties on parcel 4A, but has denied that relief as to the properties on parcel
3. This discussion then will be confined to whether a temporary injunction should be granted barring demolition of the homes in parcel 3 until the matter is decided on appeal. The parties entered into a stipulation concerning this question. Basically, the stipulation is to the effect that upon final review of the plaintiffs' complaint at trial, the court would separately consider both plaintiffs' request for temporary injunctive relief under the standards for a temporary injunction and the request for permanent injunctive relief. If the court were to render a judgment adverse to them, the plaintiffs were to be able to apply to this court "representing that they intend to appeal the case . . . and praying that the terms of this Pretrial Stipulation may be continued until final decision upon said appeal." The defendants under the terms of the stipulation reserved the right to oppose any such application (to the trial court) pursuant to Connecticut General Statutes § 52-476:
"Sec. 52-476. Continuance pending appeal. When a temporary injunction has been granted and upon final hearing judgment has been rendered adverse to its continuance, either party may apply to the court rendering the judgment, representing that he intends to appeal the case to the court having jurisdiction and praying that the temporary injunction may be continued until the final decision therein. Unless the court is of the opinion that great and irreparable injury will be done by the further continuance of the injunction, or that the CT Page 3202 application was made only for delay and not in good faith, the court shall continue the injunction until a final decision is rendered in the court having jurisdiction.
The parties further agreed that there would be one trial on both the request for temporary and permanent injunction.
The city seems to argue that because the homes were not demolished during the trial, the temporary injunction question is moot — where is the irreparable harm? The court accepts the plaintiffs observation as to this position. The whole point of the stipulation was to determine what would happen to the plaintiffs' homes after the trial and to set forth the guidelines by which the court would decide this discrete issue. The only reasonable interpretation of the stipulation is that the plaintiffs have a right to argue, as they do now, that despite the court's adverse ruling as to the homes on parcel 3, the court should enjoin the defendants from demolishing these homes pending final resolution of these matters on appeal.
The same observation applies to a position taken by the defendant NLDC where it argues at one point that: "If the court finds for the defendants on plaintiffs' request for a permanent injunction, it must also deny the plaintiffs' request for a temporary injunction because any doubt which remains about the probability of the plaintiffs' success on the merits will have been extinguished by the court's decision." But the stipulation of the parties explicitly says, "The parties further agree that there will be one trial on both the request for a Temporary Injunction and the plaintiffs' request for a permanent injunction. Contemporaneously with its decision on the merits of the permanent injunction, the trial court shall issue a decision on the temporary injunction under the proper standards for the issuance of a temporary injunction for purposes of Connecticut General Statutes § 52-476 and the Superior Court decision in Friendsof Hillhouse v. Yale University, 24 CLR 515 (1999)." In Friends ofHillhouse, no temporary injunction was in effect so the court allowed the demolition to proceed even though an appeal was pending. Section 52-476
could therefore not apply. In this case, it was to the advantage of both sides to avoid the delay and possible duplication of effort that could arise if there was to be a hearing first on the temporary injunction. Also, a decision on a preliminary injunction would give no right of appeal to the losing party. That is why a two-track type of hearing was to be conducted with the court considering the right to the temporary injunction separately from what it might also decide on the permanent injunction. Otherwise, the just quoted language of the stipulation is inexplicable and any protections sought to be achieved by the plaintiffs would have been completely illusory in a scenario where they lost the CT Page 3203 request for a permanent injunction. But the only reasonable interpretation of the stipulation is that its purpose was to ensure the plaintiffs' right to argue against the demolition of the homes, even if they lost their request for permanent injunctive relief. At another point in its brief, the NLDC appears to concede that by saying: "The significance of Connecticut General Statutes § 52-476 is that if the plaintiffs prevail in their request for a temporary injunction and lose their request for a permanent injunction, the burden would then shift to the defendants to prove that `great and irreparable injury will be done by the further continuance of the injunction' in order to prevent the injunction from continuing."
The court will perform the task all parties assigned to it and will decide the temporary injunction separately from the permanent injunction question and if it is to perform that task in a fair manner, it cannot conclude that because it has denied the request for permanent injunctive relief as to the parcel 3 homes then ipso facto, the request for temporary injunctive relief must therefore be denied.
First the court will determine whether a temporary injunction should issue. The law on this issue was set forth in Olcott v. Pendleton,128 Conn. 292 (1941), cited in Griffin Hospital v. Commission onHospitals, 196 Conn. 451 (1985), and still good law. In that case, theOlcott court said:
 "The principle purpose of such an injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits. . . . In deciding whether it should be granted or, if granted, continued or dissolved, the court is called upon to balance the results which may be caused to one party or the other, and if it appears that to deny or dissolve it may result in great harm to the plaintiff and little to the defendant the court may well exercise its discretion in favor of granting or continuing it unless indeed, it is very clear that the plaintiff is without legal right" id. p. 295.
 Olcott seems to say that on the chance of success on the merits prong of the test, the moving party need not show likelihood of success but only must show that it is not very clear that he or she will not be successful, a much more relaxed standard.
This is a so-called "balancing of equities test" approved in theGriffin Hospital case, 196 Conn. at p. 457. The analytical difficulty CT Page 3204 presented in these cases lies in the success on the merits aspect of the test. This court believes the analysis of the Second Circuit Court of Appeals as set forth in cases like Triebwasser Katz v. American Tel. Tel. Co., 535 F.2d 1356 (Ca. 2, 1976); Consolidated Gold Fields PLC v.Minorco, 871 F.2d 252 (Ca. 2, 1989) (890 F.2d 569); and SEC v. UnifundSAL, 910 F.2d 1028 (Ca. 2, 1990), is instructive. Dobbs in his second edition of the Law of Remedies, Vol. 1, § 2.11(2), p. 254, fn. 5, gives a concise definition of that circuit's test for provisional injunctive orders:
 ". . . if the probability of the plaintiff's success on the merits is more likely than not that fact plus proof of irreparable harm will justify the injunction. If the plaintiff cannot show such a good probability of success but only shows "serious questions on the merits,' then the plaintiff will have to show that her irreparable loss of rights will be greater than the defendants.
Nothing about this refinement of Olcott is repugnant to that case or any balancing of equities test approved of in Griffin Hospital.
However, the defendant NLDC seeks to import another factor into the appropriate test which the court must employ to decide the temporary injunction request. It refers to other Second Circuit case law citingCarpenter Technology Corporation v. City of Bridgeport Port Authoriy,180 F.3d 93 (Ca. 2, 1999), where the court said: "Because (the plaintiff) seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, it must establish a likelihood that it will succeed on the merits," id. p. 97. This is a stricter standard than that expressed in Olcott, Griffin Hospital, and the other Second Circuit cases just referred to by the court, Triebwasser, Minorco andUnifund, supra. A fuller statement of Second Circuit law than that expressed in Carpenter Technology is found, however, in Time Warner Cableof N.Y.C. v. Bloomberg, 118 F.3d 917 (Ca. 2., 1997), where the court said:
"This Circuit has offered differing views on the appropriate standard for issuance of a preliminary injunction against governmental action. We have sometimes required a strong showing of entitlement to a preliminary injunction against governmental action . . ., at least where the injunction `stays governmental action taken in the public interest pursuant to a . . . statutory scheme . . . or the injunction might adversely affect the public CT Page 3205 interest in a manner which cannot be compensated for by an injunction bond'. . . . Judge Friendly expressed the view that the `serious question/balance of hardship test is not applicable where an injunction is sought against a sovereign . . .' (See Mitchell v. Cuomo, Friendly, J. dissenting.)
 On the other hand, we have said that the `probability of success standard' need not always be followed merely because a movant seeks to enjoin governmental action' . . . and we have applied a lesser standard in suits against governmental entities. . . . As Haitian Centers pointed out in some litigation against the government, "no party has an exclusive claim on the public interest.'"[27]
Cases where the more rigorous Carpenter Technology standard was not employed in favor of the sovereign include Patton v. Dole, 806 F.2d 24
(Ca. 2, 1980), where a former midshipman in the Merchant Marine Academy sought a preliminary injunction to preclude the Secretaries of Transportation, Defense and Navy from compelling his involuntary induction after he voluntarily resigned from the Academy. The court at one point noted that: "Patton's prospect of involuntary naval service clearly outweighs defendants' temporary loss of the services of one able-bodied seaman," id. p. 30. In Time Warner itself, the court applied the balance of interest test not the probability of success test noting that unlike cases applying the more rigorous test the case before it was not one where the injunction was sought to prevent the exercise of governmental regulatory authority. Here, the proposed action of the city in deciding what programming to place on one of its reserved PEG channels is more akin to the sort of propriety action in a federally-regulated field, that if undertaken by a state, has sometimes been said to waive the defense of sovereign immunity," 118 F.3d at pp. 923-924). In HaitianCenters, supra, various organizations and Haitian aliens challenged procedures under an interdiction program with respect to people fleeing Haiti set forth in a presidential executive order. The government claimed its conduct was taken pursuant to the Congress' broad grant of authority. The court rejected the notion that the "serious questions" prong of the preliminary injunction standard was not available to the movants but the more rigorous probability of success standard since government action was involved. The court pointed out in cases using that standard where government action was sought to be enjoined "private litigants sought to enjoin a governmental agency from taking action in the public interest authorized by a specific statute." In the case before it, the court, as noted, concluded "no party has an exclusive claim on CT Page 3206 the public interest and in any event the likelihood of success prong need not always be followed merely because a movant seeks to enjoin governmental action," 969 F.2d at pp. 1338-1339.
This court agrees; given the facts and circumstances here, the balance of interests/serious questions test, not the likelihood of success test should be applied even though governmental entities will have their desired action stayed.
We are not concerned with staying some broad, ongoing statutory scheme aimed at classes of people of which particular plaintiffs are only a part. The eminent domain power is here being applied to discrete individuals and their property and the question is the propriety of the particular exercise of that power in these specific instances. Perhaps more to the point this is not the type of government action, the staying of which will have an immediate effect upon decided-upon government policy. That may be true in some eminent domain cases, but here, eminent domain law, as this court decided "when it ruled in the defendants favor as to parcel 3 properties, gives government entities a reasonable amount of time to accomplish the development project. There is no government interest in demolishing the plaintiffs' property as such and, as will be discussed, any stay here will not delay the immediate accomplishment of the MDP.
In most instances involving redevelopment plans under Chapter 130 or economic development plans under Chapter 132, there is no credible reason that can be offered, and none was given here, to think that allowing the appellate process to work itself out will interfere with the accomplishment of the development plan or even delay it. The defendants can immediately appeal even this stay.
Finally, the plaintiffs' arguments are under the taking clause of the state and federal constitution. Those provisions define the public interest by, in effect, providing no one's property can be taken even if compensation is offered unless it is taken for a public use. Therefore, the defendant government entities cannot make an exclusive claim to the public interest the public has recognized the interest the plaintiffs should have as of right in their property by means of constitutional bestowal.
Besides, in several instances throughout this decision, it is made clear that the authority of the city and the NLDC to exercise eminent domain power was being challenged — did Chapter 132 give that right, does the city charter authorize the exercise of eminent domain power, is the NLDC an agent of the city, did Pfizer call the time here so that it cannot be said that the city was exercising eminent domain power CT Page 3207 for its own purposes, etc. The court decided these matters in favor of the defendants. But the court said in Simmons v. State, 160 Conn. 492,500 (1971), that: "The authority to condemn is to be strictly construed in favor of the owner and against the condemnor and the prescribed method of taking must be strictly pursued." It would be incongruous to dilute and skewer the constitutional rights the plaintiffs have under the taking clause per Simmons to satisfy a Second Circuit exception to the usual test used to determine whether a preliminary injunction should issue based on the fact that the government is sought to be enjoined.
The court will not use the Carpenter Technology test but the test set out in Olcott and Griffin Hospital. Using that test it is clear to the court that the standards for a temporary injunction have been met. The plaintiffs in parcel 3 will suffer irreparable harm if their homes are demolished. The fact that if such action occurs, they will receive compensation provides no refutation of that conclusion since that result only ensues if their property has been seized for a "public use" which is an issue intrinsic to the whole litigation. The harm to the defendants certainly at the time of the hearing was de minimis — they agreed to the stay until the time of trial. In any event, a development agreement has not been signed, and even if one were to be signed, there is no prospect of immediate development. Nor was any evidence introduced at trial that demolition of these homes, right now or at any predictable time in the near future, would in any way mean development would be likely to occur sooner rather than later — let alone that it would affect in any way whether a development agreement is to be signed, the lynchpin for any development.
Also, using temporary injunction standards and paying due attention to the preliminary pleadings, evidence brought out at trial and three hundred pages of briefs, this court cannot say fairly that "it is very clear that the plaintiff(s) [are] without legal right." (See Olcott, cf. Second Circuit test.) This is true for the court even in light of its decision on permanent injunctive relief. The court appreciates that reasonable judges can differ on the issues presented, several appellate courts in other states have taken positions differing from this court's conclusions. Serious legal issues are presented.
Relying on the foregoing, the court concludes that the plaintiffs are entitled temporary injunctive relief. Having reached that conclusion, the parties' stipulation now requires the court to apply § 52-476. What does our court say about that statute? In Tomasso Bros., Inc. v. OctoberTwenty Five, Inc., 230 Conn. 641, 657 (1994), the court gives that provision of our laws the common sense reading the statutory language suggested: "Section 52-476 provides that if a temporary injunction was initially granted and later dissolved after a final hearing on the CT Page 3208 merits, and either party intends to appeal, there is a presumption in favor of granting the application to continue the temporary injunction pending appeal. Thus, the statute reflects the importance placed by the legislature on maintaining the status quo pending appeal."
Using the standards of § 52-476, a stay pending appeal is certainly warranted if not demanded by the circumstances of this case. The plaintiffs have a good faith desire to keep their homes and their position has been argued by skilled lawyers who have presented complicated and excellent arguments for their clients' position at trial and through lengthy briefs referring, as noted in some instances, to appellate law from other jurisdictions which this court may have disagreed with, but which address issues our Supreme Court has not addressed. This litigation has been brought in good faith to protect important rights raising important claims that have merit and which an appellate court may very well agree with. Also, the court, for reasons already stated, cannot say a stay on the demolition of these properties will cause great and irreparable harm to the defendants when balanced against the prospective harm to the plaintiffs.
There is an added reason why the court concludes that a stay should be granted to the demolition of homes in parcel 3. This court in a previous section of this tome discussed the issue of procedural due process. The court concluded the process given was due because (1) at least some input was given property owners prior to and even after the adoption of the MDP — input that is to people formulating and charged with approving and administering the plan; (2) and such a result was necessitated by the very nature of eminent domain and the required policies and goals supporting its exercise. One of the primary purposes of procedural due process is to ensure, as far as is possible, error-free decision making. Many novel issues have been raised in this case not explicitly decided by our appellate courts. For that reason, given the paramount purpose of procedural due process or at least given concerns akin to that policy, this court does not believe it is appropriate based on this record, to deprive the plaintiffs of the opportunity to resort to the appellate courts to finally determine, before their homes are demolished, whether this court committed error.
In any event for the just stated reason and/or previously stated reasons, the court will grant the plaintiffs' request for a stay as regards the demolition of homes in parcel 3.
 Conclusion
The court grants permanent injunctive relief against the demolition of the plaintiffs' properties in parcel 4A, but denies permanent injunctive CT Page 3209 relief against condemnation to the plaintiffs who own property in parcel 3. Pursuant to this order, the Statements of Compensation and Certificates of Taking filed against these properties should be dismissed.
However, the court will grant a temporary injunction against demolition of the properties in parcel 3 pending a final resolution of this matter in the appellate courts.
Corradino, J.